No. 21-14275

---

IN THE
UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

---

BETTY WADE, as PERSONAL REPRESENTATIVE
FOR THE ESTATE OF DAVID HENEGAR,

*Plaintiff-Appellant,*

v.

CINDY MCDADE, *et al,*

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of Georgia

No. 18-cv-192
Hon. Amy Totenberg, District Judge

---

### BRIEF OF PLAINTIFF-APPELLANT

---

Mike Kanovitz
Rachel Brady
Samantha Hamilton
LOEVY & LOEVY
311 N. Aberdeen St.
Third Floor
Chicago, IL 60607
(312) 243-5900
brady@loevy.com

*Attorneys for Plaintiff-Appellant*

**No. 21-14275**
**Betty Wade v. Cindy McDade, et al.**

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, undersigned counsel for Plaintiff-Appellant certifies that the following have an interest in the outcome of this appeal:

Applebaum Henefeld & Green, P.C. – Appellee's Counsel

Brady, Rachel – Appellant's Counsel

Elgron, Inc. – Appellant's Counsel

Estate of David Henegar – Appellant

Georgia Office of the Attorney General – Appellees' Counsel

Greenamyre, Zack – Plaintiff's Counsel

Henefeld, Paul – Appellee's Counsel

Henegar, David Jacob – Beneficiary of Estate of David Henegar

Kanovitz, Mike – Appellant's Counsel

Loevy & Loevy – Appellant's Counsel

Lones, Laura – Appellees' Counsel

Mitchell & Shapiro, LLP – Plaintiff's Counsel

Murphy, Harold – United States District Judge

Totenberg, Amy – United States District Judge

Wade, Betty – Appellant/Personal Representative of the Forthcoming Estate of David Henegar

## **CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, undersigned counsel for Plaintiff-Appellant certifies that none of the above-listed entities are publicly traded, and no publicly traded entity owns 10% or more of their stock.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant, Betty Wade, respectfully requests the opportunity for oral argument in this matter. Defendants raise issues regarding the necessity for prison officials to provide prisoners with prescription medications for serious health conditions, and the scope of qualified immunity in § 1983 deliberate indifference cases. Oral argument will aid consideration of the issues and allow Ms. Wade to answer questions from the Court.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ................................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ............................................. i

TABLE OF CONTENTS.................................................................. ii

TABLE OF CITATIONS ..................................................................v

JURISDICTIONAL STATEMENT ................................................... xi

I.    District Court Jurisdiction ............................................... xi

II.   Appellate Court Jurisdiction........................................... xi

STATEMENT OF THE ISSUES...................................................1

STATEMENT OF THE CASE.....................................................2

I.    Course of Proceedings and Dispositions Below.............................2

II.   Statement of Facts...........................................................2

    A.    Mr. Henegar Suffered Massive, Preventable Seizures That Caused Permanent Brain Damage........................................2

    B.    Defendants Stroh and Keith Ignored Mr. Henegar's Pleas for Medicine ...............................................................5

    C.    Nurse Defendants Harrell and Lee Did Not Give Mr. Henegar Any Dilantin from the Prison Backup Stash, Despite Knowing His Supply Was Empty ...............................................8

    D.    Defendant McDade's Recklessness as a Supervisor Emboldened Her Subordinates to Deny Care..........................................10

III.  Standard of Review...........................................................11

SUMMARY OF THE ARGUMENT ....................................................12

ARGUMENT ...............................................................................16

I.    INTRODUCTION ..........................................................16

II.    DEFENDANTS CONSCIOUSLY DISREGARDED A KNOWN,
       SERIOUS RISK TO MR. HENEGAR'S HEALTH ....................................16

       A.    Deliberate Indifference Is Conscious Disregard of Known Risks......18

       B.    A Deliberate Indifference Analysis Does Not Include a
             Negligence Analysis....................................................................................20

       C.    The Custody Defendants Consciously Disregarded a Known
             Risk to Mr. Henegar's Health .............................................................21

       D.    Defendants Harrell and Lee Consciously Disregarded a Known
             Risk to Mr. Henegar's Health .............................................................25

       E.    Defendant McDade's Failure to Enact Policies to Ensure Prisoners
             Received Medication was Deliberately Indifferent ...........................29

       F.    The District Court Drew Factual Inferences in Nurse Defendants'
             Favor and Ignored the Evidence Against Them.................................32

III.   DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY....36

       A.    Fair Warning Defeats Qualified Immunity .........................................36

       B.    Decades of Precedent Establish that Defendants Had Ample Notice
             that They Were Violating Mr. Henegar's Constitutional Rights .......39

             i.     Officials must provide prisoners with their prescription
                    medication ................................................................................. 39

             ii.    Officials may not ignore doctors' instructions ........................ 41

             iii.   Officials may not ignore prisoners' requests for or withhold
                    medical care .............................................................................. 43

             iv.    Officials must take appropriate measures to ensure prisoners
                    receive medical care.................................................................. 45

       C.    There is a Clear Link Between These Cases and Mr. Henegar's
             Case ........................................................................................................47

       D.    The District Court Misinterpreted the Facts and Applicability of
             These Cases ...........................................................................................48

E.      Mr. Henegar's Right to Medication was Obvious ..............................50

CONCLUSION .....................................................................................52

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT,
TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS..........54

CERTIFICATE OF SERVICE ...............................................................55

# TABLE OF CITATIONS

## Cases

*Adams v. Poag*,
    61 F.3d 1537 (11th Cir. 1995)........................................................11, 45

*Ancata v. Prison Health Servs., Inc.*,
    769 F.2d 700 (11th Cir. 1985).....................................19, 34, 43, 46, 47

*Anderson v. Creighton*,
    483 U.S. 635 (1987) ............................................................................38

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ....................................................................27, 28

*Barcelona v. Sec'y, Fla. Dep't of Corr.*,
    657 F. App'x 896 (11th Cir. 2016) ....................................................19

*Benson v. Gordon Cty., Ga.*,
    479 F. App'x 315 (11th Cir. 2012) ..............................................*passim*

*Bingham v. Thomas*,
    654 F.3d 1171 (11th Cir. 2011).....................................................19, 20

*Brookhaven Landscape & Grading Co. v. J.F. Barton Contracting Co.*,
    676 F.2d 516 (11th Cir. 1982)............................................................26

*Brosseau v. Haugen*,
    543 U.S. 194 (2004) ............................................................................51

*Brown v. Hughes*,
    894 F.2d 1533 (11th Cir. 1990).....................................................23, 45

*Camreta v. Greene*,
    563 U.S. 692 (2011) ............................................................................37

*Carswell v. Bay Cty.*,
    854 F.2d 454, (11th Cir. 1988)................................................... *passim*

*Castle v. Appalachian Tech. Coll.*,
631 F.3d 1194 (11th Cir. 2011)...........................................................37

*City of Escondido v. Emmons*,
139 S. Ct. 500 (2019) ........................................................................51

*Crocker v. Beatty*,
886 F.3d 1132 (11th Cir. 2018)...................................................38, 49

*Dadd v. Anoka Cty.*,
827 F.3d 749 (8th Cir. 2016)..............................................................51

*District of Columbia v. Wesby*,
138 S. Ct. 577 (2018) ........................................................................51

*Duncan v. Corr. Med. Servs.*,
451 F. App'x 901 (11th Cir. 2012) ....................................................25

*Estelle v. Gamble,*
429 U.S. 97 (1976) ............................................................................45

*Farmer v. Brennan,*
511 U.S. 825 (1994) ....................................................17, 18, 21, 30

*Foulks v. Cole Cty., Mo.*,
991 F.2d 454 (8th Cir. 1993).............................................................52

*Fox ex rel. Fox v. Peters*,
2011 WL 6378826 (N.D. Ill. Dec. 19, 2011) ....................................52

*Glasscox v. City of Argo*,
903 F.3d 1207 (11th Cir. 2018)...................................................38, 49

*Glisson v. Ind. Dep't of Corr.*,
849 F.3d 372 (7th Cir. 2017).......................................................31, 32

*Goebert v. Lee Cty.*,
510 F.3d 1312 (11th Cir. 2007)...................................................*passim*

*Greason v. Kemp*,
891 F.2d 829 (11th Cir. 1990)........................................29, 30, 31, 32,

*Harlow v. Fitzgerald*,
457 U.S. 800 (1982) ............................................................................37

*Harris v. Coweta Cty.*,
21 F.3d 388 (11th Cir. 1994)...................................................... *passim*

*Hoffer v. Sec'y, Fla. Dep't of Corr.*,
973 F.3d 1263 (11th Cir. 2020)......................................................21, 33

*Hope v. Pelzer*,
536 U.S. 730 (2002) ...................................................................*passim*

*Howell v. Evans*,
922 F.2d 712 (11th Cir. 1991)..................................................11, 18, 36

*Hudson v. McHugh*,
148 F.3d 859 (7th Cir. 1998)..............................................................52

*Hunter v. Social Security Admin., Comm'r.*,
808 F.3d 818 (11th Cir. 2015).............................................................38

*Jacoby v. Baldwin Cty.*,
835 F.3d 1338 (11th Cir. 2016)...........................................................37

*Johnson v. Breeden*,
280 F.3d 1308 (11th Cir. 2002)...........................................................39

*Lewis v. City of W. Palm Beach*,
561 F.3d 1288 (11th Cir. 2009)...........................................................38

*Mandel v. Doe*,
888 F.2d 783 (11th Cir. 1989)......................................................17, 46

*McCoy v. Alamu*,
    141 S. Ct. 1364 (2021) .................................................................49, 50

*McElligott v. Foley*,
    182 F.3d 1248 (11th Cir. 1999)......................................................*passim*

*Melton v. Abston*,
    841 F.3d 1207 (11th Cir. 2016) ........................................................21

*Montano v. Orange Cty.*,
    842 F.3d 865 (5th Cir. 2016)..............................................................32

*Mullenix v. Luna*,
    577 U.S. 7 (2015) ................................................................................38

*Nat'l Lime Ass'n v. Envtl. Prot. Agency*,
    627 F.2d 416 (D.C. Cir. 1980) ..........................................................26

*Ortiz v. Jordan*,
    562 U.S. 180 (2011) ............................................................................18

*Parsons v. Caruso*,
    491 F. App'x 597 (6th Cir. 2012) ................................................27, 51

*Patel v. Lanier Cty. Ga.*,
    969 F.3d 1173 (11th Cir. 2020)......................................................19, 44

*Pearson v. Callahan*,
    555 U.S. 223 (2009) ............................................................................37

*Phillips v. Jasper Cty. Jail*,
    437 F.3d 791 (8th Cir. 2006)..............................................................52

