[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 21-14275

_____

BETTY WADE,
in her capacity as Personal Representative of the Estate of David
Henegar,

                                          Plaintiff-Appellant,

*versus*

CINDY MCDADE, et al.,

                                          Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 4:18-cv-00192-AT

_____

Before NEWSOM, LUCK, and TJOFLAT, Circuit Judges.

NEWSOM, Circuit Judge:

Over a four-day stretch during his incarceration at Walker State Prison in Georgia, David Henegar failed to receive his prescribed seizure medication. On the fourth night, Henegar had two seizures that he claimed caused permanent brain damage. Proceeding under 42 U.S.C. § 1983, Henegar sued five prison employees—Lieutenant John Stroh and Sergeant Jerome Scott Keith, as well as nurses Sherri Lee, Julie Harrell, and Cindy McDade—alleging that they were deliberately indifferent to his medical needs in violation of the Eighth Amendment.

The district court granted summary judgment to all five defendants on the ground that they were entitled to qualified immunity. Shortly thereafter, Henegar died from causes unrelated to the seizures that he suffered while in prison. His sister, Betty Wade, now pursues his claims on appeal as the personal representative of his estate.

Before us, Wade asserts that the district court improperly accorded the defendants qualified immunity. In order to address that question, we find that we must first decide, by reference to our existing precedent, what mens rea a plaintiff has to prove to make out an Eighth Amendment deliberate-indifference claim. Must she show, as some of our decisions have said, that the defendant whose conduct she challenges acted with "more than *mere* negligence," or

must she go further, as others have held, and show that the defendant acted with "more than *gross* negligence"? Applying our prior-panel-precedent rule—and, in particular, following the first of two decisions that squarely addressed and purported to resolve the tension in our case law—we conclude, for reasons that we will explain, that a deliberate-indifference plaintiff must prove (among other things) that the defendant acted with "more than *gross* negligence."

Applying that standard to each of the five defendants here, we conclude that none of them was deliberately indifferent to Henegar's medical needs and, accordingly, that none of them violated the Eighth Amendment—and, accordingly, that the district court was correct to grant all of them summary judgment.

## I

## A

Because this case comes to us on appeal from a decision granting summary judgment, "we must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party." *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997). We therefore construe the facts in Wade's favor, noting factual disputes—overwhelmingly here, between and among the various defendants—where necessary.

While serving his sentence at Walker State Prison, Henegar was diagnosed with epilepsy. Initially, his condition was well-controlled with a daily anticonvulsant called Dilantin. The epileptic episode at issue here followed a four-day period—from Sunday,

August 28, to Wednesday, August 31, 2016—during which Henegar didn't receive his medication.

First, a brief introduction of the five defendants: Nurses Julie Harrell and Sherri Lee worked the day shift on weekdays in the prison medical unit. As relevant here, both were on duty from Monday, August 29, through Thursday, September 1. Lieutenant John Stroh and Sergeant Jerome Scott Keith worked the night shift on Sunday, August 28, when Henegar missed his first dose of Dilantin, and then didn't return to work until the evening of Wednesday, August 31. Nurse Cindy McDade was the nursing manager; the parties agree that she neither treated Henegar nor saw or spoke to him during the four days in question.

In August 2016, Nurse Mary Ann Melton, who isn't a party to this litigation, was responsible for ordering inmates' medications. She worked at the prison until Thursday, August 25, at which point she went on medical leave for several months. Nurse Melton usually ordered refills of inmates' medications from the Georgia Department of Corrections' pharmacy shortly before they ran out.

On Tuesday, August 23—just before going on leave—Nurse Melton ordered Henegar's Dilantin. Medications ordinarily arrived within one to two business days, and almost always within three. For reasons still unknown, Henegar's Dilantin wasn't delivered until sometime after Wednesday, August 31. Typically, if a prisoner's medicine didn't arrive as expected, Nurse Melton would follow up with the pharmacy. In Nurse Melton's absence, Nurse Harrell ordered medications, recorded them in a binder when they arrived,

cross-checked to ensure all orders had been delivered, and invento-
ried and stocked the prison's "pill cart." Nurse McDade occasion-
ally helped order and stock medicines, but it typically fell to Nurse
Harrell to cover Nurse Melton's duties.

　　As it turns out, despite the delay in the delivery of Henegar's
Dilantin, the prison had the medication on hand; there was a
backup supply in the medical department's "standard ward inven-
tory." All nurses had access to that supply, and any nurse could also
obtain Dilantin on short notice from a local pharmacy. Corrections
officers, by contrast, didn't have access to the backup supply and
couldn't order new medicines.

　　There were four "pill calls" each day at regular intervals—
5:00 a.m., 11:00 a.m., 4:00 p.m., and 9:00 p.m. Henegar was as-
signed to receive his medication at the 9:00 p.m. call. During regu-
lar hours on weekdays, nurses administered inmates' medicines;
Nurse Lee, for instance, conducted the 5:00 a.m. pill call each
morning. At night and on weekends, though, no medical person-
nel were onsite, so corrections officers distributed medications.
During those pill calls, an officer would review a prisoner's medi-
cation administration record ("MAR") to determine what medicine
he needed and then retrieve it from the pill cart. If there was an
issue with distributing or administering an inmate's medication,
the officer was supposed to make a notation to that effect in his
MAR. Standard notations included "A" for "administered," "N" for
"no-show," "R" for "refused," and "A/W" for "accepted but
wasted."

When Henegar attended the 9:00 p.m. pill call on Sunday, August 28, his Dilantin wasn't on the cart. Lieutenant Stroh was supervising that night, and Sergeant Keith, who was administering the pill call, made an "unidentifiable marking" in Henegar's MAR. It wasn't one of the four standard notations that officers had been trained to use in MARs.

Having missed his August 28 dose, Henegar returned to the 9:00 p.m. pill calls on August 29 and 30, to no avail. As already explained, both Lieutenant Stroh and Sergeant Keith were off those days. The corrections officers who conducted those pill calls put "question marks" in Henegar's MAR. It is undisputed that "it would be unusual for [a question mark] to appear in the medication [b]inder." Although we don't know who, someone also put a post-it note on Henegar's file to indicate that there had been a problem with administering his medication—the parties agree that it "st[uck] out . . . like a flag" from Henegar's file in the pill cart.

At some point on either August 29, 30, or 31, Henegar also attended a daytime pill call but still didn't receive his Dilantin. He spoke to a nurse at the time, although he couldn't remember exactly when or which one. The only nurses working daytime pill calls on those days were Nurses Harrell and Lee. Nurse Harrell admits having inventoried the pill cart at least once during the days when Henegar went without his medication and checking the binder of prescription deliveries daily. Nonetheless, she insists that she didn't know that Henegar was out of his Dilantin.