*Pourmoghani-Esfahani v. Gee*,
    625 F.3d 1313 (11th Cir. 2010)..........................................................35

*Qamar v. C.I.A.*,
    489 F. App'x 393 (11th Cir. 2012) ....................................................25

*Rivas v. Freeman,*
    940 F.2d 1491 (11th Cir. 1991)......................................................29, 32

*Robinson v. Moreland,*
    655 F.2d 887 (8th Cir. 1981)..............................................................52

*Saucier v. Katz,*
    533 U.S. 194 (2001) ...........................................................................37

*Sconiers v. Lockhart,*
    946 F.3d 1256 (11th Cir. 2020).....................................................23, 26

*Simpson v. Stewart,*
    386 F. App'x 859 (11th Cir. 2010) .....................................................29

*Smith v. Wood,*
    No. 20-12918, 2021 WL 4452526 (11th Cir. Sept. 29, 2021) ......18, 21

*Sorensen v. Nocco,*
    677 F. App'x 570 (11th Cir. 2017) .....................................................29

*Sparks v. Ingle,*
    724 F. App'x 692 (11th Cir. 2018) ...............................................*passim*

*T.R. v. Lamar Cty.,*
    25 F.4th 877 (11th Cir. 2022)................................................. 38, 48-49

*Taylor v. Adams,*
    221 F.3d 1254 (11th Cir. 2000)..........................................................16

*Taylor v. Hughes,*
    920 F.3d 729 (11th Cir. 2019)............................................................33

*Taylor v. Riojas,*
    141 S.Ct. 52 (2020) .........................................................20, 34, 49, 50

*Thomas v. Town of Davie,*
    847 F.2d 771 (11th Cir. 1988)............................................................45

*U.S. v. Lanier*,
    520 U.S. 259 (1997) ....................................................................39, 51

*Waldrop v. Evans*,
    871 F.2d 1030 (11th Cir. 1989)........................................19, 23, 41, 47

*Wate v. Kubler*,
    839 F.3d 1012 (11th Cir. 2016)....................................................27, 28

*White v. Pauly*,
    137 S.Ct. 548 (2017) .............................................................................51

*Williams v. Santana*,
    340 F. App'x 614 (11th Cir. 2009) .....................................................29

*Youmans v. Gagnon*,
    626 F.3d 557 (11th Cir. 2010)........................................................33, 35

**Statutes**

28 U.S.C. § 1331....................................................................................... xii

28 U.S.C. § 1291....................................................................................... xii

42 U.S.C. § 1983............................................................................ i, xii, 2, 29

O.C.G.A. § 9-2-41. .................................................................................. xii

**Rules**

Fed. R. App. P. 4....................................................................................... xii

# JURISDICTIONAL STATEMENT

## I.    District Court Jurisdiction

This suit involves 42 U.S.C. § 1983 claims under the Eighth Amendment against five corrections defendants. The District Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1331, which vests the district courts with "original jurisdiction of all civil actions arising under the… laws…of the United States."

## II.    Appellate Court Jurisdiction

The District Court entered the final, appealable, judgment of dismissal on September 30, 2021. Doc. 169. The notice of appeal was due on November 1, 2021. *See* Fed. R. App. P. 4(a)(1)(A). Mr. Henegar was killed on October 16, 2021. Doc. 172. His claims survive his death. *See* O.C.G.A. § 9-2-41.

The District Court granted an extension of time to file his notice of appeal until November 29, 2021, pursuant to Federal Rule of Appellate Procedure 4(a)(5). Doc. 171. The notice of appeal was timely filed on November 29, 2021. Doc. 173. Appellant, Betty Wade, was Plaintiff's sister, and is now the personal representative of Mr. Henegar's estate. She has been substituted as the Plaintiff-Appellant in this case, in her capacity as personal representative. Doc. 178. Jurisdiction to review the final judgment is conferred on this Court by 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

I.  Whether a jury could find that Defendants consciously disregarded a serious risk to Mr. Henegar's health by refusing to take any steps to provide him a dose of his readily available prescribed anti-seizure medication, despite their knowledge that he had a seizure disorder and faced serious health risks without it.

II. Whether the decades of precedent establishing that prisoners are entitled to prescription medication fairly warned Defendants that they needed to take a single step to procure for Mr. Henegar a dose of Dilantin from the prison medicine cabinet.

## STATEMENT OF THE CASE

### I.     Course of Proceedings and Dispositions Below

David Henegar filed a lawsuit under 42 U.S.C. § 1983 alleging that

Defendants were deliberately indifferent to his serious medical needs by

withholding a readily available supply of his prescription medication. Doc. 129. He

also argued that Defendants were deliberately indifferent by withholding medical

care after he suffered a second consecutive seizure due to being deprived of his

medication. Doc. 129. Defendants moved for summary judgment, and the District

Court granted both motions in their entirety. Doc. 147; Doc. 148; Doc. 168. Mr.

Henegar died in October, and Betty Wade, as Personal Representative of Mr.

Henegar's estate, appeals the District Court's decision only as to the deprivation of

medication.

### II.     Statement of Facts

#### A.     Mr. Henegar Suffered Massive, Preventable Seizures That Caused Permanent Brain Damage

From August 28, 2016, until August 31, 2016, Mr. Henegar went without his

seizure medication, Dilantin, despite repeatedly pleading for it. Doc. 147-5, PP.

137-38, 148; Doc. 147-15, PP. 16, 155; Doc. 148-4, P. 121. Defendants were

aware not only that the doctor had prescribed this medication for Mr. Henegar, but

that he needed it to prevent seizures and that going without the medication could

endanger his life. Doc. 147-5, PP. 141-42, 153; Doc. 147-15, P. 166; Doc. 147-8,

PP. 234-35. But, rather than take any one of a number of reasonable measures available to them to help Mr. Henegar, Defendants callously ignored him, passing the buck to the next shift one after another, until Mr. Henegar's time ran out. Doc. 155-7, P. 6; Doc. 155-14, P. 3; Doc. 155-15, PP. 3, 5-6.

After Defendants ignored his pleas for four days, Mr. Henegar predictably began having seizures. Doc. 147-5, PP. 157-159; Doc. 155-5, P. 3; Doc. 155-11, P.3; Doc. 155-12, P. 3; Doc. 155-14, P. 3. At 10:50 p.m. on August 31, 2016, David Henegar suffered the first of two massive seizures. Doc. 147-5, P. 16; Doc. 147-15, PP. 169-170, 196; Doc. 148-7, PP. 29-31; Doc. 155-15, P. 3.[1] He went into status epilepticus and actively convulsed for nearly 20 minutes. Doc. 147-5, PP. 57-59; Doc. 155-5, P. 3; Doc. 155-11, P. 3. His eyes were rolled back in his head and he was foaming at the mouth. Doc. 155-5, P. 3; Doc. 155-11, P. 3. He convulsed so violently that the entire bed was shaking. *Id*. He was eventually sent to the emergency room, but he was returned shortly thereafter and suffered another serious seizure that left him oxygen deprived for nearly 30 minutes. Doc. 147-9; Doc. 147-15, P. 224; Doc. 155-13, P. 7.

This first seizure alone was so prolonged and severe that it caused permanent brain damage. Doc. 147-5, PP. 57-59; Doc. 148-7, PP. 29-31; Doc. 155-

---

[1] All citations to the record rely on the page number generated in the CM/ECF caption in the header of each page.

5, P. 3; Doc. 155-11, P. 3; Doc. 155-15, PP. 3, 5-6. This length and severity of seizure is called status epilepticus, and it caused damage to Mr. Henegar's hippocampus, including loss of brain cells and abnormal scarring. Doc. 155-15, P. 4. This damage manifests as memory loss and difficulty with mood regulation, including difficulty forming new memories and unexplained anger. Doc. 155-15, P. 4.

The brain damage destroyed Mr. Henegar's ability to enjoy his remaining years. He suffered from permanent short-term memory impairment and difficulty regulating his emotions. He was plagued by fits of anger and despair. Doc. 148-4, P. 177; Doc. 155-8, P. 2; Doc 155-11, P. 4; Doc. 155-15, P. 5; Doc. 155-16, P. 2. His once well-controlled epilepsy also became uncontrollable, even with medication. Doc. 155-15, PP. 5-6. Even after his release from prison, he could no longer hold down a job in his field (welding) and the relationships he enjoyed before the brain damage became strained and faded away. He survived day-to-day only by writing down in a journal every interaction and event lest he forget. Doc. 148-4, PP. 27-28, 82-83, 88, 95-96; Doc. 155-15, PP. 5-6.

Mr. Henegar did not have to spend the final years of his life in such a miserable state. The brain damage and the seizures that caused it were entirely preventable. Until being deprived of his medication for four straight days, Mr. Henegar's seizure disorder was well-controlled. Doc. 155-15, P. 5. He had

4

been on a consistent regimen of seizure medication since his diagnosis with a seizure disorder in 2015 and had not had a single seizure since starting prescribed anticonvulsants. Doc 148-4, PP. 138-139; Doc. 155-15, P. 5.

Further, even after the Defendants allowed his medication supply to run out without refilling it, there was a ready backup supply at the prison. Doc. 155-10. Walker Prison kept an extra supply of Dilantin in the medical department's standard ward inventory ("SWI") for use in such situations. Doc. 147-4 P. 123; Doc. 148-5 PP. 29-30, 117-18. Any nurse could access this supply, and a quick call from any corrections officer would alert the nursing staff. Doc. 147-5, PP. 137-38, 148; Doc. 155-7, P. 6. Each Defendant was aware that Mr. Henegar's Dilantin had run out and that he faced serious health risks without it, Doc. 147-4, PP. 129-30, 137; Doc. 47-5, P. 114, 137-38, 141-42, 148, 153, 196-97, 245; Doc. 147-8, PP. 126; Doc. 147-12, PP. 50, 190; Doc. 147-15, PP. 166-67, but not one of them took a single step to get him his medication from a pharmacy or to arrange for him to receive anti-seizure medicine from the backup supply at the SWI. Doc. 148-2, P. 3; Doc. 147-15, PP. 154-155, 164-65; Doc. 148-4, P. 62; Doc. 155-7, P. 6; Doc. 155-14, P. 3; Doc. 155-15, PP. 3, 5-6.

### B. Defendants Stroh and Keith Ignored Mr. Henegar's Pleas for Medicine

The timeline leading up to the seizures is damning to Defendants.