On Wednesday night, August 31, Lieutenant Stroh and Sergeant Keith were back on duty together, and Sergeant Keith once again conducted the 9:00 p.m. pill call. When Henegar showed up and his Dilantin still wasn't on the pill cart, Sergeant Keith recorded another question mark in the MAR. One of the two officers told Henegar to go to the sick bay the following morning.

At 10:50 p.m. that same day, having been without his Dilantin for four days, Henegar suffered a nearly 20-minute seizure that induced status epilepticus—a condition that can cause brain damage. The resulting injury usually centers in the hippocampus, which regulates memory and mood. The on-call doctor didn't answer Lieutenant Stroh's call, so he phoned Nurse McDade, who instructed him to call 911. Henegar was transported to the emergency room, treated, and returned to the prison at around 2:30 a.m. on September 1.

Just two hours later, Henegar suffered another seizure that left him oxygen-deprived for about 20 minutes. When Lieutenant Stroh and Sergeant Keith arrived at Henegar's cell, his seizure had subsided. Lieutenant Stroh called Nurse McDade again at home to report the incident, and she told him to have Nurse Lee examine Henegar when she arrived.

When Nurse Lee got to the prison around 5:00 a.m., she took Henegar to the medical unit, examined him, and found that his oxygen level was 81%—a low but not critical level—and that his pupils were slow to dilate but otherwise functioning correctly. She

determined that he needed supplemental oxygen and additional seizure-prevention measures, so she sent him back to the hospital.

Later that day, Nurse McDade investigated the incident and contacted the pharmacy to ensure that Henegar's Dilantin was delivered. She also switched administration of all anti-seizure medications from the 9:00 p.m. pill call to the 4:00 p.m. pill call so that nurses, rather than corrections officers, would be in charge of distribution. Nurse McDade reports that a similar situation had never occurred before.

Following the August 2016 incident, Henegar regularly received his medication until his release a year later. The defendants all but acknowledge that a breakdown in communication between nurses, the pharmacy, and corrections officers caused Henegar's injuries. After his release, Henegar began to struggle with his short-term memory, finding himself unable to remember everyday conversations and keep up with his welding job. He came to rely on his mother, with whom he lived, to remind him about medical appointments, and he suffered strained relationships because he was no longer able to regulate his emotions.

\* \* \*

One last "factual" issue: There's a fair amount of finger-pointing among the defendants. For instance, Nurse McDade insists that she trained corrections officers to communicate with nurses about an inmate's medication *both* "through the MAR and verbally." (For her part, Wade likewise alleges that the officers had been trained to contact the on-call nurse immediately when a

question about medication arose.) And it is undisputed that neither Lieutenant Stroh nor Sergeant Keith called a nurse immediately when Henegar initially missed his medication on August 28.

Lieutenant Stroh and Sergeant Keith respond in three ways. First, they say—and all agree about this much—that they believed (even if incorrectly) that the medical staff reviewed their notations in the MARs every morning, although Nurse McDade rejoins that she didn't train them to think that. Second, the officers assert that they considered it an inmate's responsibility to notify the medical staff if his medicine was unavailable and that officers were supposed to communicate with the medical staff exclusively through MARs. Sergeant Keith, in particular, testified that his practice was to contact the on-call nurse only when there were discrepancies with a prisoner's medication—say, if a pill on the cart didn't match the prisoner's prescription—not when medication was missing entirely. Finally, Sergeant Keith claims (1) that he *did* tell at least one nurse verbally about the problem either late on August 28 or early on August 29, (2) that it must have been Nurse Lee because she was the only one whose shift overlapped with his, and (3) that, in any event, the nurse with whom he spoke told him that Henegar's Dilantin was "on order."

In return, the nurses seek to shift blame back to the officers. For instance, Nurse Lee denies that Sergeant Keith ever told her about Henegar's missing Dilantin. And more generally, all of the nurses deny that either Lieutenant Stroh or Sergeant Keith told

them anything—they insist that they were completely unaware that Henegar was out of Dilantin.

The nurses also point fingers at one another. Nurse Melton, for instance, testified that it was Nurse Lee's responsibility to check the MARs from the previous night's 9:00 p.m. pill call to determine whether there had been medication-related problems. Wade agrees that Nurse Lee was supposed to check the MARs and, accordingly, that she either knew or should have known that Henegar had been missing his Dilantin doses. Nurse Lee, naturally, denies that it was her responsibility either (1) to review the previous night's or weekend's MARs or (2) to communicate with corrections officers or solicit reports on the nighttime pill call. For her part, Nurse McDade testified that she didn't double-check to ensure that line nurses were reviewing the nighttime MARs or the medication-order binder because she didn't want to "micromanage" them.

**B**

Henegar sued Lieutenant Stroh, Sergeant Keith, and Nurses Harrell, Lee, and McDade under 42 U.S.C. § 1983, alleging that each of them had been deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. The district court granted summary judgment to all defendants on the ground that they were entitled to qualified immunity. In particular, the court held that even if one or more of the defendants had violated the Constitution, the law in August 2016 was insufficiently "clearly established" to give them fair notice of the unlawfulness of their conduct: "Assuming Defendants' conduct here constituted deliberate

indifference to a serious medical need in violation of Plaintiff's Eighth Amendment rights, Plaintiff has failed to point to any law applicable to the circumstances presented in this case that clearly established the alleged violation of Plaintiff's rights."

Henegar's sister, Betty Wade, assumed responsibility for his suit following his death, and on appeal she contends that the district court erred in granting the defendants summary judgment.[1]

## II

A government official sued under § 1983 may defend on the ground that he or she has qualified immunity from suit. Qualified immunity protects officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Because it is undisputed that the defendants here were at all relevant times performing discretionary functions of their offices, *see Glasscox v. City of Argo*, 903 F.3d 1207, 1213 (11th Cir. 2018), Wade has the burden both (1) to "make out a violation of a constitutional right" and (2) to show that the right that she claims the defendants violated was "clearly established at the time of [their] alleged misconduct." *Pearson*, 555 U.S. at 232 (quotation omitted).

---

[1] We review a district court's grant of summary judgment *de novo*. *See Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1284 (11th Cir. 1997).

A reviewing court may consider the two prongs of the qual-ified-immunity standard in either order. *Id.* at 236. As already ex-plained, the district court here bypassed the first prong—"[a]ssum-ing" that the defendants had violated the Eighth Amendment—in favor of deciding the case on the ground that Wade hadn't shown that applicable law was "clearly established." We think it best—and find that we are able—to resolve the case on the first, "violation" prong.