Mr. Henegar went to his assigned 9:00 p.m. pill call on August 28, as he did every

day, to receive his Dilantin. Doc. 147-5, PP. 81, 90, 94, 137; Doc 147-15, PP. 16, 72, 151-53. There were no medical personnel onsite at night, so Defendants Stroh and Keith were responsible for distributing medication at that time. Doc. 147-5, PP. 109-10; Doc. 147-8, PP. 136, 170, 171; Doc. 147-15, P. 112. Their responsibilities included looking at the prisoners' medication administration records ("MAR") to see what medication they needed; giving prisoners their medications from the pill cart; and reporting in the MAR if the prisoner had received the medication or whether there was a problem, and addressing any issue that arose. Doc. 147-4, P. 218; Doc. 147-5, PP. 81, 90, 94, 112, 128-29, 137; Doc 147-15, PP. 16, 72, 151-53. Mr. Henegar's Dilantin was not on the pill cart that night, so Keith made an unidentifiable marking in Henegar's MAR to record that Mr. Henegar had come to pill call but not received his medication, and sent Mr. Henegar on his way. Doc. 155-10, P. 2. The defendants dispute between each other whether Keith also notified a nurse about the missing medication at the end of his shift. He says he told a nurse but did not remember who, [2] Doc. 147-5, P. 145, and the nurses deny that Keith told them anything. Doc. 147-3, P. 2; Doc. 147-7, P. 2.

Mr. Henegar went to his assigned pill call the next two days, but his Dilantin still was not there. Doc. 129, P. 15. The corrections officer conducting the pill call

---

[2] The evidence showed that the only nurse with whom Keith overlapped on the 28th was Defendant Lee, and Lee denied being told. So the District Court should have allowed the jury to decide. Defendants tried to muddy the issue by

wrote a "question mark" in the row in Mr. Henegar's MAR for those two days, which signified to anyone who looked at it that there was a problem with his medication that required follow-up. Doc. 147-4, PP. 209, 273-274; Doc. 148-5, P. 266; Doc. 155-10. When Mr. Henegar went to see Defendants Stroh and Keith at pill call on August 31, Keith wrote a third consecutive question mark in the MAR and told Mr. Henegar to go to the sick bay in the morning. Doc. 147-5, PP. 137-138; Doc. 147-15, PP. 16, 155.Doc. 155-6, PP. 3, 6; Doc. 148-5, PP. 36-38, 89; Doc. 147-4, PP. 168-169; Doc. 148-3, PP. 4-5; Doc. 155-7, PP. 6-7.

Stroh and Keith had in fact been trained to call the on-call nurse immediately when a problem with a prisoner's medication arose, consistent with standard practice in correctional medicine.[3] They also acknowledge that an unmedicated seizure disorder was a serious health risk. Doc. 147-4, PP. 272-73; Doc. 147-5, PP. 126-29, 132-33, 141-42, 153; Doc. 147-15, P. 102, 165; Doc. 148-5, P. 165. So by this point, both officers knew the following: (1) there were question marks in the

---

arguing that Keith might have told Defendant Harrell, with whom he overlapped at the very beginning of his next shift, three days later. But the argument is a non-sequitur. Keith could not have known that Mr. Henegar's medication was still out when he arrived at work on the 31st, because he would not have started the pill call process. *See* Doc. 147-4, P. 36-37; Doc. 147-6; Doc. 147-8, P. 201; Doc. 147-10.

[3] Trying to justify his inaction, Keith claimed he would call the on-call nurse if there was a "discrepancy" with a prisoner's medication, but not if medication was missing entirely. In those cases, he would merely record it in the MAR and use the "code" for missing medication (even though there is no such code). Doc. 147-4, P. 218; Doc. 147-5, PP. 112, 128-129; Doc. 155-10.

two previous days' records; (2) Mr. Henegar was on his fourth day without Dilantin; (3) Mr. Henegar faced a serious health risk; (4) jotting a question mark in the MAR had not resulted in Mr. Henegar receiving Dilantin and thus was not a reasonable response; and (5) they could call the on-call nurse to address the problem. Doc. 147-4, PP. 272-73; Doc. 147-5, PP. 126-29, 132-33, 141-42, 153; Doc. 147-15, P. 102, 165; Doc. 148-5, P. 165. Nevertheless, they did nothing other than jot down another question mark and send Mr. Henegar away.

In addition to the string of question marks and Mr. Henegar's persistent requests for medication, there were other indicators to anyone looking at the MAR book that Mr. Henegar's prescription was missing, including a post-it note sticking out like a flag from Mr. Henegar's file in the pill cart. Doc. 147-5, P. 132. Post-its were unusual, and this post-it alerted anyone who looked in the pill cart that there was a problem with his medication. Doc. 147-5, P. 132; Doc. 147-12, PP. 161-162. At some point after his medication ran out, Mr. Henegar also attended a daytime pill call attempting to get Dilantin, but it was not provided to him. Doc. 148-4, P. 121.

### C.    Nurse Defendants Harrell and Lee Did Not Give Mr. Henegar Any Dilantin from the Prison Backup Stash, Despite Knowing His Supply Was Empty

Defendants Lee, Harrell, and McDade worked the day shift in the medical unit at the prison. Doc. 147-4, P. 37; Doc. 147-6, P. 3; Doc. 147-8, P. 201; Doc.

8

147-10, PP. 5-6; Doc. 148-5, P. 74. There was no official distribution of labor among them, but Lee and Harrell informally agreed to split nursing duties between them. Doc. 147-4, PP. 88-89, 117, 157, 170-71; Doc. 147-8, PP. 58, 178; Doc. 147-12, PP. 105-06, 107; Doc. 148-5, PP. 165, 166-67, 280. Lee performed the 5:00 a.m. and lunchtime pill calls. Doc. 147-8, P. 66. During the 5:00 a.m. pill call, Lee looked at the MARs that were maintained with the pill call cart, Doc. 147-4, P. 212; 147-12, PP. 156-57, and, in the normal course, she would and should have checked the MAR from the 9:00 p.m. pill call the night before. Doc. 147-12, PP. 157-159. Moreover, she would also have seen the post-it on Henegar's file in particular and known there was a problem that required her attention. Doc. 147-12, PP. 156-57, 160.

Harrell processed the medications, which included ordering medications, checking them off in a binder ("the Binder") when they were delivered, cross-checking with prescription orders to ensure everything that was ordered had been delivered, and inventorying and stocking the pill cart; she also conducted the dinnertime pill call.[4] Doc. 147-4, PP. 88-89, 117, 125; Doc. 147-8, P. 58; Doc. 147-12, PP. 106, 108; Doc. 148-5, PP. 165, 255-256, 280. She inventoried the pill cart at least once during the four days when Mr. Henegar was without his

---

[4] McDade occasionally helped process medications, but Harrell did it most often. Doc. 147-4, PP. 88-89; Doc. 147-8, P. 58; Doc. 147-12, P. 108; Doc. 148-5, PP. 165, 280.

medication, and checked the Binder containing the status of prescription deliveries almost daily. Doc. 147-4, P. 125, 157; Doc. 148-5, PP. 167-68; Doc. 148-5, PP. 256-57. Someone performing Harrell's duties would notice if any medication was missing. Doc. 148-5, PP. 267, 280.

Thus, construed in the light most favorable to Mr. Henegar, the evidence shows Harrell and Lee learned that Mr. Henegar was out of his seizure medication, and there is no dispute that neither of them took any measures to obtain it for him. Doc. 147-4, P. 123; Doc. 148-5, P. 29-30, 117-118.

### D.    Defendant McDade's Recklessness as a Supervisor Emboldened Her Subordinates to Deny Care

The evidence, again construed in the light most favorable to Mr. Henegar, also showed that Harrell and Lee were emboldened in their indifference by their supervisor, Defendant McDade, or that McDade's inadequate policies improperly excused them from fulfilling their job responsibilities—in particular, checking the medical records from the previous shift. McDade knew that continuity of care required the nurses at minimum to check the nighttime MARs and the Binder, but she made a knowing choice not to instruct on it or ensure compliance because she did not want to "micromanage." Doc. 148-3, P. 1; Doc. 148-5, PP. 179, 183, 204, 216. McDade also knew that her choice not to require the medical record review could cause prisoners to fall through cracks and expose them to serious health

risks, particularly when medication administration is left to corrections officers.

Doc. 148-5, PP. 177, 183, 204-208, 216; Doc. 155-7, P. 5-6.

## III.     Standard of Review

This Court reviews *de novo* the District Court's disposition of summary judgment on deliberate indifference and qualified immunity. *Howell v. Evans*, 922 F.2d 712, 719 (11th Cir. 1991). This Court must adopt Mr. Henegar's version of the facts and draw all inferences in his favor. *Adams v. Poag*, 61 F.3d 1537, 1542 (11th Cir. 1995).

## SUMMARY OF THE ARGUMENT

Mr. Henegar suffered two massive seizures at Walker State Prison in 2016. The first was so prolonged and severe that it caused permanent brain damage. The second caused needless oxygen deprivation and suffering. Both occurred because Mr. Henegar's regular supply of seizure medication, Dilantin, had not been timely refilled by the Department of Corrections pharmacy, and none of the defendants did a single thing to procure from the prison's backup supply the anticonvulsants he needed to protect against life-threatening seizures. Plaintiff presented facts establishing that all Defendants could be found liable, and Defendants point the finger at each other. Defendants' conflicting accounts underscore that a jury must hear this case.

It is undisputed that Mr. Henegar faced a serious health risk and that the lack of Dilantin caused his life-altering seizures, and so the only factor in the deliberate indifference analysis in dispute is whether Defendants consciously disregarded that risk. The District Court granted summary judgment for each Defendant, seeming to conclude that as a matter of law, Defendants' reckless disregard for Mr. Henegar's health, in the face of an easy and obvious solution that would have prevented the entire tragedy, did not rise to the level of deliberate indifference. The Court also concluded that each Defendant was entitled to qualified immunity because—despite decades of case law establishing that prisoners have a right to prescriptions

and prison officials cannot do nothing when faced with a prisoner's health emergency—there was no case in the federal reporter that matched the facts of this case down to the number of days Mr. Henegar was deprived of his medicine. Simply, the District Court got it wrong.

This is not a close case. It is hard to imagine what Defendants would have had to do—or not do—to demonstrate more starkly their deliberate indifference toward Mr. Henegar's medical need once they became aware of it. There were backup doses of Mr. Henegar's medicine locked in the prison's medicine cabinet; Defendants were aware that Mr. Henegar's Dilantin was missing and that he faced grave risk if he did not receive it; and no one took any meaningful steps to get him a dose.