\*   \*   \*

In relevant part, the Eighth Amendment forbids the "in-flict[ion]" of "cruel and unusual punishments." U.S. Const. amend VIII. The Supreme Court first held in *Estelle v. Gamble* that the Cruel and Unusual Punishments Clause should be understood to prohibit "deliberate indifference to serious medical needs of pris-oners." 429 U.S. 97, 104–05 (1976). As it has evolved in the years since *Estelle*, a deliberate-indifference claim has come to entail both an objective and a subjective component. *See Keohane v. Florida Dep't of Corr. Sec'y*, 952 F.3d 1257, 1266 (11th Cir. 2020). As an initial matter, the plaintiff-inmate must establish an "objectively serious medical need." *Id.* It is undisputed, as relevant here, that an un-medicated seizure disorder satisfies that objective threshold.

A deliberate-indifference claim's subjective component en-tails three subparts: The plaintiff must prove that the defendant (1) actually knew about a risk of serious harm; (2) disregarded that risk; and (3) acted with more than _____ negligence. *See Hoffer v. Secretary, Fla. Dep't of Corr.*, 973 F.3d 1263, 1270 (11th Cir. 2020). To

be clear, the blank in our paraphrase is intentional. For more than 25 years now, our case law regarding a deliberate-indifference claim's mens rea element has been hopelessly confused, resulting in what we'll charitably call a "mess." We've tried to clean up that mess at least twice, but seemingly to no avail, as panels continue to flip-flop between two competing formulations: "more than *mere* negligence" and "more than *gross* negligence." We find it necessary to address the mens rea issue once again—this time, we hope more definitively—because, as it turns out, the standard is dispositive with respect to two of our defendants.

In the discussion that follows, we will explain the dissonance in our precedent and our resolution of it, and then, having done so, apply the governing deliberate-indifference standard to each of our five defendants.

## A

The confusion in our case law arose in the wake of the Supreme Court's decision in *Farmer v. Brennan*, 511 U.S. 825 (1994). *Farmer* was a successor to *Estelle* and, for the first time, set out to explain the term "deliberate indifference." *Id*. at 829. In particular, the *Farmer* Court said that "[w]hile *Estelle* establishes that deliberate indifference entails something more than mere negligence, the cases are also clear that it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id*. at 835. The Court thus likened deliberate indifference to "subjective recklessness as used in the criminal law." *Id*. at 839.

Our post-*Farmer* decisions are a jumble, with different panels adopting one of two different mens rea standards at different times. On the one hand, some have interpreted *Estelle* and *Farmer* to require a deliberate-indifference plaintiff to show only that the defendant acted with "more than **mere** negligence." *See, e.g.*, *Adams v. Poag*, 61 F.3d 1537, 1543 (11th Cir. 1995); *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999); *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004); *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1307 (11th Cir. 2009); *Bingham v. Thomas*, 654 F.3d 1171, 1176 (11th Cir. 2011); *Jackson v. West*, 787 F.3d 1345, 1353 (11th Cir. 2015); *Melton v. Abston*, 841 F.3d 1207, 1223 (11th Cir. 2016); *Mitchell v. Nobles*, 873 F.3d 869, 876 (11th Cir. 2017); *Swain v. Junior*, 961 F.3d 1276, 1285 (11th Cir. 2020); *Keohane*, 952 F.3d at 1266.  On the other hand, just as many (if not more) of our opinions have said that a deliberate-indifference plaintiff must prove that the defendant acted with "more than **gross** negligence." *See, e.g.*, *Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir. 1996); *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005); *Burnette v. Taylor*, 533 F.3d 1325, 1330 (11th Cir. 2008); *Townsend v. Jefferson Cnty.*, 601 F.3d 1152, 1158 (11th Cir. 2010); *Harper v. Lawrence Cnty.*, 592 F.3d 1227, 1234 (11th Cir. 2010); *Youmans v. Gagnon*, 626 F.3d 557, 564 (11th Cir. 2010); *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1317 (11th Cir. 2010); *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 344 (11th Cir. 2012); *Goodman v. Kimbrough*, 718 F.3d 1325, 1332 (11th Cir. 2013); *Keith v. DeKalb Cnty.*, 749 F.3d 1034, 1047 (11th Cir. 2014); *Valderrama v. Rousseau*, 780 F.3d 1108, 1116 (11th Cir. 2015); *Patel v. Lanier Cnty.*, 969 F.3d 1173, 1188 (11th Cir. 2020); *Hoffer*, 973 F.3d at 1270; *Wade v. Daniels*, 36 F.4th 1318, 1326

(11th Cir. 2022); *Ireland v. Prummell*, 53 F.4th 1274, 1293 (11th Cir. 2022).  As the dates in our string cites attest, we have pitched back and forth—and back and forth and back and forth—between the "more than mere negligence" and "more than gross negligence" standards for the better part of the last three decades.

As already noted, on at least two separate occasions, panels of this Court have squarely confronted the mere-vs.-gross issue and attempted to set circuit law straight.  First, in 2010, the panel in *Townsend v. Jefferson County* expressly adopted the "more than gross negligence" standard.  A deliberate-indifference plaintiff, it held, must prove, among other things, that the defendant engaged in conduct that amounted to "more than [gross] negligence."  601 F.3d at 1158 (alteration in original).[2]  In doing so, the *Townsend* panel acknowledged that some opinions had "occasionally stated, in dicta, that a claim of deliberate indifference requires proof of 'more than mere negligence,'" citing for that proposition *McElligott v. Foley*, 182 F.3d at 1255.  *Townsend*, 601 F.3d at 1158.  Importantly, though, the *Townsend* panel concluded that the "earlier holding in *Cottrell* [*v. Caldwell*], 85 F.3d at 1490, made clear that, after *Farmer v. Brennan*, 511 U.S. 825, 114 S. Ct. 1970, 128 L.E. 2d 811 (1994), a claim

---

[2] To be clear, the *Townsend* panel didn't insert the word "gross" into its recitation of the governing standard.  Rather, it quoted *Bozeman v. Orum*, 422 F.3d at 1272, which in turn quoted *Brown v. Johnson*, 387 F.3d at 1351, but substituted the word "gross" for *Brown's* "mere" on the ground that the decisions in *Miller v. King*, 384 F.3d 1248, 1261 (11th Cir. 2004), and *Cottrell v. Caldwell*, 85 F.3d at 1491, had recognized that "after [*Farmer*], gross negligence fails to satisfy [the] state-of-mind requirement for deliberate indifference."  *Bozeman*, 422 F.3d at 1272.