Defendants Stroh and Keith, the corrections officers who administered Mr. Henegar's Dilantin, knew his prescription was still missing after four days, but failed to take even the most basic step of picking up the phone and calling the on-call nurse to let her know. As for the nurses, Defendants Harrell and Lee, a jury could reasonably conclude based on the direct and circumstantial evidence that they were made aware of Mr. Henegar's lack of medication and the corresponding need for it. But it is undisputed that they did not get Mr. Henegar a dose. These Defendants were emboldened by the deliberate indifference of nursing supervisor, Defendant McDade, who recklessly disregarded her responsibilities and the risk

13

facing the prisoners in her care, and failed either to train the corrections officers to notify medical personnel in an emergency like this, or to enact policies to ensure that medical personnel became aware of medical emergencies like this. In either case, McDade, too, is deliberately indifferent.

The only reason the District Court arrived at the conclusions it did was because it fundamentally misapprehended the facts of this case and drew inferences in Defendants' favor. For instance, the District Court concluded that the nursing supervisor, Defendant McDade, had enacted appropriate policies to ensure prisoners received medication, despite McDade's *own testimony* that she enacted no such policies; that Nurse Defendants Harrell and Lee were entirely unaware the medicine was missing despite that their job responsibilities required them to keep track of medication supplies, and that they had dozens of opportunities to learn the medicine was gone; and that Stroh and Keith were reasonable to think that jotting down a mystery marking in the medication log was sufficient, even though they knew after three days that it had failed to result in Henegar receiving his medication. The evidence establishes multiple avenues on which a jury could find some combination of Defendants, or all Defendants, liable.

The District Court also improperly concluded that Defendants are entitled to qualified immunity. It was clearly established in 2016 that Defendants had to do something when they learned Mr. Henegar's Dilantin was missing. A nearly

14

identical case out of this Court acknowledges as much. That case and others like it provide clear warning to Defendants that they must attempt to provide prisoners with their prescriptions. Not only that, but these cases recognize that the decades of case law outlining that prison officials cannot ignore a prisoner's known health problem apply to situations specifically involving failures to give prisoners medication, like this one. This precedent provided Defendants fair warning that they were violating Mr. Henegar's rights, and so they are not entitled to qualified immunity. This Court should reverse and remand for further proceedings.

## ARGUMENT

## I.    INTRODUCTION

Plaintiff is entitled to a trial on his Eighth Amendment claim because (1) the evidence shows that Defendants did nothing to get him a readily available dose of medication from the medical department despite knowing he needed one, and therefore consciously disregarded a known, serious risk to his health; and (2) Defendants are not entitled to qualified immunity because it was clearly established in 2016 that prison officials cannot withhold a prisoner's prescription medication.

## II.   DEFENDANTS CONSCIOUSLY DISREGARDED A KNOWN, SERIOUS RISK TO MR. HENEGAR'S HEALTH

For decades, the Supreme Court has reiterated that prison officials violate the Eighth Amendment's prohibition on cruel and unusual punishment when they display deliberate indifference to an unreasonable risk of serious harm likely to befall a prisoner under their supervision. *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000); *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999). The test for deliberate indifference is made up of two components, the first an objective inquiry and the second subjective. First: Did the plaintiff suffer from an objectively serious medical need? *See also Taylor*, 221 F.3d at 1258. Second, as relevant in this appeal: Did the official have a "sufficiently culpable state of mind"? *Id*. at 296. This inquiry focuses on whether the prison official was aware of a substantial risk

16

to the prisoner, and consciously disregarded that risk. *Farmer v. Brennan*, 511 U.S. 825, 839 (1994). A plaintiff "need not show that a prison official acted or failed to act believing that harm *actually would* befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id*. at 842 (emphasis added).

Defendants rightly do not dispute that Mr. Henegar had an objectively serious medical condition that required medication, that a seizure is objectively serious, or that failure to provide seizure patients with medication for any length of time is a serious risk. Nor do they dispute that the four-day deprivation of Dilantin caused Mr. Henegar's seizures. Rather, the only issue in dispute is whether, as to each Defendant, a jury could find he or she was aware of Mr. Henegar's missing medication and whether the response to that awareness would permit a reasonable jury to conclude they consciously disregarded the risk to Mr. Henegar's health. In other words: was the defendant aware that Mr. Henegar's Dilantin was missing, and, in light of the knowledge of the risk Mr. Henegar faced without Dilantin, did he or she take "appropriate measures to ensure that" Mr. Henegar received it? *Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir. 1989).

A jury must hear the case as to each Defendant. Two of the defendants, Stroh and Keith, admit they were aware the Dilantin was missing, and the only dispute about their conduct is whether they took appropriate measures by merely

writing a question mark in the MAR despite knowing that it was utterly ineffective at getting Mr. Henegar his medication. A jury could readily conclude that this was deliberate indifference. As for the nurses, it is undisputed that—despite their ready access to Dilantin—they did not at any point during that four-day period get Mr. Henegar a dose. The only dispute about the Defendant Nurses is whether they were aware that it was missing. A jury could readily conclude that they were.

This Court reviews *de novo* the District Court's summary judgment decision about deliberate indifference. *Howell*, 922 F.2d at 719.

### A.    Deliberate Indifference Is Conscious Disregard of Known Risks

The cases decided since *Farmer* have reaffirmed that the requisite state of mind to establish deliberate indifference is conscious disregard. *See Ortiz v. Jordan*, 562 U.S. 180, 190 (2011) ("prison official may be held liable for 'deliberate indifference' to a prisoner's Eighth Amendment right to protection against violence while in custody if the official 'knows that [the] inmat[e] face[s] a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it'"); *Hope v. Pelzer*, 536 U.S. 730, 738 (2002) (describing deliberate indifference as "subjective state of mind").

This Court's decisions follow the Supreme Court's rulings that the subjective standard for determining deliberate indifference requires knowledge of a risk and a conscious disregard of that risk. *Smith v. Wood*, No. 20-12918, 2021 WL

4452526, at *3 (11th Cir. Sept. 29, 2021). As applied in the prison medical context, a conscious disregard of a medical need is one in which a prison official is aware that a prisoner has an objectively serious medical condition and: (1) the prisoner received "grossly inadequate care"; (2) the official made "a decision to take an easier but less efficacious course of treatment"; and (3) the official provided "medical care that is so cursory as to amount to no treatment at all." *McElligott*, 182 F.3d at 1255; *see also Bingham v. Thomas*, 654 F.3d 1171, 1176 (11th Cir. 2011) ("A complete denial of readily available treatment for serious medical condition is deliberate indifference.") (quoting *Harris v. Coweta Cty.*, 21 F.3d 388, 393 (11th Cir. 1994)); *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985) ("The knowledge of the need for medical care and intentional refusal to provide that care has consistently been held to surpass negligence and constitute deliberate indifference.").

Deliberate indifference also includes refusal to provide readily available treatment or failure to inform competent authorities of a need for medical care. *Patel v. Lanier Cty. Ga.*, 969 F.3d 1173, 1190 (11th Cir. 2020) (officer was deliberately indifferent by failing "to enlist the help of a medical professional in the face of a serious medical need"); *Waldrop v. Evans*, 871 F.2d 1030, 1036 (11th Cir. 1989) ("failure to notify competent officials" about a serious medical need can constitute deliberate indifference); *Barcelona v. Sec'y, Fla. Dep't of Corr.*, 657 F.

19

App'x 896, 899 (11th Cir. 2016) (citing *Bingham*, 654 F.3d at 1176). In the

"failure of an alternative course of action," prison officials must do more. *Harris*,

21 F.3d at 394.

It is the jury's province to determine whether there is a good explanation for

the deprivation of medical care. *See Taylor v. Riojas*, 141 S.Ct. 52, 54 (2020)

(remanding grant of summary judgment on conditions of confinement claim,

explaining, "The Fifth Circuit identified no evidence that the conditions of

Taylor's confinement were compelled by necessity or exigency. Nor does the

summary-judgment record reveal any reason to suspect that the conditions

of Taylor's confinement could not have been mitigated, either in degree or

duration."). Where prison officials deprive prisoners of medical care without

justification and in the face of easy mitigation, juries can find deliberate

indifference. *Goebert v. Lee Cty.,* 510 F.3d 1312, 1328-29 (11th Cir.

2007) (finding deliberate indifference when "[t]he period of delay was

approximately one day, and there was no good reason for it."); *Harris*, 21 F.3d at

394; *Ancata*, 769 F.2d at 704 ("if necessary medical treatment has been delayed for

non-medical reasons, a case of deliberate indifference has been made out").

### B. A Deliberate Indifference Analysis Does Not Include a Negligence Analysis

Some courts, the District Court in this case included, have evaluated this

subjective inquiry by applying a negligence framework, and then determining

whether the conduct at issue was worse. This Circuit is split on whether the level of negligence required must be more than "mere negligence" or more than "gross negligence," though it recently has explained that the "more than mere negligence" standard was the one contemplated by the Supreme Court in *Farmer*, 511 U.S. 825. *See Melton v. Abston*, 841 F.3d 1207, 1223 n.2 (11th Cir. 2016). This disagreement is largely academic, and this Court need not address the split here, because the relevant inquiry is whether Defendants were aware of a risk of harm but did nothing about it. *See Smith*, 2021 WL 4452526 at *3 ("Fortunately, we need not resolve the inconsistency in our case law (nor the fact that the third prong of our deliberate indifference test is somewhat redundant with the first) because one thing is clear: '[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'") (citing *Farmer*, 511 U.S. at 837); *Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1270 n.2 (11th Cir. 2020).

### C.    The Custody Defendants Consciously Disregarded a Known Risk to Mr. Henegar's Health

A jury could easily find that Defendants Stroh and Keith were deliberately indifferent because they consciously disregarded a known risk to Mr. Henegar's health. There is no dispute that Defendants Stroh and Keith consciously chose their actions and inactions with respect to Mr. Henegar; they did not, for example, intend to call nursing staff but forget. Instead, the inquiry in dispute involves the

21

culpability of their disregard. Any combination of inferences about these defendants allows for a reasonable finding of deliberate indifference. As the District Court rightly concludes, a jury could decide that Stroh and Keith "should have contacted the on-call nurse immediately upon discovering Mr. Henegar had missed his Dilantin for four days." Doc. 168, P. 23.

The facts support this conclusion. Stroh and Keith testified that they were aware on day one that Mr. Henegar's medication was missing. Doc. 147-5, PP 137-38, 148; Doc. 147-15, PP. 16, 154, 155. And there is ample evidence from which a jury could conclude that neither Stroh nor Keith did anything other than put an unidentifiable marking in the medication record. In fact, the only evidence that either of them did anything about it is Keith's self-serving testimony that he told a nurse, but the nurses dispute this, and a jury is entitled to believe them. Doc. 147-3, P. 2; Doc. 147-7, P. 2. Plaintiff is entitled to the inference here that Keith did not tell a nurse.