of deliberate indifference requires proof of more than gross negligence." *Id.*

Notwithstanding *Townsend*'s embrace of *Cottrell* and the "more than gross negligence" standard, within a few years some panels reverted to the "more than mere negligence" formulation. *See, e.g.*, *Bingham*, 654 F.3d at 1176; *West*, 787 F.3d at 1353. So in 2016, another three-judge panel re-engaged the mere-vs.-gross issue. In *Melton v. Abston*, the panel held that "[a] plaintiff claiming deliberate indifference to a serious medical need must prove," *inter alia*, that the defendant engaged in conduct that amounted to "more than *mere* negligence." 841 F.3d at 1223 (emphasis added). The *Melton* panel acknowledged *Townsend*'s earlier conclusion that "under [*Cottrell*] and [*Farmer*], 'a claim of deliberate indifference requires proof of more than gross negligence.'" *Id.* at 1223 n.2 (quoting *Townsend*, 601 F.3d at 1158). But the *Melton* panel "disagree[d]" with *Townsend* "for three main reasons." *Id.* First, the *Melton* panel expressed the view that "the 'more than mere negligence' standard in *McElligott*" was "more consistent with *Farmer* than the 'more than gross negligence' standard in *Townsend*." *Id.* Second, and relatedly, it observed that the phrase "more than gross negligence" didn't appear (at least in so many words) in either *Cottrell* or *Farmer*. *Id.* And finally, the *Melton* panel said that *Cottrell*'s adoption of the "more than gross negligence" standard came only in dicta: "[T]he panel in *Cottrell*," it said, "found no deliberate indifference where the plaintiff failed to prove 'the subjective intent element prescribed in *Farmer*,' and therefore, did not reach whether *Farmer* requires 'more than mere negligence' or 'more than gross negligence.'" *Id.*

(quoting *Cottrell*, 85 F.3d at 1491–92). Accordingly, the *Melton* panel held that the 1999 decision in *McElligott*—rather than the 1996 decision in *Cottrell*—was the "earliest Eleventh Circuit case after *Farmer* to directly address" the mens rea issue, that the *McElligott* panel's determination of the mens rea issue was not dicta, as *Townsend* had said, and, therefore, that the "more than mere negligence" standard controlled. *Id.*

What to do with *Townsend*'s and *Melton*'s dueling attempts to answer the mere-vs.-gross question? The short answer is that our prior-panel-precedent rule binds us to *Townsend*'s earlier resolution. "When there is no method for reconciling an intracircuit conflict of authority"—as there isn't here, given the *Melton* panel's explicit "disagree[ment]" with and rejection of *Townsend*—"the earliest panel opinion resolving the issue in question binds this circuit until the court resolves the issue en banc." *United States v. Dailey*, 24 F.3d 1323, 1327 (11th Cir. 1994) (quoting *Clark v. Housing Auth. of Alma*, 971 F.2d 723, 726 n.4 (11th Cir. 1992)); *see also United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008) (emphasizing "the strength of the prior panel precedent rule in this circuit").[3]

---

[3] To be clear, the "issue in question" with respect to which we apply the prior-panel-precedent-rule here, *see Dailey*, 24 F.3d at 1327 (quoting *Clark*, 971 F.2d at 726 n.4), isn't whether "more than mere negligence" or "more than gross negligence" is the proper mens rea standard as an initial matter. If that were the proper object of our prior-panel-precedent-rule inquiry, then we would seek out the "earliest panel opinion" addressing that issue, whatever that opinion might be. *Id.* But that's not our task; rather, the prior-panel-precedent issue that we confront *now*, in the wake of *Townsend* and *Melton*, is which of those two previous efforts to clarify circuit law controls our decision. *Cf.*

To summarize the key points about *Townsend* and *Melton*:  In 2010, *Townsend* held that our then-existing decisions could be read consistently (and in any event were best read) to impose a "more than gross negligence" standard.  In particular, *Townsend* held (1) that the existing decisions did not embody conflicting holdings on the mere-vs.-gross issue, (2) that *McElligott*'s adoption of the "more than mere negligence" standard was mere "dicta," and (3) that the "earlier holding" in *Cottrell* was clear that the "more than gross negligence" standard applied.  *Townsend*, 601 F.3d at 1158.  Six years later, the *Melton* panel expressly "disagree[d] with" *Townsend* on the grounds (1) that in fact (and contra *Townsend*) there *was* a split in our cases that required resolving, (2) that in fact (and contra *Townsend*) *Cottrell* had *not* "h[eld]" that a "more than gross negligence" standard applied, and (3) that in fact (and contra *Townsend*) *McElligott*'s adoption of the "more than mere negligence" standard was not just "dicta" but instead a binding holding.

With all due respect to the *Melton* panel, under our prior-panel-precedent rule, it had no authority to "disagree with" *Townsend*—either *Townsend*'s treatment of *McElligott* as "dicta," its treatment of *Cottrell* as a "holding," or its resulting conclusion that circuit precedent, properly understood, embraces a "more than gross

---

*Offshore of the Palm Beaches, Inc. v. Lynch*, 741 F.3d 1251, 1256–57 (11th Cir. 2014) (applying the prior-panel-precedent rule not to the first case to decide the underlying question—there, whether the court had appellate jurisdiction over interlocutory admiralty-related orders under 28 U.S.C. § 1292(a)(1)—but, rather, to the first of several conflicting cases to determine whether an intervening Supreme Court decision had abrogated contrary circuit precedent).

negligence" mens rea standard. We too are bound by *Townsend*. Whatever we might think about the confusion surrounding the mens rea issue or its resolution, *Townsend* settled matters by embracing *Cottrell* and the "more than gross negligence" standard. The *Melton* panel was powerless to decide otherwise, and so are we.[4]

Filling in the blank, then: To make out the subjective component of an Eighth Amendment deliberate-indifference claim, a plaintiff must establish that the defendant (1) had subjective knowledge of a risk of serious harm, (2) disregarded that risk, and (3) acted with more than ***gross*** negligence.

**B**

Having resolved the standard that governs our analysis, we now proceed to apply it to each of our five defendants.

**1**

We consider the corrections officers first. Our analysis of Wade's claim against Lieutenant Stroh is straightforward, as it founders on the subjective component's first subpart: Lieutenant Stroh didn't have "subjective knowledge of a risk of serious harm."

---

[4] Were the rule otherwise—such that any panel was free to re-decide what it thought the first-in-time case *actually* was, even in the face of intervening decisions resolving that very issue—there could, by definition, be no closure. Every day would be a new day. That is precisely the situation that our prior-panel-precedent rule is designed to prevent.