Regardless of the dispute of fact regarding day one, it is undisputed that by day four, Defendants Stroh and Keith were both aware that (1) Mr. Henegar had gone four days without Dilantin; (2) the method of marking a "?" in the medication record—a method that was not sanctioned by their training or any practices in place at the prison—did not alert anyone to the dire medical situation unfolding; and (3) even if Keith had told Lee on day one (a factual assertion the Court must

22

reject for purposes of summary judgment)[5], he was aware on day four that she had not fixed the problem. *See supra,* Statement of Facts § B. Beyond that, there are facts establishing (and Plaintiff is entitled to the inference) that Stroh and Keith had been trained to contact an on-call provider in situations exactly like this but ignored that obligation. *See supra*, § II(C) & n.3 In other words, not only did they do something they knew to be ineffective, but they ignored their own training. As it is undisputed that Stroh and Keith knew that without his medication, Mr. Henegar faced a serious risk of harm, a jury could certainly find their inaction to reflect conscious disregard for Mr. Henegar's health.

This Court's precedents make clear that, having been made aware that Mr. Henegar's Dilantin was missing, Stroh and Keith were at a minimum required to ensure that the medical staff was informed of this emergency. *Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990) ("When prison guards ignore without explanation a prisoner's serious medical condition that is known or obvious to them, the trier of fact may infer deliberate indifference") (internal citation and quotation marks omitted); *Waldrop*, 871 F.2d at 1036 (prison official who "took no action" and failed to "inform competent authorities …of a prisoner's need for…care" was deliberately indifferent); *Sparks v. Ingle*, 724 F. App'x 692, 694

---

[5] Plaintiff is entitled to both inferences at summary judgment. *Sconiers v. Lockhart*, 946 F.3d 1256, 1262-63 (11th Cir. 2020).

(11th Cir. 2018) (affirming denial of summary judgment for jail official who failed to administer plaintiff's seizure medication). Instead they turned a blind eye.

Defendants may try to convince the jury at trial that their decision to jot down a question mark was a sufficient attempt to "notify competent authorities," but they are not entitled to that inference as a matter of law. Given the evidence they saw the three consecutive question marks in a row and knew Mr. Henegar still did not have his medicine, Doc. 147-5, PP 137-38, 148; Doc. 147-15, PP. 16, 154, 155, a jury could easily conclude that they knew their response was far from reasonable. As this Court explained in *Carswell*, a jail administrator who "simply yelled into a crowded room: 'Get this man to see the Doctor'" was deliberately indifferent because he did "nothing significant to ensure that [plaintiff] received medical attention." *Carswell v. Bay Cty.*, 854 F.2d 454, 455, 457 (11th Cir. 1988). Defendants Stroh and Keith did even less than yell into a crowded room. By making a meaningless notation in a medication record, which they knew accomplished nothing, they essentially whispered into an empty room. Doc. 147-5, P. 135; Doc. 147-15, PP. 15, 150; Doc. 148-4, PP. 62, 120, 221-23. This is the exact kind of lip service that this Court has found to be deliberately indifferent. *Id.*; *see also Benson v. Gordon Cty., Ga.*, 479 F. App'x 315, 318 (11th Cir. 2012) (leaving medication at plaintiff's cell door when he could not get out of bed to retrieve it is deliberate indifference). A jury in this case could certainly agree.

### D.    Defendants Harrell and Lee Consciously Disregarded a Known Risk to Mr. Henegar's Health

There were doses of Dilantin sitting in the prison's medicine cabinet, and Defendants Lee and Harrell had the key and the ability to provide Henegar the Dilantin he so desperately needed. So there is no question that Harrell and Lee "disregarded" the risk; the only question as to these defendants involves "consciousness." If a jury concludes that they were aware Mr. Henegar was not receiving Dilantin, the jury could reasonably find them deliberately indifferent. *Carswell*, 854 F.2d at 457 (affirming denial of summary judgment where jail physician's assistant was found deliberately indifferent for ignoring jail officers' warnings of plaintiff's serious medical need); *Duncan v. Corr. Med. Servs.*, 451 F. App'x 901, 905 (11th Cir. 2012) (summary judgment not appropriate for prison officials who "wholly ignore an inmate's prescription needs"); *Benson*, 479 F. App'x at 318 (jail nurse was deliberately indifferent when she failed to provide medication to prisoner); *Sparks*, 724 F. App'x at 694 (affirming denial of summary judgment for jail official who failed to administer plaintiff's seizure medication); *see also Qamar v. C.I.A.*, 489 F. App'x 393, 396 (11th Cir. 2012) (plaintiff's allegations that he was denied access to Dilantin stated claim for deliberate

25

indifference). This record provides ample evidence from which a jury could infer

that these defendants were aware of the missing medications.

*Defendant Lee*. The following evidence must be credited against Defendant

Lee:

- Defendant Keith told her Mr. Henegar's medication had run out.[6] Doc. 147-4, P. 36; Doc. 147-5, P. 141, 144; Doc. 147-6, P. 293; Doc. 147-10; Doc. 148-5, P. 73.

- Mr. Henegar went to a daytime pill call and told her directly that his medication was missing.[7] Doc. 148-4, P. 62, 121.

- There was a post-it note, visible to anyone who conducted pill call, alerting of the problem. Since Lee conducted two pill calls per day, a jury could infer that she saw the post-it and knew there was a problem on day one *and* that it had not been resolved by day four. Doc. 147-8, P. 65; Doc. 147-12, PP. 157, 161-62; Doc. 147-5, P. 132.

- Mr. Henegar's MAR clearly demonstrated the absence of medication on day one. Doc. 155-10, P. 2. Lee looked at MARs while she was administering pill call. From this evidence, a jury could easily infer that Lee saw Henegar's MAR. Doc. 147-12, P. 157.

---

[6] Lee denies this. If a jury believes Lee, it could find Keith liable because he did nothing to get Mr. Henegar his medication. If a jury believes Keith, a jury could find Lee liable because she did nothing about the missing medicine. At summary judgment, Plaintiff is entitled to argue alternate theories of liability, *see Brookhaven Landscape & Grading Co. v. J.F. Barton Contracting Co.*, 676 F.2d 516, 523 (11th Cir. 1982); and is entitled to both inferences, *Sconiers*, 946 F.3d at 1262-63. A jury will have to decide who to believe.

[7] Defendant Lee conducted two of the three daytime pill calls. Doc. 147-8, P. 66. Although Mr. Henegar is unsure which nurse he talked to, there is a two out of three chance he talked to Lee, and because a preponderance of the evidence standard "demands only 51% certainty," *Nat'l Lime Ass'n v. Envtl. Prot. Agency*, 627 F.2d 416, 453 n.139 (D.C. Cir. 1980) (internal citation omitted), a jury could reasonably infer Mr. Henegar spoke with Defendant Lee.

- As the 5:00 a.m. pill call nurse, Lee should have checked the MARs in the morning. This is supported by Nurse Melton's testimony, and also Stroh and Keith's testimony that they believed someone from nursing checked the MAR every morning. A jury could believe that she did so, saw the string of question marks, and learned (1) that Mr. Henegar had not received medication since August 27, and (2) that it was not because he was declining to take it or failed to show up at pill call. Doc. 147-4, PP. 208-09; Doc. 147-5, PP. 11, 148; Doc. 147-12, P. 157-58; Doc. 147-15, P. 143 Doc. 155-10, P. 2. *See also Parsons v. Caruso*, 491 F. App'x 597, 605 (6th Cir. 2012) (testimony that medical providers conduct medication "chart reviews" raises inference that they were aware plaintiff was not getting seizure medicine).

Any one of these inferences alone would establish that Defendant Lee was aware Mr. Henegar's Dilantin was missing. The only evidence to the contrary is Defendant Lee's own self-serving testimony. At trial, a jury will need to decide what to make of these conflicting accounts, but at summary judgment, it is Plaintiff's evidence *against* Defendant Lee that must be taken as truthful, and the Court must further take all reasonable inferences from the evidence in Plaintiff's favor, granting summary judgment only if *no* reasonable jury could find in Plaintiff's favor. *Wate v. Kubler*, 839 F.3d 1012, 1018 (11th Cir. 2016) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge….") (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

**Defendant Harrell.** The following evidence must be credited against

Defendant Harrell:

- She inventoried the pill cart on the Monday and/or Wednesday that Mr. Henegar's medication was missing and in doing so looked through the Binder and medications to be sure all necessary medications were there, as was her job. In doing so, she saw that Mr. Henegar's medication was missing. Doc. 147-4, PP. 88-89, 125, 157, 269; Doc. 147-8, PP. 58, 178; Doc. 147-12, PP. 108, 132; Doc. 148-3, P. 5; Doc. 148-5, PP. 165, 167-68, 255-56, 280; Doc. 155-9, P. 9.

- There was a post-it note, visible to anyone who conducted pill call, alerting of the problem. Harrell conducted one pill call per day. A jury could infer that she saw the post-it while conducting pill call and knew there was a problem on day one *and* that it had not been resolved by day four. Doc. 147-4, P. 47; Doc. 147-5, P. 132; Doc. 147-12, P. 161-62.

- She looked at the MARs while conducting pill call for other patients, and saw Henegar's MAR in the process. Doc. 147-12, P. 157, 161-62.

- Harrell looked at the Binder while processing other incoming meds. Anyone who looked at the Binder would see that Mr. Henegar's medication was missing, Doc. 148-5, PP. 267, 280, and a jury could conclude that she saw that Mr. Henegar's medication had not arrived when it was supposed to. Doc. 147-4, PP. 88-89, 125, 157, 269; Doc. 147-8, PP. 58, 178; Doc. 147-12, PP. 108, 132; Doc. 148-5, PP. 165, 255-56, 280; Doc. 155-9, P. 9.

As with Defendant Lee, any one of these inferences alone establishes that

Defendant Harrell was aware Mr. Henegar's Dilantin was missing. Together, they

provide a compelling case from which a jury may reasonably conclude Harrell's

deliberate indifference. The only evidence to the contrary is Defendant Harrell's

self-serving testimony. Here too, a jury must evaluate the evidence. *Wate*, 839 F.3d

at 1018; *Anderson*, 477 U.S. at 255.