*Hoffer*, 973 F.3d at 1270.[5]  "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842.  Here, Lieutenant Stroh testified—without contradiction—that he didn't "have a sense of urgency" about Henegar's missing Dilantin because (1) he had a son with epilepsy and (2) his son could miss doses of his seizure medication without incident.  So while Lieutenant Stroh acknowledged that he knew that an unmedicated seizure disorder constituted a serious health risk, he didn't know that missing medication for just a few days could *produce* that risk.  Because he lacked the requisite subjective knowledge, Lieutenant Stroh was not deliberately indifferent to Henegar's medical needs, and the district court correctly granted him summary judgment.

Next, Sergeant Keith.  It's undisputed that Sergeant Keith made MAR notations on the first and fourth nights that Henegar missed his Dilantin, a fact from which one could reasonably (if uncharitably) infer that he had a subjective awareness of a serious risk to Henegar's health.  Construing the facts in Wade's favor vis-à-vis Sergeant Keith, one could also reasonably infer that he had been

---

[5] Although Lieutenant Stroh was Sergeant Keith's supervisor, "[i]t is well established in this circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (internal quotation and citation omitted).  Accordingly, our review is limited to the question whether Lieutenant Stroh *himself* exhibited deliberate indifference to Henegar's serious medical needs.

trained not only to convey medication-administration problems through MAR notations, but also to communicate them directly to nurses. All agree that Sergeant Keith made notations in Henegar's MAR in an attempt to signal problems with administering his Dilantin and that he believed (even if incorrectly) that the nurses generally reviewed MAR notations. The defendants dispute among themselves, though, whether Sergeant Keith ever told a nurse. Construing the facts in the light most favorable to Wade—again, vis-à-vis Sergeant Keith—we must assume that he never verbally told a nurse about the problem as he had been told to do. Based on the facts as thus understood, we conclude that Wade has shown not only that Sergeant Keith was subjectively aware of a risk of serious harm but also that he at least partially disregarded that risk. *Hoffer*, 973 F.3d at 1270.

But was he more than grossly negligent? We hold, especially in light of his attempt to communicate with the prison's medical staff through notations in Henegar's MAR, that he was not. In *Cottrell*, we described the "more than gross negligence" standard as "'the equivalent of recklessly disregarding' a substantial risk of serious harm to the inmate." *Cottrell*, 85 F.3d at 1490–91 (quoting *Farmer*, 511 U.S. at 836). Sergeant Keith's partial disregard of (what we will assume to be) his training doesn't satisfy that high standard. Accordingly, the district court correctly granted him summary judgment.

**2**

Nurses Harrell and Lee are closer calls. The subjective prong's first subpart is pretty easily satisfied. Circumstantial evidence, which *Farmer* says we may consider and from which we may draw reasonable inferences, indicates that both knew that Henegar wasn't getting his Dilantin, and we may further assume that, as medical professionals, both knew that he faced a risk of serious harm.

Nurse Harrell, in particular, doesn't dispute either that she staffed the daytime pill calls on three of the four days that Henegar missed his medication or that he attended at least one daytime pill call during those days. She also admits that she inventoried the pill cart at least once during those days—on either Monday, August 29, or Wednesday, August 31—and that an unusual post-it note had been attached to and was protruding from Henegar's MAR during that period. Beyond her conclusory testimony, Nurse Harrell has done nothing to demonstrate that she was unaware of the serious risk that Henegar faced.

So, too, with respect to Nurse Lee. We must assume that she was supposed to check the previous night's MARs to determine whether there were problems with administering an inmate's medications. And taking the facts in the light most favorable to Wade vis-à-vis Nurse Lee, we must also assume that Sergeant Keith actually told her early on Monday that Henegar was missing his medication.

Construing the facts in Wade's favor, we further conclude that Nurses Harrell and Lee "disregarded th[e] risk" of a serious health concern. *Hoffer*, 973 F.3d at 1270. The parties agree that they knew about the backup Dilantin supply, had access to it, and had the ability to order medications from either the prison-system pharmacy or a local pharmacy. And yet no one suggests that either attempted to order or obtain backup Dilantin for Henegar. Based on the totality of the circumstances, we can reasonably infer not only that both knew Henegar was out of Dilantin, but also that at least one of them—and perhaps both—did little to remedy the situation. Henegar testified that when he told the daytime-pill-call nurse that he was out—he couldn't remember who it was—she simply responded that his Dilantin was "on order" from the prison system's pharmacy. And Sergeant Keith, of course, said that Nurse Lee responded the same way—that the medicine was "on order"— when he told her that Henegar's Dilantin had run out.

Even so, we hold that both Nurses Harrell and Lee are entitled to summary judgment because their conduct was not more than grossly negligent. The nurses' responses—replying that Henegar's Dilantin was "on order" rather than obtaining a substitute dose from the supply closet or a local pharmacy—was regrettable, and we think it was likely more than *merely* negligent. But it is axiomatic that simple medical malpractice does not rise to the level of a constitutional violation. *Estelle*, 429 U.S. at 106. If (as we assume for present purposes) Nurses Harrell and Lee were told verbally that Henegar was missing his Dilantin, the facts show that they both checked to ensure that it would be arriving soon and

reported that it was "on order." We cannot say that their actions in that respect constitute the sort of "reckless[ ] disregard[ ]" that we have held characterizes conduct that is more than grossly negligent. *Cottrell*, 85 F.3d at 1490–91; *see also Poag*, 61 F.3d at 1543 (stating, even in what appears to be a "more than mere negligence" case, that "it is obduracy and wantonness, not inadvertence or error in good faith, that violates the Eighth Amendment in supplying medical needs" (alteration in original) (internal quotations omitted) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986))).

Our decisions imposing deliberate-indifference liability have typically involved egregious circumstances, often involving prison officials denying inmates medication for no reason at all. Nothing like that happened here. *See Goebert v. Lee Cnty.*, 510 F.3d 1312, 1330 (11th Cir. 2007) (applying a more-than-gross-negligence standard and observing that "an official acts with deliberate indifference when he intentionally delays providing an inmate with access to medical treatment, knowing that the inmate has a life-threatening condition or an urgent medical condition that would be exacerbated by delay" (quoting *Lancaster v. Monroe Cnty.*, 116 F.3d 1419, 1425 (11th Cir. 1997))). *Compare, e.g., Lawrence Cnty.*, 592 F.3d at 1234–35 (holding that the complaint plausibly alleged that prison officials were more than grossly negligent when they failed to treat an alcoholic suffering from severe withdrawal and obvious delirium for four days until he eventually died), *with, e.g., Burnette*, 533 F.3d at 1328–31 (holding that officers were *not* more than grossly negligent when they failed to obtain medical attention for a lucid

arrestee who had "glassy eyes and dilated pupils" and died hours later of an overdose).