28

### E.  Defendant McDade's Failure to Enact Policies to Ensure Prisoners Received Medication was Deliberately Indifferent

Defendant McDade was also deliberately indifferent as a supervisor. To succeed on a claim of supervisory liability under Section 1983, Mr. Henegar must present facts that (1) there was a constitutional deprivation[8]; and (2) McDade's failure to implement certain policies was deliberately indifferent and was a cause of Mr. Henegar's injuries. *See Sorensen v. Nocco*, 677 F. App'x 570, 573 (11th Cir. 2017); *Williams v. Santana*, 340 F. App'x 614, 617 (11th Cir. 2009) (internal citations omitted); *Simpson v. Stewart*, 386 F. App'x 859, 860 (11th Cir. 2010) (there must be a causal connection or "direct link" between the policy and the constitutional deprivation). A causal connection can be established when the injury arises from "haphazard and ill-conceived procedures." *Greason v. Kemp*, 891 F.2d 829, 837 n.18 (11th Cir. 1990). A supervisor's failure to implement reasonable policies in the face of a known risk, like the fact that prescription medications can run out, is deliberate indifference. *Simpson*, 386 F. App'x at 860; *Rivas v. Freeman,* 940 F.2d 1491, 1495 (11th Cir. 1991) ("liability may be imposed due to the existence of an improper policy or from the absence of a policy").

McDade's reckless approach to her supervisory responsibilities in the face of the known serious risks facing prisoners who have been stripped of "virtually

---

[8] Mr. Henegar was deprived of his Eighth Amendment right to medical care, and medication.

every means of self-protection" and have no "access to outside aid," *Farmer*, 511 U.S at 833, constitutes deliberate indifference. McDade acknowledges it was her responsibility to enact policies to ensure prisoners received medication. Doc. 148-5, P. 177-204. She also knew of the risk facing prisoners whose medications ran out, *id.,* PP. 205-08, and that it was necessary to have someone ensure medications were on the pill cart, *id.*, PP. 102-03. But she herself admits that she enacted nearly no policies to ensure that prisoners received medication or otherwise check her subordinates' work. *Id*., PP. 183, 204-216. The policies she did enact were the very definition of "haphazard and ill-conceived." *Greason*, 891 F.2d at 837 n.18.

A jury reasonably could find that this reckless failure of leadership directly linked to Mr. Henegar's crisis in several ways, including through McDade's failure to set up reasonable policies and/or training for the corrections officers to alert medical staff when a medicine runs out, and a failure to assign responsibilities among the nursing staff to check if prisoners' medicine had run out.

Specifically, if a jury believes that Defendants Harrell and Lee truly did not have notice that Mr. Henegar was not receiving his medication, Defendant McDade would be culpable for either or both of two reasons. Either: She did not train Stroh and Keith to contact a nurse directly in the event of an emergency like this, which would be supported by Stroh and Keith's testimony that they were trained to communicate only through the MAR. Doc. 147-5, P. 117; Doc. 147-15,

P. 143. This would alone be deliberately indifferent, because it means McDade

defied common corrections medicine practices by failing to ensure that Stroh and

Keith had an effective mechanism to communicate with medical at times when

there were no medical staff on duty. Doc. 155-7, P. 5-6; *Greason*, 891 F.2d at 837

n.18; *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 382 (7th Cir. 2017) (en banc)

(failure to implement policies ensuring coordination of care is deliberate

indifference).

Alternatively, or in addition: A jury could find Defendant McDade was

deliberately indifferent for failing to properly ensure her subordinates, Lee and

Harrell, searched the MARs daily for communications from security, or otherwise

check to be sure all medications were on the pill cart, despite training Stroh and

Keith to communicate only via the MAR. This interpretation is supported by

evidence that the nursing department had a policy of weekly rather than daily chart

reviews, and no policy to check the pill cart after the weekend and weeknight pill

calls to ensure medications were received.[9] Doc. 148-5, PP. 204-05, 222. In this

case, McDade also defied common correction medicine practices and exhibited

---

[9] This does not preclude a finding of deliberate indifference against
Defendants Stroh and Keith, because as discussed *supra*, § II(C), a jury could find
them liable once they realized that medical was not getting the message.

deliberate indifference, particularly given the importance of policies like this when no nursing staff were onsite. Doc. 155-7, PP. 5-6.

In either or both scenarios, a jury could find that this reckless mismanagement was deliberately indifferent. *See Rivas,* 940 F.2d at 1495 (sheriff could be liable as supervisor for failing to establish sufficient policies and procedures to keep track of identities of people in custody, including when there were discrepancies in the records); *Greason*, 891 F.2d at 838 (must act reasonably if risk is known); *Glisson*, 849 F.3d at 382; *Montano v. Orange Cty.*, 842 F.3d 865, 871 (5th Cir. 2016) (failing to review work of supervisee can be deliberate indifference).

## F. The District Court Drew Factual Inferences in Nurse Defendants' Favor and Ignored the Evidence Against Them

To arrive at the conclusion that each Nurse Defendant was, as a matter of law, not deliberately indifferent, the District Court both relied on inaccurate statements of fact, and also drew factual inferences in Defendants' favor—both inappropriate at summary judgment. For instance, the Court inexplicably concludes that Nurse Lee enacted appropriate policies *and* that Harrell and Lee did not know the medication was missing. Doc. 168, P. 26. This is belied by McDade's own testimony that there were no set procedures or protocols to ensure nursing staff provided prisoners with their medication. Doc. 148-5, PP. 183, 204-216. This conclusion also affords Defendants Lee and Harrell the inference did not know the

medication was missing. To reach this conclusion, the District Court impermissibly ignored all of Plaintiff's evidence that Lee and Harrell knew the medication was gone. *See supra*, § II(D).

The District Court also acknowledges the case law establishing that there is no question that ignoring medical needs entirely is deliberate indifference, Doc. 168, P. 20 ("'Choosing to deliberately disregard' an inmate's complaints of pain 'without any investigation or inquiry,' constitutes deliberate indifference.") (quoting *Hoffer*, 973 F.3d at 1272 and *Taylor v. Hughes*, 920 F.3d 729, 734 (11th Cir. 2019)), but attempts to distinguish it by relying on an inaccurate recitation of the facts. The District Court then puzzlingly points out that prison officials are not required to provide "the best response," and states that federal courts are reluctant to wade into disputes over the adequacy of medical treatment once a prisoner has received some amount of care, despite that there is no dispute that Lee and Harrell provided no care whatsoever. Doc. 168, P. 21 (citing *Youmans v. Gagnon*, 626 F.3d 557, 564 (11th Cir. 2010)).

The District Court fundamentally misapprehended Mr. Henegar's case, causing it to reject his evidence under theories that he did not raise or pursue, and facts that do not exist. First, the Court approached this case as though it were a dispute about the quality of medical care Mr. Henegar received, suggesting that Mr. Henegar's complaint is that he did not receive "the best" medical care. *Id*.

33

This, however, is not Mr. Henegar's argument—rather his claim is based on evidence that he did not receive *any* medical care. A jury could reasonably infer that jotting a meaningless question mark on Mr. Henegar's chart while failing to take any steps to procure Mr. Henegar's vital medication was tantamount to providing no medical care at all. *See supra,* § II(C); *see, e.g.*, *Harris*, 21 F.3d at 394 ("Inaction in the face of a…prescribed course of care, *and the failure of an alternative course of action*…is not conduct that a sheriff could reasonably consider lawful.") (emphasis added); *Carswell*, 854 F.2d at 455, 457; *Benson*, 479 F. App'x at 318.

Second, the District Court viewed this case through the prism of a "delay" in treatment rather than a wholesale denial of medical care. Doc. 168, P. 21. Not only is this a misreading of the case law on delays in medical care, but it ignores the applicable principles in these cases, such as the directive for courts to inquire into the reason for a delay in medical care. *See Taylor*, 141 S.Ct. at 54; *Goebert,* 510 F.3d at 1328; *Harris*, 21 F.3d at 394; *Ancata*, 769 F.2d at 704. These principles serve only to support Mr. Henegar's argument, because here, the supply of Dilantin was readily available and there was no reason to withhold it. Any nurse could have gotten a dose at any time, and Stroh and Keith needed only to alert someone in the medical department. As the District Court acknowledged, that simple step would have prevented this "manifest tragedy." Doc. 168, P. 32.

And in any event, the case law about delays in medical care invoked by the district court involve delays in evaluating a prisoner's medical condition *when treatment is ultimately provided. See Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1317 (11th Cir. 2010) (five-minute delay before receiving medical care after a fight is not deliberate indifference); *Youmans*, 626 F.3d 557 (four-hour delay before receiving medical care after being beaten up was not deliberate indifference). These are inapposite here, since Mr. Henegar had already been evaluated by a physician and a course of treatment had been laid out, and he did not receive any prescribed medical care before his life-altering seizures. This is a case about wholesale denial of care, not a delay in care.

Notably, the District Court acknowledged toward the end of its opinion that even under its view, Defendants were grossly negligent. Doc. 168, P. 31. This is significant given that the District Court drew all inferences in *Defendants*' favor. It is hotly disputed in this Circuit whether a showing of deliberate indifferences requires more than gross negligence in the first place (and Plaintiff maintains that "more than mere negligence" is the appropriate standard), and thus this acknowledgement should be sufficient in and of itself to warrant reversal. But even if this Court disagrees, it demonstrates that a fair view of Plaintiff's evidence, and a faithful crediting of reasonable inferences in *Plaintiff's* favor as is required at this juncture, would easily permit a reasonable jury to determine that Defendants were

35

deliberately indifferent. The Court's conclusion to the contrary was error and should be reversed.

The District Court's misinterpretation of the facts and misapplication of the law notwithstanding, Plaintiff has presented evidence that would allow a jury to find liability. With Defendants pointing the finger at each other, it is at this point it is impossible to know which version of facts a jury will believe. Because there is no combination of inferences that absolves every defendant of liability as a matter of law, the case must be tried against all defendants.

## III. DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY

It was clearly established in 2016 that prison staff cannot deprive prisoners under their care of necessary prescription medications, through closely analogous case law, broad constitutional principles, and through the sheer fact that it was obvious. This Court reviews the District Court's decision to grant summary judgment on qualified immunity grounds, which was based entirely on a misapprehension of the law on qualified immunity, *de novo*. *Howell*, 922 F.2d at 719.

### A. Fair Warning Defeats Qualified Immunity

Qualified immunity insulates public officials from liability for unconstitutional conduct if they did not have fair warning that they were violating the constitution. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Overcoming a

defense of qualified immunity requires two things: (1) presenting facts that a jury

could conclude that an official committed a constitutional violation, as

Mr. Henegar has done *supra*, § II; and (2) establishing that a reasonable official

would have had notice at the time of the incident that their conduct was

unconstitutional. *Castle v. Appalachian Tech. Coll.*, 631 F.3d 1194, 1197 (11th Cir.

2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The "salient

question" underlying qualified immunity is whether officers have "fair warning

that their conduct violated the Constitution." *Hope*, 536 U.S. at 741; *Saucier v.

Katz*, 533 U.S. 194, 206 (2001); *see also Camreta v. Greene*, 563 U.S. 692, 705

(2011) (explaining that qualified immunity applies only when "prior case law has

not clearly settled the right" by "giv[ing] officials fair notice of it"); *Jacoby v.