Because neither Nurse Harrell nor Nurse Lee was more than grossly negligent, neither exhibited deliberate indifference to Henegar's medical needs. The district court properly granted them summary judgment.

**3**

Wade's claim against Nurse McDade is different in that it names her in her supervisory capacity. Where, as here, there is no allegation that a supervisor "personally participated" in any wrong-doing, she can be held liable only if she "instigated or adopted a policy that violated [the plaintiff's] constitutional rights." *Poag*, 61 F.3d at 1544. We have emphasized that "[t]he standard by which a supervisor is held liable in her individual capacity for the actions of a subordinate is extremely rigorous." *Braddy v. Florida Dep't of Lab. & Emp. Sec.*, 133 F.3d 797, 802 (11th Cir. 1998).

Policy-based supervisory liability can result either where a challenged policy is unconstitutional on its face or where it is implemented in an unconstitutional manner. *See Goebert*, 510 F.3d at 1332. To succeed on an implementation-based challenge, a plaintiff must show, among other things, that the supervisor "had actual or constructive notice of a flagrant, persistent pattern of violations." *Id.*

Wade challenges two of Nurse McDade's policies. First, she targets the MAR policy. Nurse McDade, of course, insists that she trained the officers to call a nurse immediately if a problem arose

dispensing an inmate's medication; Lieutenant Stroh and Sergeant Keith deny that she did so.  Construing the facts in the light most favorable to Wade vis-à-vis Nurse McDade, we will assume that she didn't train the officers to contact a nurse if they encountered medication-related issues and that her system relied entirely on MAR notifications.  Even so, an MAR-only policy—while not ideal—is not deliberately indifferent on its face.  It would not, as Wade asserts, necessarily "fail[ ] to ensure that Lieutenant Stroh and Sergeant Keith had an effective mechanism to communicate with medical at times when there were no medical staff on duty." Br. of Appellant at 30–31; *see Goebert*, 510 F.3d at 1332 (holding that a "policy of not permitting inmates to lie down at their leisure during the daytime" was "certainly [ ] not facially unconstitutional" in a case involving a pregnant woman who, when denied an exemption, suffered a miscarriage).  That is especially true given the undisputed fact that there was a medical staff member on call.

Second, Wade alleges that Nurse McDade was deliberately indifferent for "failing to properly ensure her subordinates, Nurses Lee and Harrell, searched the MARs daily for communications from security, or otherwise check to be sure all medications were on the pill cart."  Br. of Appellant at 31.  To the extent that Wade assails that policy on its face, her challenge fails.  It was not facially deliberately indifferent for Nurse McDade to expect subordinates to check MARs daily without looking over their shoulders, especially given that she had established an elaborate system of ordering, cross-checking, and inventorying the pill cart to ensure that each inmate received his medicine.  *Cf. Goebert*, 510 F.3d at 1332.

We likewise reject any implementation-based challenge, although doing so requires a bit more explanation.  For implementation-related deliberate-indifference claims,

> [w]e apply a three-prong test to determine a supervisor's liability: (1) whether the supervisor's failure to adequately train and supervise subordinates constituted deliberate indifference to an inmate's medical needs; (2) whether a reasonable person in the supervisor's position would understand that the failure to train and supervise constituted deliberate indifference; and (3) whether the supervisor's conduct was causally related to the subordinate's constitutional violation.

*Poag*, 61 F.3d at 1544.  Here, for reasons we will explain, Wade cannot meet the third, causation element; accordingly, her challenge fails.

For our purposes, a causal connection is shown when: (1) "a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so"; (2) "a supervisor's custom or policy . . . results in deliberate indifference to constitutional rights"; or (3) "facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003), *abrogated in part on other grounds by Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010) (alteration accepted) (internal

citations and quotations omitted).  None of those requirements is
satisfied here.

First, Wade hasn't alleged any facts to indicate that there
was a "history of widespread abuse" sufficient to put Nurse
McDade on "actual or constructive notice of a flagrant, persistent
pattern of violations." *Goebert*, 510 F.3d at 1332.  It is undisputed
(1) that Henegar's condition was well-controlled before the inci-
dent that underlies this case and (2) that he received his medication
regularly thereafter until his release.  And Wade has pointed to no
evidence of a pattern of similar violations with respect to other in-
mates, either.  *See* Reply Br. of Appellant at 19 ("[T]hose cases in-
volve allegations of widespread patterns of policy violation, which
is not an issue here.").

Second, and for similar reasons, there is no evidence that a
policy of trusting subordinates to monitor the MARs and manage
the pill cart generally "results in deliberate indifference to constitu-
tional rights." *Cottone*, 326 F.3d at 1360.  Lieutenant Stroh testified
that in 23 years at the prison, it was not "typical" for medication to
be missing, McDade testified that no comparable situation had ever
occurred, and Wade has alleged no facts to the contrary.  Though
failing to double-check subordinates' work might open cracks in
the system to accidents and oversights, "[m]edical malpractice does
not become a constitutional violation merely because the victim is
a prisoner." *Estelle*, 429 U.S. at 106.  *Compare, e.g., Doe v. School Bd.
of Broward Cnty., Fla.*, 604 F.3d 1248, 1266 (11th Cir. 2010) (holding
that allegations that supervisors had been aware of "two instances

of sexual harassment" were insufficient to "show the requisite causal connection" for deliberate-indifference purposes), *with, e.g.,* *Valdes v. Crosby*, 450 F.3d 1231, 1243–44 (11th Cir. 2006) (holding that a prison warden was deliberately indifferent when he had received at least 13 complaints and inquiries in 13 months before the plaintiff's son's death at the hands of prison guards).

Finally, there have been no allegations that Nurse McDade directed subordinates to act unlawfully or knew that subordinates would do so and failed to stop them. At worst, perhaps she should have assumed that mistakes might occur if she didn't review nurses' work on the MARs. That is not enough.

### III

We echo the district court's lament that the defendants' "careless actions and their systemic communication failures caused Mr. Henegar serious suffering" and "irreparably altered his life." And we reiterate that "while engaged in the business of prison medicine"—no less so than on the outside, so to speak—"the essential command of the Hippocratic Oath is 'first, do no harm.'" Even so, the bar to proving an Eighth Amendment deliberate-indifference claim is appropriately high, and we conclude that Wade hasn't met it. We therefore affirm the district court's order granting all five defendants summary judgment.