Baldwin Cty.*, 835 F.3d 1338, 1344 (11th Cir. 2016) ("The central question is

whether the state of the law at the time of the violation gave the officials 'fair

warning' that their alleged actions were unconstitutional.") (citing *Hope*, 536 U.S.

at 739).

Officials can derive fair warning in three ways: "(1) case law with

indistinguishable facts clearly establishing the constitutional right; (2) a broad

statement of principle within the Constitution, statute, or case law that clearly

establishes a constitutional right; or (3) conduct so egregious that a constitutional

right was clearly violated, even in the total absence of case law." *T.R. v. Lamar*

*Cty.*, 25 F.4th 877, 883 (11th Cir. 2022) (internal citation and quotation marks omitted). A "broad statement of principle" can be established by a "robust consensus of [published or unpublished] persuasive authority."[10] *Glasscox v. City of Argo*, 903 F.3d 1207, 1217 (11th Cir. 2018); *Crocker v. Beatty*, 886 F.3d 1132, 1137 (11th Cir. 2018) (citing *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291-92 (11th Cir. 2009).

While these familiar three options lay out a useful framework, the Supreme Court has cautioned that "[g]eneral statements of the law are not inherently incapable of giving fair and clear warning." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The Supreme Court has rejected the notion that the facts of previous cases must be "directly on point," *Mullenix v. Luna*, 577 U.S. 7, 12 (2015), or even "materially similar" to prove that a right was clearly established, *Hope*, 546 U.S. at 731. Rather, "officials can be on fair notice that their conduct violates clearly established law even in novel factual situations." *Hope*, 526 U.S. at 731 (citing *U.S. v. Lanier*, 520 U.S. 259 (1997)).

"[I]f the evidence at the summary judgment stage, viewed in the light most favorable to the plaintiff, shows there are facts that are inconsistent with qualified immunity being granted, the case and the qualified immunity issue along with it

---

[10] Unpublished opinions "may be cited as persuasive authority." 11th Cir. R. 36-2; *Hunter v. Social Security Admin., Comm'r.*, 808 F.3d 818, 821 n.2 (11th Cir. 2015).

will proceed to trial." *Johnson v. Breeden*, 280 F.3d 1308, 1317, 1318 (11th Cir. 2002).

### B. Decades of Precedent Establish that Defendants Had Ample Notice that They Were Violating Mr. Henegar's Constitutional Rights

A "robust consensus" of applicable persuasive authority illustrates that Mr. Henegar's right to receive his seizure medication was clearly established in 2016. When Defendants consciously disregarded the harm Mr. Henegar faced by "basically doing nothing" to ensure that he received his Dilantin, *McElligott*, 182 F.3d at 1257, they violated his specific constitutional right to receive necessary prescription medication, and his constitutional right to receive minimally adequate medical care generally. It has long been the case that prison officials cannot ignore doctors' orders or do "basically nothing" when prisoners need prescriptions, *id.*, as Defendants did here. It has been equally long established that prison officials must take meaningful steps to ensure prisoners receive medication, which Defendants did not.

i. *Officials must provide prisoners with their prescription medication*

This Circuit has repeatedly held that prison officials cannot deprive prisoners of needed prescription medication. Most recently, in a case strikingly similar to Mr. Henegar's, this Court held that a jail official violated a prisoner's constitutional rights when he failed to provide the plaintiff with his seizure

medication. *Sparks*, 724 F. App'x at 695. In *Sparks*, the jail official knew the plaintiff had seizures without his medication, but every time the plaintiff inquired about his medication, the official gave him "the run-around." *Id*. This Court affirmed the decision denying qualified immunity to the officers at summary judgment, explaining that a litany of cases from 1976 through 2007, which held that prison officials cannot deny or delay necessary medical treatment, provided the officials with fair notice that they needed to provide the seizure medication. *Id*.

This Court in *Benson v. Gordon County* similarly held that a jail nurse violated the plaintiff's constitutional rights when she came to the detainee's cell and merely offered his prescription at the door, knowing that he could not get out of bed and therefore could not retrieve it. 479 F. App'x at 318-19. Even though she brought the plaintiff his medication, this Court concluded that she failed to "provide it" to him. *Id.* at 319. This Court explained that the nurse either "deliberately withheld" the plaintiff's medication, or alternatively provided "grossly inadequate care," and concluded that in either case she was deliberately indifferent, affirming the district court's denial of summary judgment based on qualified immunity. *Id.* This Court further explained that Eleventh Circuit precedent holding that "that knowledge of the need for medical care and an intentional refusal to provide that care constitutes deliberate indifference" provided

the nurse with fair warning that she was violating the Constitution. *Id*. (internal citations and quotation marks omitted).

In fact, this Court acknowledged a prisoner's right to medication over three decades ago in *Waldrop*, 871 F.2d at 1032. In *Waldrop*, the prison psychologist took the plaintiff off his psychotropic medications upon his arrival at the prison. *Id*. The plaintiff went four days without his medication and the psychiatrist learned he was experiencing mental distress, but nevertheless refused to give the plaintiff any new medication. *Id*. at 1034. The plaintiff then engaged in several acts of self-mutilation as a result of being deprived of his medication. *Id.* The district court denied the doctors' summary judgment motions on qualified immunity grounds, and this Court affirmed, explaining that it is unconstitutional for prison officials to knowingly deprive prisoners of psychiatric medication when they face a risk of harm without it. *Id.* at 1034-36.

Taken together, and as applicable here, these three cases clearly establish that prison officials cannot knowingly deprive prisoners of their prescription medication.

ii. *Officials may not ignore doctors' instructions*

It has also long been the case that prison officials cannot ignore a doctor's instructions. For instance, this Court in *Goebert* reversed the district court's decision granting summary judgment on qualified immunity grounds when a

41

doctor recommended bed rest for a detainee, but medical staff refused to provide her with a lie-down pass that allowed her to take bed rest. 510 F.3d at 1317. She later gave birth to a stillborn. *Id*. at 1319. This Court emphasized that the plaintiff was not requesting a particular doctor or facility, but "was simply pleading for the outside medical care *that [a doctor] had already determined she needed*…." *Id*. at 1328 (emphasis added). The Court concluded that a jury could find this to be deliberate indifference and the defendants could not escape liability through qualified immunity. *Id.*

A line of cases leading up to *Goebert* also established fair notice to prison officials that they cannot simply ignore doctors' orders. For instance, in *Harris v. Coweta County*, this Court concluded that a jury could find a delay in performing a diagnostic that a doctor had ordered was objectively unreasonable, and violated clearly established legal norms. 21 F.3d at 394. The court affirmed the district court's denial of summary judgment on qualified immunity. *Id*. And in *Ancata v. Prison Health Services*, the court found that the plaintiff had stated an Eighth Amendment claim when prison medical staff determined that plaintiff "required a psychiatric or orthopedic evaluation," but defendants "took no steps to have [plaintiff] examined." 769 F.2d at 702, 704.[11]

---

[11] In each of these cases, courts also considered why prison officials failed to timely comply with doctors' orders, and in each case found that the lack of an explanation for the officials' conduct to be even further evidence of deliberate

      iii.   *Officials may not ignore prisoners' requests for or withhold medical care*

Not only do cases like *Goebert*, *Sparks*, and *Benson* provide notice to prison officials that they must give prisoners like Mr. Henegar their prescriptions—which alone is grounds to deny qualified immunity—they also make clear that the broader, long-established principles that prison officials cannot knowingly ignore or withhold medical care are themselves sufficient sources of notice that prison officials must comply with doctors' prescriptions or instructions for prisoners. Even if this Court does not find the cases above provided sufficient notice to Defendants, these broader principles certainly did. As this Court explained in *Patel*, "The knowledge of the need for medical care and intentional refusal to provide that care has consistently been held to surpass negligence and constitute deliberate indifference…. This broad principle has put all law-enforcement officials on notice that if they actually know about a condition that poses a substantial risk of serious harm and yet do *nothing* to address it, they violate the Constitution." 969 F.3d at 1190 (internal citation and quotation marks omitted).

---

indifference. *Goebert*, 510 F.3d at 1329 ("The period of delay was approximately one day, and there was no good reason for it."); *Harris*, 21 F.3d at 394; *Ancata*, 769 F.2d at 704 ("[I]f necessary medical treatment has been delayed for non-medical reasons, a case of deliberate indifference has been made out"). The same is true for Mr. Henegar's case: There was no explanation for the denial of treatment. The medication was right there at the prison, and no one gave it to him.

For instance, in *McElligott*, this Court reaffirmed that depriving a prisoner of necessary medical care is unconstitutional. 182 F.3d at 1252. It was clear to the defendants in *McElligott* that the medication the plaintiff was receiving was insufficient to treat his pain, but they did not provide him additional medication or follow up with additional treatment. *Id*. at 1253. The *McElligott* court reversed the district court's decisions on liability and qualified immunity, holding first that a jury could conclude that the defendants consciously disregarded a risk to the plaintiff. *Id*. at 1256. In doing so, the court established that providing some care that "basically [did] nothing"—as Stroh and Keith did—was unconstitutional. *Id*. at 1254, 57.

Citing a long line of cases establishing that delays and denials of care are unconstitutional, this Court in *McElligott* also concluded that the defendants were fairly warned that their decision to persist with an ineffective treatment was unconstitutional. *Id*. at 1255.[12] *See, e.g., Estelle v. Gamble,* 429 U.S. 97, 104-05 (1976) (deliberate indifference can "manifest[]," *inter alia*, "by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment

---

[12] The District Court seemed to consider that writing a "question mark" in the MAR constituted "providing some treatment," which is incorrect. To the extent that this Court considers the "question mark" to be "some treatment," cases like *Carswell*, *infra*, § III(B)(iv), firmly establish that such ineffective treatment is also unconstitutional because it is akin to doing nothing. 854 F.2d at 457.

once prescribed"); *Adams*, 61 F.3d at 1544 ("[W]hen the need for medical treatment is obvious, medical care that is so cursory as to amount to no treatment at all may constitute deliberate indifference."); *Brown*, 894 F.2d at 1538 ("When prison guards ignore without explanation a prisoner's serious medical condition that is known or obvious to them, the trier of fact may infer deliberate indifference."); *Carswell*, 854 F.2d at 457 (finding a constitutional violation where prison officials "had knowledge of [the plaintiff's] need for medical care," but "did nothing significant to ensure that [the plaintiff] received medical attention."); *Goebert*, 510 F.3d at 1331 (affirming denial of summary judgment where defendant official cursorily replied to plaintiff's medical complaints "without investigation"); *Thomas v. Town of Davie,* 847 F.2d 771, 773 (11th Cir. 1988) (reversing district court's dismissal of plaintiff's claim that he was "denied *proper* medical care" where defendant officers took him to the sheriff's office instead of the hospital) (emphasis added).