**AFFIRMED.**

21-14275                Newsom, J., Concurring                1

N<small>EWSOM</small>, Circuit Judge, concurring:

As the majority opinion explains, our precedent has for years bobbed and weaved between two competing views regarding the mens rea that underlies an Eighth Amendment deliberate-indifference claim:  Must an inmate prove that the prison official whose conduct he challenges acted with "more than *gross* negligence," or is it enough to show "more than *mere* negligence"?  Applying our prior-panel-precedent rule, the Court holds today—correctly, under existing law—that the former, "more than gross negligence" standard governs.  *See* Maj. Op. at 13–19.

I'd like to explore a more foundational question:  Is *any* negligence-based standard consistent with the plain language and original understanding of the Eighth Amendment, which by its terms applies only to "punishments"?  The answer, I think, is pretty clearly no.  Just as a parent can't accidentally punish his or her child, a prison official can't accidentally—or even recklessly—"punish[]" an inmate.

## I

The Eighth Amendment states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII.  To my mind, it is fairly well-established that, as originally understood, the Amendment's Cruel and Unusual Punishments Clause prohibited only certain particularly objectionable methods of punishment imposed in conjunction with a criminal defendant's judgment of conviction.  It did not, for instance, entail a proportionality principle that

empowered judges to determine that a particular penalty was excessive in relation to a particular crime, nor did it purport to regulate the conditions of a prisoner's confinement.  I won't reinvent the wheel; I'll simply say that I find myself persuaded by Justice Scalia's thorough analysis in *Harmelin v. Michigan*, 501 U.S. 957, 961–85 (1991) (Scalia, J.); *see also, e.g.*, Anthony F. Granucci, *Nor Cruel and Unusual Punishments Inflicted: The Original Meaning*, 57 Calif. L. Rev. 839 *passim* (1969).  Be that as it may, the Supreme Court has moved on.  It has read the Clause more broadly, not only to embrace a proportionality criterion, *see Gregg v. Georgia*, 428 U.S. 153, 172 (1976), but also to "appl[y] to some deprivations that were not specifically part of the sentence but were suffered during imprisonment," *see Wilson v. Seiter*, 501 U.S. 294, 297 (1991), and, even more generally, to embody a fuzzy, eye-of-the-beholder "evolving standards of decency" criterion, *see Trop v. Dulles*, 356 U.S. 86, 101 (1958) (plurality opinion).

It remains the case, though, that the Eighth Amendment, by its plain terms, applies only to "punishments."  And whatever the proper understanding of the phrase-of-art "cruel and unusual punishments," the word "punishment[]" had—and has—a settled meaning.  Samuel Johnson's 1785 English dictionary, for instance, defined it as "[a]ny infliction or pain imposed in vengeance of a crime."  2 Samuel Johnson, *Dictionary of the English Language* 424 (6th ed. 1785).  And nearly two centuries later, Americans were still using the term in fundamentally the same way to mean a "[p]enalty [or a] retributive suffering, pain, or loss."  *Punishment*, Webster's New International Dictionary (2d ed. 1934).  It seems plain to me

21-14275          Newsom, J., Concurring          3

that both of those definitions—and others like them—denote an element of intentionality. And that seems all the more plain in the specific context of the Eighth Amendment, which addresses not just "punishments" simpliciter, but their "infliction," a term that likewise indicates purposeful, directed conduct. *See* 1 Samuel Johnson, *Dictionary of the English Language* 1040 (6th ed. 1785) (defining "inflict" to mean "[t]o put in act or impose as punishment"); *accord* Noah Webster, *An American Dictionary of the English Language* 444 (1828) ("Inflict, *verb transitive*: To lay on; to throw or send on; to apply; as, to *inflict* pain or disgrace; to *inflict* punishment on an offender.").

        To be clear, I'm hardly the first person to make this observation about the Cruel and Unusual Punishments Clause's text. Writing for the Second Circuit in *Johnson v. Glick*, Judge Friendly emphasized that "[t]he thread common to all [Eighth Amendment] cases is that 'punishment' has been deliberately administered for a penal or disciplinary purpose." 481 F.2d 1028, 1032 (2d Cir. 1973). Even more directly to the point, Judge Posner has explained, pointing to what he called "normal meaning[]," that "[t]he infliction of punishment is a deliberate act intended to chastise or deter." *Duckworth v. Franzen*, 780 F.2d 645, 651–52 (7th Cir. 1985). "That," he correctly said, "is what the word means today; it is what it meant in the eighteenth century." *Id*. at 652 (citing Samuel Johnson, *Dictionary of the English Language* (1755)). And Justice Scalia, writing for the Supreme Court in *Wilson v. Seiter*—citing and quoting, among others, Judges Friendly's and Posner's observations and adding his own emphasis for good measure—indicated that the Eighth

Amendment entails an "intent requirement" and clarified that "[t]he source of t[hat] requirement is not the predilections of this Court, but the Eighth Amendment itself, which bans only cruel and unusual *punishment*." 501 U.S. at 300 (emphasis in original).[1]

The undeniable linguistic fact that the term "punishment" entails an intentionality element would seem to preclude *any* legal standard that imposes Eighth Amendment liability for unintentional conduct, no matter how negligent—whether it be only "mere[ly]" so or even "gross[ly]" so. Negligence and recklessness, after all, are expressly defined *in contradistinction to* intentional conduct. *See, e.g.*, *Negligence*, Black's Law Dictionary (10th ed. 2015) ("[A]ny conduct that falls below the legal standard established to protect others against unreasonable risk of harm, *except for conduct that is intentionally, wantonly, or willfully disregardful of others' rights*." (emphasis added)); *Recklessness*, *id*. ("Recklessness involves a

---

[1] Tellingly, even those who contend that the constitutional term "cruel" should be understood by reference to a punishment's effect on the punished, rather than to the punisher's particular motivation, acknowledge my fundamental point—that, by definition, "all punishment involves intent." John F. Stinneford, *The Original Meaning of "Cruel"*, 105 Geo. L.J. 441, 479 (2017). They admit that under "the Eighth Amendment's intent requirement," "[t]o violate the Cruel and Unusual Punishments Clause, some government official must intend to punish"; they just deny that the Clause requires the further proof that the official "intend[ed] to punish cruelly." *Id*. at 493. *Accord, e.g.*, John F. Stinneford, *Is Solitary Confinement a Punishment?*, 115 Nw. L. Rev. 9, 17 (2020) (reviewing historical and modern definitions of "punishment" and concluding that the term "involves intent to inflict pain or suffering, [just] not necessarily culpable intent").

greater degree of fault than negligence *but a lesser degree of fault than intentional wrongdoing.*" (emphasis added)).