### iv. *Officials must take appropriate measures to ensure prisoners receive medical care*

It has also long been established in this Circuit that officials must take "appropriate measures" to ensure that prisoners receive necessary medical care. *Mandel*, 888 F.2d at 789. For instance, the *Carswell* court concluded that "simply yell[ing] into a crowded room: 'Get this man to see the Doctor'" was insufficient to ensure that the prisoner actually saw a doctor, and concluded that the officer had

45

acted with deliberate indifference because he did "nothing significant to ensure that [plaintiff] received medical attention." 854 F.2d at 455, 457. The *Carswell* court affirmed the jury verdict finding sufficient evidence of deliberate indifference. *Id*. at 459. This Court in *Harris*, in affirming the district court's denial of summary judgment, likewise stated that "[i]naction in the face of a known serious medical need, a prescribed course of care, *and the failure of an alternative course of action*…, is not conduct that a sheriff could reasonably consider lawful." 21 F.3d at 394 (emphasis added). And this Court in *Ancata* held that prison officials could be deliberately indifferent even though they provided *some* non-prescription drugs and diagnosed the plaintiff as needing to see a non-staff specialist. 769 F.2d at 704. The *Ancata* court reversed the district court's summary judgment ruling for defendants. *Id*.

If an officer realizes that a prisoner is still in need of care, even if he had previously been seen by a medical professional, the officer has an obligation to, at the very least, "look into the matter," *Goebert*, 510 F.3d at 1328, or "take action or to inform competent authorities," *Waldrop*, 871 F.2d at 1036. As this Court explained in *Fikes v. Abernathy*, "*Carswell* and *Goebert* clearly established that a nonmedical official does not fulfill his obligations to an inmate whose condition is clearly deteriorating merely by obtaining some medical attention for the inmate, if it is plain and obvious to a person without medical expertise that the care is

inadequate and insufficient." 793 F. App'x 913, 924 (11th Cir. 2019). *Fikes* similarly reversed the district court's summary judgment ruling for defendant officers. *Id*.

### C.    There is a Clear Link Between These Cases and Mr. Henegar's Case

Taken together (or individually, for that matter), these cases clearly establish that prisoners have a right to receive prescription medication for serious conditions like seizure disorders, and prison officials have a constitutional obligation to take appropriate steps to ensure that prisoners receive it. Defendants Stroh and Keith failed to clear this low bar by refusing to so much as look into Mr. Henegar's missing prescription, despite knowing that whatever mechanism they invented to get him a dose was entirely ineffective. Whatever their explanation for why they declined to take the simple step of telling a nurse Mr. Henegar's medication was missing, it cannot be disputed that they "basically did nothing." *McElligott*, 182 F.3d at 1257; *Benson*, 479 F. App'x at 318 (paying lip service to a medication order, knowing that the prisoner will not receive it, is deliberate indifference). Based on this long line of precedent, Stroh and Keith had ample warning that their continued inaction was unconstitutional.

Defendants Lee, Harrell, and McDade are an even simpler case, because they did literally nothing. It cannot be disputed that this long line of cases provided

fair warning that they could not simply ignore Mr. Henegar's missing medication once they learned about it.

### D.    The District Court Misinterpreted the Facts and Applicability of These Cases

The District Court did not consider any of these broad principles in its qualified immunity analysis. It considered only the fraught "factually identical" mechanism to defeat qualified immunity, and ultimately concluded that Defendants were entitled to qualified immunity for one reason: there are no published, factually identical Eleventh Circuit or Supreme Court cases stating that a prisoner has a right to receive his prescribed Dilantin within four days. This was an impermissibly stringent reading of the qualified immunity doctrine—an approach that has been rejected by this Court at least once in the last year, *Lamar Cty. Board of Ed.*, 25 F.4th at 887 (reversing because the district court relied on too narrow a reading of factually similar precedent), and numerous times by the Supreme Court, *e.g. McCoy v. Alamu*, 141 S. Ct. 1364 (2021) (mem.) (vacating and remanding Fifth Circuit order granting qualified immunity based on overly narrow factual delineation from similar precedent, in light of *Taylor v. Riojas*, 141 S.Ct. 52 (2020) (per curiam)—and an incorrect conclusion that a factually identical case is the only way to show that a right is clearly established.

Contrary to the District Court's conclusion, a factually identical case is not required to establish fair warning based on a "robust consensus" or "broad

principle." *Glasscox*, 903 F.3d at 1217; *Crocker*, 886 F.3d at 1137. Cases like *Sparks* establish the lay of the law surrounding prison officials' constitutional obligations to provide mediation for their wards. But rather than acknowledge this principle, the District Court engaged in the unnecessary exercise of attempting to distinguish *Sparks* on the facts. In its attempt, the District Court impermissibly drew all inferences in Defendants' favor. More critically, the Court ignored this Court's clear directive in *Sparks*: decades of precedent have clearly established that seizure patients have a right to seizure medicine.

As for the Court's flawed factual distinctions: the Court explained that in Mr. Henegar's case, unlike *Sparks*, there was no evidence that "Lt. Stroh or Sgt. Keith ignored Mr. Henegar's requests for medication, refused to obtain the medication in response to his requests, or failed to communicate with other prison officials regarding Mr. Henegar's requests for medication." Doc. 168, P. 29. These constructions of fact clearly favor Defendants. Taking the facts in the light most favorable to Mr. Henegar, as the court must do, Plaintiff presented ample evidence that Mr. Henegar went to pill call and Stroh and Keith "basically did nothing." *See McElligott*, 182 F.3d at 1257; *see supra,* § II(C)*.* The District Court simply chose to ignore this evidence.

The only actual difference between *Sparks* and this case is that the *Sparks* plaintiff went longer without his medication. But the *Sparks* court was not at all

concerned about the number of days the plaintiff had gone without his medicine, because, like here, the defendants did not dispute that an unmedicated seizure condition *of any length* is a serious health risk. *See Sparks*, 724 F. App'x at 695 & *generally*. It focused on the fact that prison officials were aware that the plaintiff had not received his medication and took no steps to procure it. *Id.*

By conducting a hair-splitting analysis on the number of days that Mr. Henegar went without medication, the District Court engaged in the myopic, "rigid, overreliance on factual similarity," the "danger[s]" of which the Supreme Court has condemned. *Hope*, 536 U.S. at 743; *see also McCoy*, 141 S. Ct. at 1364; *Taylor*, 141 S.Ct. at 53-54. The above authority clearly demonstrates that Mr. Henegar's right to medication was clearly established in 2016.

### E.    Mr. Henegar's Right to Medication was Obvious

Not only were Defendants on notice that Mr. Henegar had a right to his Dilantin from decades of Supreme Court and Eleventh Circuit precedent, but Mr. Henegar's right to medication was obvious. Recent Supreme Court decisions have reaffirmed that obviously illegal conduct can strip officials of qualified immunity, even in "novel factual circumstances." *Hope*, 536 U.S. at 741; *see City of Escondido v. Emmons*, 139 S. Ct. 500, 504 (2019) (per curiam); *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018); *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam); *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per

curiam) (citing *Hope*, 536 U.S. at 738); *Lanier*, 520 U.S. at 270-71 (particularly egregious conduct may be clearly unconstitutional even if "the very action in question has [not] previously been held unlawful").

The sheer quantity of cases from other circuits and unpublished cases in this circuit establish that the right to receive prescribed medication was obvious. *See Sparks*, 724 F. App'x at 694; *Dadd v. Anoka Cty.*, 827 F.3d 749, 757 (8th Cir. 2016) ("When an official denies a person treatment that has been ordered or medication that has been prescribed, constitutional liability may follow."); *Parsons*, 491 F. App'x at 605-06 (finding right to receive Dilantin was clearly established through out-of-circuit precedent, reversing grant of summary judgment to prison employees because their knowing failure to provide Dilantin was deliberate indifference); *Phillips v. Jasper Cty. Jail*, 437 F.3d 791, 796 (8th Cir. 2006) ("knowing failure to administer prescribed [seizure] medicine can itself constitute deliberate indifference"); *Hudson v. McHugh*, 148 F.3d 859 (7th Cir. 1998) (denying summary judgment for officers and nurse who allegedly failed to provide Dilantin to a prisoner known to take the medication for his seizure disorder); *Foulks v. Cole Cty.*, *Mo*., 991 F.2d 454, 455-57 (8th Cir. 1993) (holding there was liability where jail officials disregarded an instruction sheet from the plaintiff's doctor, ignored complaints of sickness and pain, and refused to provide medication they were aware was prescribed); *Robinson v. Moreland*, 655 F.2d 887,

890 (8th Cir. 1981) (holding that one instance of contact with the plaintiff after the injury was enough to establish liability); *Fox ex rel. Fox v. Peters*, 2011 WL 6378826, at *6 (N.D. Ill. Dec. 19, 2011) (plaintiff's comment to defendant that "I take Dilantin" should have caused defendant to investigate).

Taken together, these cases show the obviousness of Mr. Henegar's right to his seizure medication. This, too, is a sufficient basis on which Mr. Henegar can overcome qualified immunity. But the District Court considered none of them.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court reverse the District Court's decision to grant summary judgment and remand for further proceedings, and order any other relief that this Court deems just and proper.

Date: March 7, 2022

Respectfully submitted,

/s/ Rachel Brady
Illinois Bar No. 6312402

/s/ Samantha Hamilton
Georgia Bar No. 326618

*Attorneys for Betty Wade, as Personal Representative Estate of David Henegar*

Mike Kanovitz
Rachel Brady
Samantha Hamilton
311 N. Aberdeen Street, Third Floor
Chicago, IL 60607
312-243-5900
brady@loevy.com

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

I, Rachel Brady, an attorney, hereby certify that this brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7) because it contains 12,624 words, excluding those parts excluded by FED. R. APP. P. 32(f). This motion complies with the typeface requirements of FED. R. APP. P.32(a)(5) and FED. R. APP. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14-point.

/s/ Rachel Brady
Illinois Bar No. 6312402
*Attorney for Betty Wade, as Personal Representative of the Estate of David Henegar*

## CERTIFICATE OF SERVICE

I, Rachel Brady, an attorney, certify that on March 7, 2022, I served a copy of this document on all counsel of record by filing it using the Court's CM/ECF filing system.

/s/ Rachel Brady
Illinois Bar No. 6312402
*Attorney for Betty Wade, as Personal Representative of the Estate of David Henegar*

55