So on a plain reading, the Cruel and Unusual Punishments Clause applies *only* to penalties that are imposed intentionally and purposefully.

## II

How is it, then, that we find ourselves debating which of two negligence-based standards governs a particular species of Eighth Amendment claim? When and where did things go so wrong? It started innocently enough, with *Estelle v. Gamble*, 429 U.S. 97 (1976), in which the Supreme Court minted what it dubbed (and we still call) a "deliberate indifference" claim under the Eighth Amendment. There, the Court was *pretty* good about minding the line between intentional and negligent conduct—but it sowed seeds that would later flower into a clean break from the text's intentionality criterion. On the one hand, the *Estelle* Court made clear that ordinary negligence does not constitute "punishment" within the meaning of the Eighth Amendment: Neither "[a]n accident" nor "an inadvertent failure to provide adequate medical care," it said— even one that would give rise to a "medical malpractice" claim— crosses the constitutional line. *Id*. at 105–06. And, in fact, in describing the types of conduct that could "manifest" sufficiently culpable conduct, the Court twice adverted to purposeful actions: prison guards "*intentionally* denying or delaying access to medical care or *intentionally* interfering with the treatment once prescribed." *Id*. at 104–05 (emphasis added). On the other hand,

though, the Court also repeated language from its "evolving stand-ards of decency" line of decisions asserting that the "unnecessary and *wanton* infliction of pain" could give rise to an Eighth Amend-ment claim. *Id*. at 103 (emphasis added) (quoting *Gregg*, 428 U.S. at 173). "Wanton"-ness is a heightened mental state, to be sure, but it is *not* the same thing as intent or purpose.

Next came *Wilson v. Seiter*, to which I've already referred. Re-spectfully, *Wilson* is an odd opinion. The question there was whether an ordinary conditions-of-confinement claim should be decided under *Estelle*'s "deliberate indifference" standard, whatever its precise parameters—or instead under a higher standard that ap-plies when "officials act in response to a prison disturbance," in which the complaining inmate must prove that officers acted "ma-liciously and sadistically for the very purpose of causing harm." 501 U.S. at 302 (quoting *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)). In the course of its opinion, the Court nodded strongly toward a true intentionality criterion. As already noted, the Court stated that the source of what it called "the intent requirement" was "the Eighth Amendment itself, which bans only cruel and un-usual *punishment*," *id*. at 300, and went on to quote favorably Judge Posner's definition of the term "punishment" as "a deliberate act intended to chastise or deter," as well as Judge Friendly's observa-tion that "punishment" is "deliberately administered for a penal or disciplinary purpose," *id*. (quoting *Duckworth*, 780 F.2d at 652, and *Glick*, 481 F.2d at 1032, respectively).

Strangely, though, having made the case—and a convincing one—that "[a]n intent requirement is . . . implicit in the word 'punishment,'" *id*. at 301, the *Wilson* Court then pivoted, in the second part of its opinion, to decide what it (somewhat inconsistently) presented as an open question: "[I]t remains for us to consider what state of mind applies in cases challenging prison conditions" as violative of the Eighth Amendment. *Id*. at 302. And in answer to that question, the Court deferred to language in its earlier decisions (including *Estelle*) rather than the language of the Constitution itself: "[O]ur cases say that the offending conduct must be *wanton*." *Id*. (emphasis in original). In particular, the *Wilson* Court said that the form of wantonness to which *Estelle* had adverted was sufficient: In the ordinary prison-conditions "context, as *Estelle* held, 'deliberate indifference' would constitute wantonness." *Id*.

Lastly—in the Supreme Court, anyway—came *Farmer v. Brennan*, 511 U.S. 825 (1994). There, the Court set out to specify "the proper test for deliberate indifference," as adopted in *Estelle* and seconded in *Wilson*. *Id*. at 834. Canvassing its earlier decisions, the Court opted for a standard "lying somewhere between the poles of negligence at one end and purpose or knowledge at the other," settling on one that it loosely called "recklessness." *Id*. at 836. More precisely, the Court embraced a *criminal*-recklessness standard, which, it explained, requires a complaining prisoner to prove that the prison official whose conduct he challenges subjectively "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *Id*. at 837. In justifying its choice, the Court briefly adverted to the Eighth Amendment's language, noting that

it "does not outlaw cruel and unusual 'conditions'" but only "cruel and unusual 'punishments.'" *Id*. It never explained, though, how even a criminal-recklessness standard followed from the text itself. Rather, the most the Court could muster was that "subjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause *as interpreted in our cases*"—that is, as glossed in decisions like *Estelle* and *Wilson*. *Id*. at 839–40 (emphasis added). Having said so, the *Farmer* Court "adopt[ed]" criminal recklessness "as the test for 'deliberate indifference' under the Eighth Amendment." *Id*. at 840.

With *Farmer*, the retreat from the Eighth Amendment's "punishment" requirement—and the intentionality criterion that it indicates—was complete. And our own post-*Farmer* decisions have only widened the gap between text and doctrine. As today's majority opinion explains, at times we have stated that a deliberate-indifference plaintiff need only prove that an official acted with a mental state of "more than mere negligence." *See, e.g.*, *Melton v. Abston*, 841 F.3d 1207, 1223 n.2 (11th Cir. 2016). At others, we've insisted that a plaintiff prove a mens rea of "more than gross negligence." *Townsend v. Jefferson Cnty.*, 601 F.3d 1152, 1158 (11th Cir. 2010). Notably, even the higher gross-negligence standard seems to set a lower bar than *Farmer*'s criminal-recklessness criterion. *See Farmer*, 511 U.S. at 837 (rejecting a standard grounded in recklessness as used in civil tort law). And in any event, neither of our competing negligence-based standards—whether "mere" or "gross"—has any foundation in, or even connection to, the Eighth

21-14275                 Newsom, J., Concurring                 9

Amendment's "punishment" requirement, which, as a matter of both language and logic, demands proof of intentionality.

## III

Maybe it makes sense to hold prison officials liable for negligently or recklessly denying inmates appropriate medical care. Maybe not. But any such liability, should we choose to recognize it, must find a home somewhere other than the Eighth Amendment. We—by which I mean the courts generally—have been ignoring that provision's text long enough. Whether we like it or not, the Cruel and Unusual Punishments Clause applies, as its moniker suggests, only to "punishments." And whether we like it or not, "punishment[]" occurs only when a government official acts intentionally and with a specific purpose to discipline or deter.