No. 21-14275

In the

# United States Court of Appeals
## for the Eleventh Circuit

Betty Wade, as representative of the Estate of David Henegar,

*Plaintiff-Appellant,*

v.

Georgia Correctional Health, LLC, et al.,

*Defendant-Appellees.*

On Appeal from the United States District Court for the
Northern District of Georgia, Rome Division.
No. 4:18-cv-192-AT — Amy Totenberg, *Judge*

## *EN BANC* BRIEF OF DEFENDANT-APPELLEES HARRELL, KEITH, LEE, AND STROH

Loretta L. Pinkston-Pope
*Deputy Attorney General*

Laura L. Lones
*Senior Asst. Attorney General*

Christopher M. Carr
*Attorney General of Georgia*

Stephen J. Petrany
*Solicitor General*

Justin T. Golart
*Deputy Solicitor General*

Zachary A. Mullinax
*Asst. Attorney General*

Office of the Georgia
Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov
*Counsel for Defendant-Appellees*

*Wade v. Ga. Corr. Health*, No. 21-14275

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

I hereby certify that the following persons and entities may have an interest in the outcome of this appeal:

Applebaum, Eve, Counsel for Defendant-Appellee Cindy McDade

Applebaum, Henefield & Green, P.C., Counsel for Defendant-Appellee Cindy McDade

Art, Steven, Counsel for Plaintiff-Appellant

Brady, Rachel, Counsel for Plaintiff-Appellant

Carr, Christopher M., Attorney General, Counsel for Defendant-Appellees

Chalmers, Roger A., Senior Assistant Attorney General, Counsel for Defendant-Appellees

Elgron, Inc., Counsel for Plaintiff-Appellant

Estate of David Henegar, Plaintiff-Appellant

Golart, Justin T., Deputy Solicitor General, Counsel for Defendant-Appellees

Greenamyre, Zack, Counsel for Plaintiff-Appellant

Hamilton, Samantha C., Counsel for Plaintiff-Appellant

Harrell, Julie, Defendant-Appellee

Henefield, Paul, Counsel for Defendant-Appellee Cindy McDade

Henegar, David J., Beneficiary of Estate of David Henegar

Kanovitz, Mike, Counsel for Plaintiff-Appellant

*Wade v. Ga. Corr. Health*, No. 21-14275

Keith, Jerome S., Defendant-Appellee

Lee, Sherrie, Defendant-Appellee

Loevy & Loevy, Counsel for Plaintiff-Appellant

Lones, Laura L., Senior Assistant Attorney General, Counsel for
    Defendant-Appellees

McDade, Cindy, Defendant-Appellee

Mitchell & Shapiro, LLP, Counsel for Plaintiff-Appellant

Mullinax, Zachary A., Assistant Attorney General, Counsel for
    Defendant-Appellees

Murphy, Honorable Harold Lloyd, United States District Judge,
    Northern District of Georgia (deceased)

Pacious, Kathleen M., Deputy Attorney General, former Counsel
    for Defendant-Appellees

Petrany, Stephen J., Solicitor General, Counsel for Defendant-
    Appellees

Pinkston-Pope, Loretta L., Deputy Attorney General, Counsel for
    Defendant-Appellees

Prossnitz, Annie, Counsel for Plaintiff-Appellant

Stroh, John, Defendant-Appellee

Teaster, Susan E., Senior Assistant Attorney General, former
    Counsel for Defendant-Appellees

Totenberg, Honorable Amy, United States District Judge,
    Northern District of Georgia

*Wade v. Ga. Corr. Health*, No. 21-14275

Wade, Betty, Plaintiff-Appellant/Personal Representative of the
    Estate of David Henegar

No publicly traded company or corporation has an interest in the
outcome of this appeal.

/s/ *Stephen J. Petrany*
Stephen J. Petrany

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is scheduled for the week of February 13, 2024.

# TABLE OF CONTENTS

**Page**

Statement Regarding Oral Argument ................................................ i

Table of Authorities ......................................................... iv

Statement of Issues .......................................................... 1

Introduction ................................................................ 2

Statement of the Case ........................................................ 7

    A. Factual Background ................................................. 8

    B. Proceedings Below ................................................ 14

    C. Standard of Review ............................................... 16

Summary of Argument ...................................................... 17

Argument ................................................................. 22

    I. The *mens rea* for deliberate indifference is subjective
       criminal recklessness. ........................................... 23

       A. Criminal recklessness requires an official to know his
          inaction will result in an excessive risk of substantial
          injury and consciously choose to do nothing. ............... 24

       B. Wade distorts *Farmer*'s subjective criminal recklessness
          standard into little more than a negligence standard. . 32

    II. Defendants were not deliberately indifferent. ................... 39

       A. Wade failed to present evidence that could establish
          that Lieutenant Stroh and Sergeant Keith actually
          knew Henegar faced an excessive risk of serious injury.
          39

# TABLE OF CONTENTS
## (continued)

**Page**

    B.  Wade failed to present evidence that could establish that Nurses Lee and Harrell actually knew Henegar faced an excessive risk of serious injury. ...................... 48

III. Defendants are entitled to qualified immunity ................. 54

Conclusion ...................................................................... 56

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Poag,*
   61 F.3d 1537 (11th Cir. 1995) ........................................ 29, 37, 38

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ................................................... 39

*Benson v. Gordon County,*
   479 F. App'x 315 (11th Cir. 2012) ............................................. 53

*Brown v. Johnson,*
   387 F.3d 1344 (11th Cir. 2004) ................................................. 43

*Burnette v. Taylor,*
   533 F.3d 1325 (11th Cir. 2008) ................................................. 40

*Cnty. of Sacramento v. Lewis,*
   523 U.S. 833 (1998) ................................................... 37

*Cope v. Codgill,*
   3 F.4th 198 (5th Cir. 2021)........................................................ 27

*Counterman v. Colorado,*
   143 S. Ct. 2106 (2023) ............................................................ 26

*\*Estelle v. Gamble,*
   429 U.S. 97 (1976) .......................... 3, 17, 18, 24, 34, 37, 45, 46, 54

*\*Farmer v. Brennan,*
    511 U.S. 825 (1994) ... 2, 3, 4, 7, 17, 18, 24, 25, 26, 27, 28, 32, 33, 35, 36, 44, 46, 48, 53

*Goebert v. Lee County,*
   510 F.3d 1312 (11th Cir. 2007) ................................................. 52

*Gogel v. Kia Motors Mfg. of Ga.*,
    967 F.3d 1121 (11th Cir. 2020) ........................................... 16, 17

*Greason v. Kemp*,
    891 F.2d 829 (11th Cir. 1990) .................................................. 52

*Grote v. Kenton County*,
    85 F.4th 397 (6th Cir. 2023) ..................................................... 39

*Hammett v. Paulding County*,
    875 F.3d 1036 (11th Cir. 2017) ................................................. 51

*Harris v. Shelby Cnty. Bd. of Educ.*,
    99 F.3d 1078 (11th Cir. 1996) .................................................. 39

*Henegar v. Georgia Correctional Health, LLC*,
    No. 4:18-cv-192, 2021 WL 11133945 (N.D. Ga. Sept. 30, 2021)....
    15, 38, 40, 47, 54, 55

*Hinson v. Edmond*,
    192 F.3d 1342 (11th Cir. 1999) ................................................. 37

*Ireland v. Prummell*,
    53 F.4th 1274 (11th Cir. 2022)........................................... 38, 46

*J.F.K. v. Troup Cnty. Sch. Dist.*,
    678 F.3d 1254 (11th Cir. 2012) ................................................. 21

*Johnson v. City of Miami Beach*,
    18 F.4th 1267 (11th Cir. 2021)................................................. 55

*Johnson v. Prentice*,
    No. 22-693, 2023 WL 7475168 (Mem.) (Nov. 13, 2023) ............ 23

*Koon v. North Carolina*,
    50 F.4th 398 (4th Cir. 2022)..................................................... 51

*Lee v. Ferraro*,
    284 F.3d 1188 (11th Cir. 2002) ................................................. 54

*Letterman v. Does*,
    789 F.3d 856 (8th Cir. 2015) ...................................................... 28

*Mahan v. Plymouth County House of Corrections*,
    64 F.3d 14 (1st Cir. 1995)..................................................... 31, 47

*Marbury v. Warden*,
    936 F.3d 1227 (11th Cir. 2019) ...................................... 20, 27, 35

*Mullenix v. Luna*,
    577 U.S. 7 (2015) ........................................................................ 55

*Pearson v. Callahan*,
    555 U.S. 223 (2009) .................................................................... 56

*Pfaller v. Amonette*,
    55 F.4th 436 (4th Cir. 2022)....................................................... 27

*Rodriguez v. Sec'y for the Dep't of Corr.*,
    508 F.3d 611 (11th Cir. 2007) .................................................... 20

*Safeco Ins. Co. of Am. v. Burr*,
    551 U.S. 47 (2007) ...................................................................... 26

*Smith v. Carpenter*,
    316 F.3d 178 (2d. Cir. 2003)................................................. 30, 31

*Snow v. City of Citronelle*,
    420 F.3d 1262 (11th Cir. 2005) ........................................ 29, 30, 52

*Sparks v. Ingle*,
    724 F. App'x 692 (11th Cir. 2018) ....................................... 46, 52

*Taylor v. Adams*,
    221 F.3d 1254 (11th Cir. 2000) ... 6, 17, 19, 20, 23, 24, 25, 26, 27, 47

*Thomas v. Cooper Lighting, Inc.*,
    506 F.3d 1361 (11th Cir. 2007) .................................................. 17

*Wade v. Daniels*,
  36 F.4th 1318 (11th Cir. 2022) ................................................... 40

*Wade v. McDade*,
  67 F.4th 1363 (11th Cir. 2023) ........ 2, 4, 8, 16, 32, 33, 38, 44, 55

*Wade v. United States*,
  13 F.4th 1217 (11th Cir. 2021) ................................................... 43

*Waldrop v. Evans*,
  871 F.2d 1030 (11th Cir. 1989) ................................................... 46

*Walker v. Darby*,
  911 F.2d 1573 (11th Cir. 1990) ................................................... 17

*West v. Tillman*,
  496 F.3d 1321 (11th Cir. 2007) ................................................... 17

*Wilson v. Seiter*,
  501 U.S. 294 (1991) ........................................................... 24, 25

## Other Authorities

Fed. R. Civ. P. 56(a) ...................................................................... 17

Model Penal Code § 2.02(2)(c) ...................................................... 18

## STATEMENT OF ISSUES

1.    What is the standard for establishing liability on an Eighth Amendment deliberate-indifference claim?

2.    Under the appropriate standard, which requires criminal recklessness, did correctional officers or nurses act with deliberate indifference where an inmate did not receive his anti-seizure medication for four days, but there is no evidence the officials *knew* of the risk that such an error entailed?

3.    In any event, are the officials entitled to qualified immunity where no clearly established law put them on notice that their actions were supposedly unconstitutional?

1

## INTRODUCTION

This Court granted *en banc* rehearing to determine "the standard for establishing liability on an Eighth Amendment deliberate-indifference claim." The answer to this question is, apparently, undisputed. As *Farmer v. Brennan*, 511 U.S. 825 (1994), makes clear, the Eighth Amendment prohibits only indifference that rises to the level of criminal recklessness on the part of the prison official. Although panels of this Court have for years debated whether the standard requires "more than mere negligence" or "more than gross negligence," *Wade v. McDade*, 67 F.4th 1363, 1371 (11th Cir. 2023) (*Wade I*), *reh'g en banc granted and opinion vacated*, 83 F.4th 1332 (11th Cir. 2023), in actuality the standard is significantly higher than even gross negligence. Criminal recklessness requires that a prison official be subjectively aware—that is, have "actual knowledge"—that his inaction will cause an excessive risk of harm. *Farmer*, 511 U.S. at 842.

So clear is this point that Plaintiff-Appellant Betty Wade agrees, at least in principle. The Supreme Court in *Farmer* unequivocally rejected negligence as the standard, and more than that, it rejected even civil recklessness (which can include constructive knowledge). 511 U.S. at 837. Instead, the Supreme

2

Court held that deliberate indifference claims require *criminal* recklessness. Criminal recklessness requires not just an objectively serious risk of harm and not just facts where an official *should* know that she should take action. Criminal recklessness requires that an official subjectively does believe that she must take some action to prevent the risk of serious harm and then consciously decides not to take action. *See generally id.*

That exceedingly high standard makes sense, of course, because the "Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.'" *Id.* at 837. To violate the Eighth Amendment, then, a prison official must have a "sufficiently culpable state of mind." *Id.* at 834. Cruel and unusual punishment requires the "unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (citation omitted). Accordingly, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also *draw the inference*." *Farmer*, 511 U.S. at 837 (emphasis added).

Mistakes, however tragic and however egregious, are not enough to make out an Eighth Amendment claim. "[I]nadvertent failure[s]" are not "repugnant to the conscience of mankind." *Estelle*, 429 U.S. at 105–06 (citation omitted). Confusion,

3

miscommunication, absent-mindedness, blatantly erroneous subjective beliefs—none of these are sufficient to reach the level of criminal recklessness. There must be a "conscious[]" decision to abandon someone to a highly dangerous situation. *Farmer*, 511 U.S. at 839 (citation omitted). "[A]n official's failure to alleviate a significant risk that he should have perceived but did not … cannot under our cases be condemned as the infliction of punishment." *Id.* at 838.

That high bar makes this an easy case on the facts. Because an official must *know* that by failing to perform some act, he or she is putting the inmate at a substantial risk of serious harm, Wade's claims on behalf of David Henegar's estate cannot succeed. Although the circumstances here are tragic, they are a tragedy of errors, not a tragedy of punitive prison officials. Henegar missed his medication for a few days because prison officials made mistakes, not because they *knew* they were putting him at exceedingly high risk of serious injury and consciously decided they were okay with such a risk.

As the panel opinion put it, there was a series of "careless actions and … systemic communication failures," not any deliberate decision to punish. *Wade I*, 67 F.4th at 1378. That is undisputedly unfortunate, and other legal claims—common-law,

statutory—may reach this behavior, but the Constitution does not. Even if Wade could establish that each of the prison guards and nurses *should have* realized that Henegar would be at serious risk of injury if they did not personally do more—itself a questionable proposition—that is not enough. There is no evidence that any Defendant *did in fact know* that Henegar would face an excessive risk of serious injury if they did not personally do something more to ensure his medication was not delayed for a few days.

To create a claim here, Wade tries to dilute the standard. Although acknowledging, as she must, that *Farmer* requires criminal recklessness, she proceeds to apply a standard that, as a practical matter, could best be described as "negligence plus." In Wade's view, as long as an official knows, at a high level of generality, that an inmate has some medical risk—like Henegar's risk of seizures without Dilantin—prison officials must act *reasonably* in responding to that risk. *E.g.*, Br. at 26. That means that any negligence, any mistake, anything a *reasonable person* would not do becomes the subject of an Eighth Amendment claim. In her telling, the Defendants here are liable because they made mistakes while knowing, at a high level of generality, that Henegar needed his medication.

5

But Wade's sleight of hand would vitiate the criminal recklessness standard and transform the Eighth Amendment into a source for claims of medical malpractice. The question is whether an official *knows* that his specific decision not to act will cause or maintain an exceedingly high risk of injury. *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000). That means the officer must know far more than the bare fact that a prisoner has been prescribed a particular medication.

Obvious illustrations abound. An officer might know that an inmate has a need for a particular medication but also believe, for instance, that it is someone else's responsibility to *handle* that need. If the officer is wrong, that is a potentially serious mistake. But it is not criminally reckless. Likewise, an official might know of the general condition and medical risk but not realize that missing only a few days of medication is critically important. An official might believe (erroneously) that he or she *did* alert the appropriate person to the situation. A medical professional might be aware of a serious medical risk but issue an erroneous treatment plan—that might be medical malpractice, but it is not cruel and unusual punishment unless the physician *knew* he was pursuing an inappropriate plan.

6

In all of these situations, the official made a mistake but did not subjectively "know[] of … an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. That is what happened here, and that means Wade cannot succeed on the merits.

On top of everything else, Defendants are plainly entitled to qualified immunity. They could not possibly have known that their conduct was unconstitutional—indeed, a panel of this Court just unanimously held that their conduct was *not* unconstitutional. So while the Court can hold, simply and clearly, that there is no violation at all, it should at a bare minimum affirm the district court's holding as to qualified immunity.

## STATEMENT OF THE CASE

David Henegar, formerly incarcerated in Walker State Prison, filed a lawsuit alleging constitutional and state-law tort claims against nearly 20 individual and institutional defendants connected with his incarceration. Doc. 129 at 21–35. The district court dismissed most claims against most defendants, leaving only federal claims against five defendants—two corrections officers and three nurses working at Walker State Prison. *Id.* at 2 n.1. The district court granted the remaining defendants' motion for summary judgment, Doc. 168, and Henegar's sister, representing his estate after Henegar died for unrelated reasons, Doc. 172,

appealed the order as to five defendants, Doc. 173. A panel of this Court affirmed the summary judgment order, *Wade I*, 67 F.4th at 1378, and this Court voted to vacate the opinion and rehear the case *en banc*.

### A.  Factual Background

**1.** In August 2016, Defendant-Appellees Stroh, Keith, Harrell, and Lee were employed at Walker State Prison in Rock Spring, Georgia. Lieutenant Stroh and Sergeant Keith were correctional officers. Doc. 147-5 at 12; Doc. 147-15 at 12. Julie Harrell and Sherri Lee were nurses. Doc. 147-4 at 16; Doc. 147-10. Each played a role in the prison's process for delivering medication to inmates. Doc. 147-5 at 107–09.

Another nurse, Mary Ann Melton, was generally responsible for placing orders with the Georgia Department of Corrections' pharmacy to fill and refill inmate prescriptions and for inventorying the prison's pill cart. Doc. 147-12 at 91. The pharmacy typically filled inmates' prescriptions in two to three business days. *Id.* at 97. In August 2016, while Nurse Melton was on medical leave, *id.* at 18, Nurse Harrell interacted with the pharmacy to process inmate medication, Doc. 147-4 at 154–55, 157.

Nurses received prescription medications from the pharmacy, placed them on the pill cart, and listed them on each inmate's Medication Administration Record (MAR). *Id.* at 82–83, 88; Doc. 147-12 at 99, 144–46. The MAR noted the inmate's medications, dosages, and administration instructions. Doc. 147-5 at 107–08. Correctional officers like Lieutenant Stroh and Sergeant Keith could not order medication and, instead, relied on medical staff to stock the pill cart. Doc. 147-15 at 114, 121–22.

Pill calls, where nurses or correctional staff dispensed medications from the pill cart, occurred four times daily, at 5:00 a.m., 11:00 a.m., 4:00 p.m., and 9:00 p.m. Doc. 147-12 at 243. On weekdays, medical staff conducted daytime pill calls. Doc. 147-15 at 113. Corrections officers handled pill calls on evenings and weekends, *id.*, and would update the MARs based on whether an inmate received their medicine, refused their medicine, did not show up to the pill call, or had a reason to be absent from the facility, Doc. 147-5 at 112–13.

Lieutenant Stroh and Sergeant Keith considered inmates to be generally responsible for notifying medical staff if their medication was unavailable. *Id.* at 141; Doc. 147-15 at 123. The officers also believed medical staff reviewed the MARs each morning. Doc. 147-5 at 117, 128; Doc. 147-15 at 143.

9

Inmates could also seek medical care directly through the "sick call" process. Doc. 147-15 at 93–94. They could fill out a request and place it in a drop box accessible daily from 4:30 a.m. to 9:00 p.m. *Id.* at 44–45; Doc. 147-5 at 86–87. Nurses checked the drop box daily, and for requests placed at night, medical staff typically saw inmates the following day. Doc. 147-8 at 238; Doc. 147-12 at 174. For urgent needs, inmates could bypass the sick call process and go straight to medical staff or notify correctional officers. Doc. 147-5 at 87, 126; Doc. 147-12 at 175. Upon arrival at Walker State Prison, all inmates received an orientation regarding the sick call process, the sick call form, and the medical unit's location. Doc. 147-5 at 125.

**2.** Plaintiff David Henegar was incarcerated at Walker State Prison from July 2014 to August 2017. Doc. 148-4 at 219. Before the events that led to this lawsuit, which occurred over four days in August 2016, he was diagnosed with a seizure disorder. *Id.* at 46, 48. In August 2016, a correctional officer typically administered Henegar his anti-seizure medication, Dilantin, at the 9:00 p.m. pill call. *Id.* at 163, 221.

On August 23rd, 2016, the prison's medical director wrote a new Dilantin prescription for Henegar. Doc. 147-12 at 114; Doc. 147-13. That same day, Nurse Melton faxed the prescription to the

prison pharmacy, Doc. 147-12 at 115; Doc. 147-13, but the pharmacy did not fill the prescription by the end of the month, Doc. 147-11, ¶ 4.

Henegar received his Dilantin on August 27th, 2016. Doc. 148-4 at 120, 221–23. But Henegar did not receive his Dilantin doses on the nights of August 28th, August 29th, August 30th, or August 31st. *Id.* at 62, 120, 221, 221–23.

None of the Defendant-Appellees worked on all four of those days. Lieutenant Stroh and Sergeant Keith worked only on August 28th and 31st. Doc. 147-5 at 137; Doc. 147-6; Doc. 147-15 at 151–53. Nurses Lee and Harrell worked the 29th through the 31st, with Nurse Lee on duty from roughly 5:00 a.m. to 2:00 p.m. and Nurse Harrell on duty from roughly 9:30 a.m. to 6:00 p.m. Doc. 147-4 at 37; Doc. 147-8 at 200–01. Nurses Lee and Harrell were not present at any evening pill call, including those where Henegar did not receive his Dilantin. Doc. 147-4 at 37; Doc. 147-8 at 35–36, 171.

Lieutenant Stroh and Sergeant Keith worked the 9:00 p.m. pill call on the 28th and the 31st. Doc. 147-5 at 90, 97, 137; Doc. 147-15 at 16, 151, 153, 155. On the 28th, Sergeant Keith made an unidentifiable marking on Henegar's MAR to indicate the missing dose. Doc. 155-10 at 2. On the 31st, Sergeant Keith put a question

11

mark on Henegar's MAR to indicate that missing dose. *Id.*
Sergeant Keith, in Lieutenant Stroh's presence, told Henegar on
the 31st that he should notify medical staff in the morning. Doc.
147-15 at 16.

Nurse Harrell likely processed medications arriving at the
prison and inventoried the pill cart at some point, Doc. 147-4 at
157, and Wade concedes that no correctional staff informed her of
the missed medication, Doc. 155-1 at 32. Wade claims that Nurses
Lee and Harrell saw a post-it note of unknown origin sticking out
of Henegar's MAR and indicating his Dilantin was on order, Br. at
7, 41, but there is no evidence either saw the note (or what
significance they would take from it) before this suit was filed,
Doc. 147-4 at 223–25.

At no point between August 28th and August 31st did
Henegar fill out a sick call request concerning the missing
Dilantin doses. Doc. 148-4 at 120–21. He would later assert that
he spoke with a nurse concerning the missed Dilantin, but he did
not know which nurse he spoke with or when this conversation
occurred. *Id.* at 121–22. Sergeant Keith also spoke with a nurse
about Henegar's missing Dilantin, Doc. 147-5 at 142, 145, and the
nurse informed him that the medication had been ordered, *id.* at

142. Sergeant Keith does not recall which nurse he spoke with or when the discussion took place. *Id.* at 142, 145, 149.

On the night of August 31st, Henegar had a seizure. *Id.* at 16; Doc. 147-15 at 13, 172. In response, Lieutenant Stroh called 911. Doc. 147-15 at 177. In the meantime, Sergeant Keith remained with Henegar, standing beside his bed to ensure he would not fall off. *Id.* at 172. Emergency responders arrived and took Henegar to an emergency room at a local hospital. Doc. 147-5 at 19–20; Doc. 147-15 at 179, 181.

After the hospital discharged Henegar, officials returned him to his prison dorm. Doc. 147-15 at 186, 189–90. Shortly thereafter, around 4:30 a.m. on September 1st, 2016, he experienced another seizure. *Id.* at 211–27, 229. Sergeant Keith responded to another inmate's call and went to Henegar's cell while Lieutenant Stroh called Nurse McDade. *Id.* at 211–12. Nurse McDade instructed Lieutenant Stroh to have Nurse Lee see Henegar when she arrived in thirty minutes for her 5:00 a.m. shift. *Id.* at 212. Sergeant Keith remained with Henegar until Nurse Lee arrived. *Id.* at 216. Upon arrival, Nurse Lee inspected Henegar and took his vital signs. Doc. 147-8 at 23. She thought he should return to the hospital to get supplemental oxygen and ensure he did not seize again, so she consulted the on-call doctor. *Id.* at 23–24. The

doctor agreed, and Nurse Lee instructed Lieutenant Stroh to call 911. *Id.* at 303; Doc. 147-15 at 221. He did so, and emergency responders arrived and took Henegar back to the hospital. Doc. 147-15 at 221–22, 225.

### B. Proceedings Below

Henegar filed this action alleging constitutional violations and state-law tort claims against almost twenty defendants. Doc. 1; Doc. 18; Doc. 129. Following the district court's ruling on multiple motions to dismiss, the matter proceeded to discovery on his Eighth Amendment deliberate-indifference claims against Lieutenant Stroh, Sergeant Keith, Nurse Manager Cindy McDade, and Nurses Lee, Harrell, and Melton. Doc. 68.

Following discovery, these defendants[1] moved for summary judgment, arguing that they were not deliberately indifferent to Henegar's serious medical needs and that they were entitled to qualified immunity. Doc. 147; Doc. 148.

The district court agreed, concluding it "[could not] find that Defendants' conduct arose to the onerous standard required to

---

[1] Though Nurse Melton was a defendant below, Henegar did not contest her motion for summary judgment and does not seek review of her dismissal. Doc. 155 at 24 n.3. And Wade no longer pursues her appeal against McDade. *See* Br. at xiii.

establish deliberate indifference." *Henegar v. Ga. Correctional Health, LLC*, No. 4:18-cv-192, 2021 WL 11133945, at *14 (N.D. Ga. Sept. 30, 2021). The court first noted that Lieutenant Stroh and Sergeant Keith worked only two of the four days that Henegar missed his Dilantin and that when they discovered the problem on August 31st, they told Henegar to contact medical staff in the morning. *Id.* at *10. The court concluded that even if Lieutenant Stroh and Sergeant Keith "*should* have contacted the on-call nurse immediately," Henegar "ha[d] not pointed to *any* authority that clearly establishes that their failure to do so under the specific facts of this case constitutes deliberate indifference." *Id.* at *11 (emphases added).

And for the nurses, the court said the "reasonable inference to be drawn from [the] evidence is that there were policies and procedures in place to track the administration of inmate prescription medication, but that these policies and procedures were not followed in this case." *Id.* at *12. Even assuming that did constitute deliberate indifference—and the court said it did not— Henegar "failed to point to any law applicable to the circumstances presented in this case that clearly established the alleged violation of [his] rights. *Id.* at *14.

Henegar's estate, through its representative Betty Wade, timely appealed. Doc. 170; Doc. 171; Doc. 172; Doc. 173. On appeal, a panel of this Court affirmed the district court's order, concluding that no Defendant was deliberately indifferent. *Wade I*, 67 F.4th at 1374–75, 1375–76. The panel acknowledged that the Defendants might have made mistakes exceeding "mere negligence," but held that deliberate indifference claims require something *more* than even gross negligence. *Id.* at 1374–76. The panel acknowledged cases of this Court either holding or purporting to hold that only conduct beyond *negligence* is required, but the panel held that those cases were not the properly binding authorities. *Id.* at 1373.

Wade petitioned for *en banc* review, which this Court granted. The Court subsequently instructed the parties to focus their briefs on the "standard for establishing liability on an Eighth Amendment deliberate-indifference claim[.]"

### C.   Standard of Review

This Court "review[s] a district court's grant of summary judgment de novo," and "view[s] the evidence in the light most favorable to the non-moving party." *Gogel v. Kia Motors Mfg. of Ga.*, 967 F.3d 1121, 1134 (11th Cir. 2020) (*en banc*) (quoting *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir.

16

2007) (per curiam)). Summary judgment is proper when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). And "a mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Gogel*, 967 F.3d at 1134 (quoting *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990)).

## SUMMARY OF ARGUMENT

**I.** "[D]eliberate indifference … is a high standard." *West v. Tillman*, 496 F.3d 1321, 1333 (11th Cir. 2007). It "requires much more than negligence or malpractice." *Taylor*, 221 F.3d at 1259; *see also Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). And that makes sense: "The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.'" *Farmer*, 511 U.S. at 837.

The standard for deliberate indifference is "subjective recklessness as used in the criminal law." *Farmer*, 511 U.S. at 839–40. Unlike negligence or even civil recklessness, this test has both objective and subjective requirements. Specifically, subjective criminal recklessness occurs only when "a person … 'consciously

17

disregard[s]' a substantial risk of serious harm." *Id.* at 839 (quoting Model Penal Code § 2.02(2)(c)) (alteration accepted). The first requirement (conscious disregard) is subjective; the second (substantial risk of serious harm) is objective.

The standard is demanding because the Eighth Amendment prohibits only "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 104. Eighth Amendment claims require *punishment*, so they are proper only when an inmate is both at an objectively excessive risk of serious injury *and* there is a sufficiently culpable subjective state of mind on the part of the official. *Farmer*, 511 U.S. at 837. Subjective criminal recklessness fits the bill because it requires much more than objective negligence or even objective recklessness—it requires *knowing* behavior on the part of the official.

A prison official must "know[] of and disregard[] an excessive risk to inmate health or safety." *Id.* This means "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* Deliberate indifference does not ask what a "reasonable person" would have known; it asks what each defendant "*actually* knew." *Id.* at 843 n.8, 844 (emphasis added).

18

Criminal recklessness thus requires more than an official knowing, in the abstract, that an inmate has some medical condition or faces some general risk of harm. The official must make an "actual inference of required action" but then consciously disregard that understanding. *Taylor*, 221 F.3d at 1258. A generalized awareness of a medical need is not enough. Anyone could know someone has a medical condition that generally puts them at a serious risk of harm but believe someone else is attending to that medical need. That subjective belief might be wrong, unreasonable, negligent—but it would not be criminally reckless because there is no subjective awareness of the risk.

Wade purports to acknowledge *Farmer*'s subjective criminal recklessness standard, but she downplays the stringency of that standard and faults this Court for using "progressively more extreme language" to describe the required *mens rea*. Br. at 32. But this Court's recent decisions have been angling back to the *correct* standard of criminal recklessness, which is indeed "*far more onerous* than normal tort-based standards of conduct sounding in negligence." Br. at 32 (citation omitted). For years, this Court asked whether someone acted with "more than negligence" or "more than gross negligence," but neither are sufficient.

Wade applies a standard that, in practice, is barely distinguishable from negligence. In her eyes, once a prison official is generally aware of an inmate's potentially serious medical condition, they must act *reasonably*. But to make out a deliberate indifference claim, the *risk* of which an official must be subjectively aware is a risk based on his own action or inaction; the official must actually draw an "inference of required *action* from th[e] facts." *Taylor*, 221 F.3d at 1258 (emphasis added). The official must "'kn[ow] of ways to reduce the harm' but knowingly or recklessly decline[] to act." *Marbury v. Warden*, 936 F.3d 1227, 1233 (11th Cir. 2019) (quoting *Rodriguez v. Sec'y for the Dep't of Corr.*, 508 F.3d 611, 620 (11th Cir. 2007)). Wade's watered-down analysis would expand the bounds of deliberate indifference far beyond where the Supreme Court set them; she would make cases turn on the *objective* accuracy of a medical professional's response, rather than what they *believed* was sufficient. That is wrong, and the Court should say so.

**II.** Under the criminal recklessness standard, Wade's claims fail. Wade presented no evidence sufficient to support her allegations that the officers or the nurses *actually knew* that, lest they act differently, Henegar would labor under an excessive risk of serious injury. Wade plays fast and loose with the facts, but

20

summary judgment standards do not mean Wade can simply *assume* facts not in evidence. *See, e.g.*, *J.F.K. v. Troup Cnty. Sch. Dist.*, 678 F.3d 1254, 1256 n.2 (11th Cir. 2012) (criticizing district court for including "alleged facts that were not supported by the record" in nonmovant's narrative on summary judgment).

It is hard even to understand what else Wade believes the officers should have done. The officers noted Henegar's missing medication and counseled him to inform medical staff. They also knew that he could, at any time, inform medical staff or seek emergency care (and yet did not do so). They had no reason to believe that they needed to do anything else to head off a serious risk of injury. Indeed, even under Wade's negligence-plus theory, the officers plainly acted reasonably.

The nurses are a similar story. Wade does not even have evidence that could prove the nurses *knew* Henegar had missed his medication. Wade assumes they must have read the officers' markings in the MARs, but there is no evidence either nurse actually did. That might not be ideal medical care, but it does preclude a finding of cruel and unusual punishment. Moreover, even assuming the nurses knew Henegar had missed a few doses of Dilantin, Wade puts forth no evidence tending to prove that either nurse believed that Henegar would face a substantial risk

21

of seizure after a few days' delay in receiving his medication. Hindsight makes it clear that they should have made that connection, but hindsight cannot establish criminal recklessness.

**III.** If the Court has any reservations about whether a particular Defendant violated the Constitution, it should not matter. Qualified immunity plainly applies. Wade points to no case with materially similar facts that would have placed any Defendant on notice that their conduct was constitutionally deficient. To state the obvious, their liability could not possibly have been "clearly established" in August 2016 when a panel of this Court held in 2023 that *these* Defendants were not deliberately indifferent.

This Court should affirm.

## ARGUMENT

The Court granted this rehearing *en banc* to determine "the standard for establishing liability on an Eighth Amendment deliberate-indifference claim." At the level of theory, the parties agree: the standard is criminal recklessness. But in practice, Wade seeks to undermine that high standard with a series of arguments that would, effectively, reduce the standard to one of barely more than negligence. Under the correct standard, Wade did not put forth evidence that could establish any Defendant had

a sufficiently culpable mental state, so the district court's summary judgment against Wade should be affirmed. And even if that were not the case, Defendants are plainly protected by qualified immunity, as the district court held.

## I.    The *mens rea* for deliberate indifference is subjective criminal recklessness.

Nearly thirty years after *Farmer*, the subjective criminal recklessness test is "well established." *Johnson v. Prentice*, No. 22-693, 2023 WL 7475168 (Mem.), at *3 (Nov. 13, 2023) (Jackson, J., dissenting from denial of certiorari). Here, even Wade agrees that criminal recklessness is the appropriate standard. *See* Br. at 14–18. But Wade goes wrong in her legal analysis because she tries to sneak a negligence standard through the back door. In Wade's view, as long as an official is generally aware of a medical need or risk, he must act "reasonably" in response to that need. *Id.* at 1, 3, 4, 12, 13, 14, 17, 26, 27, 37, 38, 39, 40, 42. But that is not the test—it analyzes the subjective awareness of a serious risk of harm at far too high a level of generality. The question is whether an official makes an "actual inference *of required action*" from the objective facts. *Taylor*, 221 F.3d at 1258. Awareness of an abstract risk or medical condition is insufficient—an awareness of one's

23

own inaction as causing or maintaining an excessive risk is necessary.

### A. Criminal recklessness requires an official to know his inaction will result in an excessive risk of substantial injury and consciously choose to do nothing.

The demanding standard for deliberate indifference claims flows directly from the Eighth Amendment, which proscribes "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 104; *see also Farmer*, 511 U.S. at 840 ("[T]hat Eighth Amendment liability requires consciousness of a risk is … based on the Constitution … , not merely on a parsing of the phrase 'deliberate indifference.'"). That is, a prison official who acts with deliberate indifference not only errs in the performance of his duties, he violates the Constitution's ban on cruel and unusual punishments. *See Farmer*, 511 U.S. at 834. An offense of this magnitude demands "a 'sufficiently culpable state of mind.'" *Id.* (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).

Eighth Amendment claims, therefore, contain both an *objective* requirement that the prison official's "conduct [is] sufficiently serious to constitute a cruel or unusual deprivation," *Taylor*, 221 F.3d at 1257 (quotation omitted), and a *subjective* requirement of punitive intent. Because "only inflictions of

24

punishment carry liability," a "subjective approach isolates those who inflict punishment." *Farmer*, 511 U.S. at 839, 841.

The objective side is plain enough. The inmate's situation must be "one that, if left unattended, 'poses a substantial risk of serious harm.'" *Taylor*, 221 F.3d at 1258 (quoting *Farmer*, 511 U.S. at 834). And the prison official's response must be objectively insufficient. *See Farmer*, 511 U.S. at 845 ("[P]rison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause.").

Because punishment is required, an official must also *subjectively* "know[] of and disregard[] [the] excessive risk to inmate health or safety." *Id.* at 837. This subjective requirement means "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and he must also draw the inference*." *Id.* (emphasis added).

The subjective aspect is necessary because the "Eighth Amendment … bans only cruel and unusual *punishment* … [and] some mental element must be attributed to the inflicting officer before [the pain inflicted] can qualify" as punishment. *Wilson*, 501 U.S. at 300. "The infliction of punishment is a deliberate act intended to chastise or deter. This is what the word means today; it is what it meant in the eighteenth century." *Id.* (citation

25

omitted). Critically, the subjective component makes deliberate indifference harder to prove than claims implicating objective standards like negligence or even *civil* recklessness. *See, e.g.*, *Counterman v. Colorado*, 143 S. Ct. 2106, 2117 n.5 (2023) (negligence); *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68–69, 69 n.18 (2007) (civil recklessness). "[T]here must be a subjective intent by the public officials involved to use the sufficiently serious deprivation in order to punish." *Taylor*, 221 F.3d at 1257. Without the intent to punish, there is no cruel and unusual punishment.

Accordingly, deliberate indifference does not ask what a "reasonable person" would have known; it asks what each defendant "actually knew." *Farmer*, 511 U.S. at 843 n.8, 844. In *Farmer*, the Supreme Court specifically rejected a reasonable person standard, akin to civil recklessness. "[A]n official's failure to alleviate a significant risk that he should have perceived but did not … cannot …be condemned as the infliction of punishment." *Id.* at 838; *see also id.* at 843 n.8 ("It is not enough merely to find that a reasonable person would have known, or that the defendant

26

should have known."). Instead, the Court pointedly adopted *criminal* recklessness as the required standard. *Id.* at 836–37.[2]

Critically, the subjective inference required by criminal recklessness is not satisfied simply because an official knows, in the abstract, that an inmate has some medical condition or faces some general risk of harm. The official must make an "actual inference of required *action*" but then consciously disregard that understanding. *Taylor*, 221 F.3d at 1258 (emphasis added). That is, a defendant must "disregard precautions he knows should be taken." *Cope v. Codgill*, 3 F.4th 198, 209 (5th Cir. 2021) (alterations accepted and quotation omitted). *See also, e.g.*, *Marbury*, 936 F.3d at 1233 (defendant must "know of ways to reduce the harm" but decline to act); *Pfaller v. Amonette*, 55 F.4th 436, 445 (4th Cir. 2022) (official must have "actual knowledge of

---

[2] Wade argues that the Eighth Amendment, as originally understood, does not require "intentional conduct." Br. at 34–37. Because *Farmer* answers the question as to the appropriate *mens rea* here, there is no need to dive into questions of original meaning. But it is worth noting that the Supreme Court relied on the necessity of a culpable state of mind to *arrive* at the criminal recklessness standard. *E.g.*, *Farmer*, 511 U.S. at 837–38 ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not … cannot under our cases be condemned as the infliction of punishment."). It is also worth noting that the entirety of Wade's authority on this point is a single law review article. Br. at 34–37.

the risk of harm to the inmate" and "recogni[tion] that his actions were insufficient") (quotation omitted); *Letterman v. Does*, 789 F.3d 856, 862 (8th Cir. 2015) (stating that a defendant must have "recognized that a substantial risk of harm existed *and* knew that their conduct was inappropriate in light of that risk") (emphasis in original) (quotation omitted).

To use a simple example: suppose two parents both know that their child needs a particular medication within 24 hours or he is at excessive risk of suffering serious harm. But each parent believes (wrongly) that the other parent gave the child the medication. The parents are mistaken, but they are not criminally reckless, because they did not *believe* that the child would face a substantial risk of harm—they thought the other spouse was handling the issue. That is true even though they were aware *as a general matter* that if their child did not receive the medication on time, he would be at risk of serious harm. The question is whether they were aware that *their inaction* would lead to the risk. Without that specific awareness, they cannot "consciously disregard" a serious risk. *Farmer*, 511 U.S. at 839 (citation omitted).

This Court's cases have repeatedly illustrated the need for subjective awareness of a need for a particular action, rather than

a generalized awareness of a medical need. For instance, in *Adams v. Poag*, this Court rejected an inmate's deliberate-indifference claim based on his allegation that a prison physician "did not diligently pursue alternative means of treating" his asthma. 61 F.3d 1537, 1546 (11th Cir. 1995). All agreed that, in the abstract, the plaintiff's asthma was a "serious medical need." *Id.* at 1543. And the physician was aware of the condition. *Id.* at 1546. And it was at least arguable that the physician did not pursue the appropriate course of treatment over time. *Id.* But there could be no deliberate indifference because there was no evidence that the physician *knew* her treatment was insufficient—at most, the plaintiff asserted that she "*should* have known." *Id.* (emphasis added). Put another way, it was not enough that the physician be *generally* aware of the condition—she had to know that her action (or inaction) was insufficient to ameliorate the risk.

Another illustrative case is *Snow v. City of Citronelle*, 420 F.3d 1262 (11th Cir. 2005), where the Court distinguished between one defendant with a mere generalized awareness of a certain condition and another defendant with a particular awareness of the need for action. The Court held that just because several prison officials were generally aware that a prisoner had

29

attempted suicide did not mean they had the subjective knowledge that the prisoner was *currently* at high risk for suicide. *Id.* at 1269. But a different officer, who specifically knew that the prisoner had attempted suicide within the past month, was a different matter. That was sufficient evidence to (potentially) infer a subjective awareness of current risk sans action on the officer's part. *Id.* Again: a general awareness of a problem is not sufficient—there needs to be a specific awareness that the problem requires the officer's action.

There are cases demonstrating these principles throughout the circuits. In *Smith v. Carpenter*, for example, the Second Circuit rejected an inmate's argument that prison officials' general awareness of his HIV diagnosis constituted awareness of a "serious medical need." 316 F.3d 178, 185 (2d Cir. 2003). Instead, when an inmate's Eighth Amendment claim concerns a temporary delay or interruption of treatment, the question is whether the "challenged *delay* or *interruption* in treatment" is sufficiently serious. *Id*. Thus, the inmate failed to prove deliberate indifference when a clerical error left him without prescription medication *twice*—once for five days and once for seven days. *Id.* at 181. He could show the defendants' awareness of his diagnosis

30

but *not* the specific risk he may have faced from two nearly-week-long interruptions. *Id.* at 187.

Likewise, the First Circuit has held that a pretrial detainee's deliberate-indifference claim failed because he could not show that prison officials were aware of any serious symptoms he suffered while not receiving his prescription anti-seizure medication for seven days. *Mahan v. Plymouth Cnty. House of Corr.*, 64 F.3d 14, 18 (1st Cir. 1995). Even though the defendants knew of the detainee's prescription *and* of the fact that he was not receiving it, nothing made them "subjectively aware of a condition requiring their intervention." *Id.* They were aware of both the prescription itself, the continued interruption in administration, *and* of the detainee's "*repeated*[] *request*[s]" for it. *Id.* (emphasis added). But they were *not* aware of the specific risk the interruption—and their response to it—posed. *Id.* at 18. There could be no constitutional violation: the officers simply lacked the requisite subjective awareness.

As these cases demonstrate, deliberate indifference is nowhere close to ordinary tort liability or even liability for reckless behavior under civil law. An official is liable only if he "*knows* that [an] inmate[] face[s] a substantial risk of serious harm." *Farmer*,

511 U.S. at 847 (emphasis added). Without that subjective awareness, there is no constitutional violation.

*    *    *

The panel lamented that "[f]or more than 25 years now, our case law regarding a deliberate-indifference claim's mens rea element has been hopelessly confused, resulting in what [it] charitably call[ed] a 'mess.'" *Wade I,* 67 F.4th at 1371. The confusion stemmed from "two competing formulations" that have befuddled this Court for over twenty years: Whether deliberate indifference demands that a defendant acted with "more than *mere* negligence" or "more than *gross* negligence." *Id.* But that is, respectfully, a question that was asked and answered in *Farmer*. There, the Supreme Court held that criminal recklessness is required, and criminal recklessness is beyond even civil recklessness, which is far beyond any kind of negligence.

**B.    Wade distorts *Farmer*'s subjective criminal recklessness standard into little more than a negligence standard.**

Although Wade purports to acknowledge *Farmer*'s subjective criminal recklessness standard, she downplays the stringency of that standard. By the time she is done recharacterizing criminal recklessness, one is left with a standard that could only be

32

described as "negligence plus"—far removed from what the Eighth Amendment actually demands.

To start, as a rhetorical matter, Wade faults this Court for using "progressively more extreme language" in describing the required *mens rea* for deliberate indifference claims. Br. at 32. But if anything, this Court's recent decisions have been inching the Court back to the *correct* standard of criminal recklessness, after it had experimented with formulations such as "more than negligence" or "more than gross negligence." *Cf. Wade I*, 67 F.4th at 1375 (noting that the Court had "described the 'more than gross negligence' standard as the "equivalent of recklessly disregarding a substantial risk of serious harm to the inmate") (quotation omitted). Contrary to Wade's protestations, the criminal recklessness standard is indeed "*far more onerous* than normal tort-based standards of conduct sounding in negligence." Br. at 32 (citation omitted). It requires more than a mistake, more than an egregious mistake, more than even an egregious mistake that a reasonable person should have known was an egregious mistake. It requires an official to "*actually kn[o]w*" that her inaction would put a prisoner at an excessive risk of serious harm. *Farmer*, 511 U.S. at 844 (emphasis added). Semantics are debatable, but it is

hard to understand how that is anything other than a "far more onerous" standard.

The Supreme Court has described deliberate indifference as requiring inaction "repugnant to the conscience of mankind." *Estelle*, 429 U.S. at 106. That is not, as Wade charges, "pre-*Estelle* language," Br. at 33, that *is Estelle*'s language. To be sure, the *Estelle* Court drew that term from a prior concurrence analyzing the Due Process Clause, but plainly the Court thought it appropriate to describe the requirements of the Eighth Amendment as well. So to the extent there is any lack of clarity in what "criminal recklessness" means in a given context, it is sensible to be mindful of the extreme behavior required.

Wade's mistaken rhetoric seems to inform her legal argument, which, although paying lip service to criminal recklessness, in practice asserts something else. In Wade's view, once someone is aware, at a high level of generality, that someone has a potentially serious medical condition, they must act *reasonably*. She repeatedly downplays the specific knowledge required by the legal standard and argues that Defendants failed to take *reasonable measures* to respond to the "known" risk of Henegar's seizures. *See, e.g.*, Br. at 1, 3, 12 (Defendants failed to "take reasonable measures"); 13 (equating disregard of substantial

34

risk of serious harm with "failure to take reasonable measures");
37, 38, 39 (describing Defendants' response as "far from
reasonable" and "unreasonable"); 40 n.10, 42 (Defendants "fail[ed]
to take reasonable steps").

But she defines the "knowledge of risk" at far too high a level
of generality, and this sleight of hand transforms the standard
into little more than negligence. As long as it can be said that
officials are *generally* aware that someone has a serious medical
condition, suddenly they must act reasonably—that is, non-
negligently. But that is hardly criminal recklessness, and it would
sweep in an extraordinary amount of plainly constitutional (if
negligent) conduct. It is precisely what *Farmer* precludes when it
holds that courts should "be careful to ensure that the
requirement of subjective culpability is not lost." 511 U.S. at 843
n.8.

To make out a deliberate indifference claim, the risk of which
an official must be subjectively aware is a risk based on his *own*
action or inaction. The knowledge required is a specific awareness
of the ability and need to perform some action. *Marbury*, 936 F.3d
at 1233. So, for instance, an officer who abstractly "knows" that a
prisoner needs medication but believes someone else is handling
the medication is *not* liable. The "conscious disregard" of a serious

35

risk—the desire to punish—is not present. It might be that the officer's action is entirely unreasonable. Perhaps he should know there is no one else responsible for the medication. Perhaps someone even *told* him as much and he then forgot. Perhaps someone told him, reminded him to put it on his calendar, and he failed to do so because he became distracted and never returned to the thought. Those might be highly *unreasonable* actions, but they are not criminally reckless, because the officer did not, as a subjective matter, have "knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842.

Wade appears to take her erroneous understanding from a reference to "reasonable measures" in *Farmer*. *Id.* at 845–47. But there, the Court was simply making the point that even if a prison official "actually knew of a substantial risk to inmate health or safety," they are not liable if they "responded reasonably" to the risk. *Id.* at 844. Of course that is true. Even if an official is deliberately *trying* to punish someone, there can be no liability if his actions are in fact a reasonable response to a known risk. But nothing about this section of the *Farmer* opinion suggests that officials must always act reasonably or make reasonable inferences simply because they have a *general* awareness of a prisoner's medical needs or risks.

36

Moreover, under Wade's analysis, the Eighth Amendment, *especially* in cases involving medical personnel, would nearly always transform into a "font of tort law." *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998) (citation omitted). In the vast majority of circumstances, physicians in particular are going to be *aware* of a general risk to an inmate's health or a generalized medical need. So under Wade's understanding, those medical personnel must always act "reasonably" or be faced with claims of cruel and unusual punishment. *But see, e.g., Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999) ("That medical malpractice … is insufficient to form the basis of a claim for deliberate indifference is well settled.").

This Court has repeatedly rejected claims that would succeed under Wade's watered-down analysis. In *Poag*, for instance, this Court rejected an inmate's deliberate indifference claim against a prison doctor, a prison nurse, and a prison physician's assistant involved in treating the inmate's serious asthma condition. 61 F.3d at 1544–48. They were all obviously aware of the condition and provided some, even if less than stellar, medical care. *Id.* at 1546–48. But "at most," that was a "colorable claim of medical

37

malpractice." *Id.* at 1548. Yet under Wade's theory, these defendants were aware of the condition and did not act "reasonably," so they should have been held liable.

Another helpful example is *Ireland v. Prummell*, where a prison physician, aware of an external hospital's prescription for an inmate suffering from alcohol withdrawal, decided to conduct her own examination instead of honoring the prescription. 53 F.4th 1274, 1283–84, 1294–95 (11th Cir. 2022). This Court said that even if the decision to independently examine the inmate before prescribing any medication "was unsound—it was, at worst, negligent." *Id.* at 1294. But again, under Wade's theory, the physician should have been liable: he was generally aware of prisoner's condition and acted negligently—that is, *unreasonably*.

Applying Wade's theory would make these and innumerable other cases turn on the *objective* accuracy of an official's response, rather than what they *believed* was sufficient. That obviously cannot be right, and it is not—as every court to rule on Wade's claim so far has emphasized. *See Henegar*, 2021 WL 11133945 at *14; *Wade I*, 67 F.4th at 1375. Being generally aware of a medical condition or risk is entirely distinct from being aware that one must do something specific to avoid an excessive risk of serious

injury. The Constitution imposes liability only in the latter
circumstance, and the Court should make that clear.

## II.   Defendants were not deliberately indifferent.

Wade presents no evidence to support her contention that any
Defendant acted with a sufficiently culpable mental state to
support deliberate indifference under the Eighth Amendment.
Summary judgment for Defendants is appropriate if "the evidence
favoring [Wade] is insufficient to support a jury verdict on
[Wade's] behalf." *Harris v. Shelby Cnty. Bd. of Educ.*, 99 F.3d
1078, 1082 (11th Cir. 1996) (citing *Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 249 (1986)). So Wade must produce *some* evidence to
prove each element of deliberate indifference. But Wade produced
no evidence that any Defendant *actually* inferred that their
response to Henegar missing some small number of Dilantin doses
created an excessive risk of harm. If anything, the evidence
affirmatively proves the opposite.

### A.   Wade failed to present evidence that could
establish that Lieutenant Stroh and Sergeant Keith
actually knew Henegar faced an excessive risk of
serious injury.

Deliberate indifference liability is not dispensed in gross;
"the … inquiry is *individualized*," *Grote v. Kenton County*, 85
F.4th 397, 413 (6th Cir. 2023), and "each individual defendant

must be judged separately and on the basis of what that person knows," *Wade v. Daniels*, 36 F.4th 1318, 1342 (11th Cir. 2022) (quoting *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008)) (alteration accepted). To survive summary judgment, therefore, Wade must put forth evidence to establish that Henegar missing a few days of Dilantin doses created an objectively serious risk of injury and the officers each *drew* the inference that Henegar's missed Dilantin required them to do more than they did. Wade established no such thing. And even if she did, their response *was* reasonable, so under Wade's own (erroneous) theory, the officers are still not liable.

To recap, Lieutenant Stroh and Sergeant Keith worked evening pill call on the first and fourth nights that Henegar missed his Dilantin. *Henegar*, 2021 WL 11133945, at *10. On the night of Henegar's first missed dose, Sergeant Keith made an unidentifiable marking in Henegar's MAR, and on the fourth night he wrote a question mark in Henegar's MAR. Doc. 155-10 at 2. By the fourth night, both officers presumably knew Henegar had missed his Dilantin for three days. *Id.* One of them told Henegar to notify medical staff about his missing medication the following morning. Doc. 147-15 at 16. And, of course, the officers were aware that Henegar could alert medical personnel at any

40

time about his needs. Doc. 147-5 at 84–86; Doc. 147-15 at 44–45, 93–94.

Wade could find *no evidence* that the officers were subjectively aware that a few days' delay in Henegar's receiving his medication would cause an excessive risk of serious injury. On appeal, Wade tries to assume the problem away, asserting that "Defendants agree that … [Henegar] faced a serious risk of harm without his seizure medication," and that the "parties agreed that the only question … is whether [the officers] … failed to take reasonable steps … to address the known risk Mr. Henegar faced without his medication." Br. at 37 n.9, 38. But Defendants agreed to nothing of the sort. At most, they acknowledged that as a *general matter* they knew Henegar needed Dilantin and that they generally understood his seizure condition was serious. Doc. 147-5 at 114 (Sergeant Keith acknowledging that an epileptic patient not receiving Dilantin "could" have serious consequences); Doc. 147-15 at 167 (Lieutenant Stroh acknowledging that someone missing anti-seizure medication would become serious "at some point"). But it is precisely that type of general awareness that is insufficient to establish liability. *See supra* § I.B. There is no evidence they thought Henegar would be at risk even *in spite of* the efforts they made on his behalf.

The officers had marked the MAR and told Henegar to contact medical staff. They also knew that Henegar always had the capacity to inform medical staff of an urgent need. If he had, that could have signaled an urgent need. But they had no reason to believe he had done as much, so they also had no reason to believe the situation was so urgent as to demand more action of them. There is nothing whatsoever to suggest that the officers, after taking the precautions they did, knew that Henegar nevertheless faced an excessive risk of serious injury.

Wade now argues that the officials "ignored his pleas for four days," Br. at 8, but that unsupported assertion is absurd. Wade points to no evidence that Henegar alerted *anyone* before the officers told him to alert medical staff. There is no evidence that he availed himself of the system for alerting staff as to medical needs or requested emergency assistance. And Wade no longer pushes the argument advanced below, *see* Doc. 155 at 27–28; Doc. 155-1 at 33–34; Doc. 155-3 at 11, that Henegar spoke to a nurse about the missing medication. That is not surprising given that the closest thing to evidence supporting that claim is Henegar's vague recollection that he informed *a* nurse about his missing Dilantin at some point. Doc. 148-4 at 63, 121–22. But he could not remember which nurse or when he supposedly had this

42

conversation. *Id.* This absence of evidence that Henegar told anyone is sufficient to preclude any notion that medical staff or the officers had actually drawn the inference that a short delay in Henegar receiving his Dilantin was a serious problem. If it was, he surely would have done something to make the error (and the gravity of the error) known.

It is also worth remembering that the "risk" here was from a few days *delay* in receiving medication, not the complete absence of medication. *Compare, e.g.*, *Wade v. United States*, 13 F.4th 1217, 1226–29 (11th Cir. 2021) (distinguishing ten-minute delay in treatment for cut on inmate's hand from earlier case where inmate with profusely bleeding cut under the eye did not receive treatment for two and a half hours); *with Brown v. Johnson*, 387 F.3d 1344, 1350 (11th Cir. 2004) (complete withdrawal of treatment for HIV and hepatitis). And there is no evidence that the officers knew that a short delay in receiving medication was an emergency-level threat. Why would they? No evidence suggests Henegar appeared unwell or otherwise presented as if a seizure was imminent, and the officers' actions are consistent with what they would be expected to do: mark the MAR and counsel Henegar to alert medical staff. Plus, again, Henegar himself had numerous

43

ways of informing medical staff, so the officers had no reason to believe he would decline to do so in case of emergency.

If anything, the affirmative evidence precludes the argument that the officers subjectively knew a few days' delay in receiving Dilantin was an excessive risk. As the panel opinion acknowledged, Lieutenant Stroh specifically "lacked the requisite subjective knowledge" of Henegar's medical needs because his own epileptic son had missed doses of his seizure medication without incident. *Wade I*, 67 F.4th at 1374. Moreover, that Lieutenant Stroh and Sergeant Keith lacked "a sufficiently culpable state of mind" and did not intend to "punish[]" Henegar is borne out in their responses to Henegar's seizures. *Farmer*, 511 U.S. at 834, 841 (quotation omitted). Lieutenant Stroh called a doctor and called 911 after Henegar's first seizure, and he notified Nurse McDade of Henegar's second seizure after learning about it from Sergeant Keith. Doc. 168 at 7–8. Sergeant Keith remained with Henegar after both seizures. Doc. 147-15 at 173, 216. They did not abandon Henegar to his fate. The officers *might* have made errors, but their own actions make clear they cared. So while it is not Defendants' burden to disprove their own subjective awareness, the officers did that as well.

Wade hinges her argument on the assertion that, by the fourth day, the officers should have called a nurse when Henegar's Dilantin was not administered, instead of making a notation in the MAR. That is, the officers "knew" of Hengar's need for Dilantin and did not respond "reasonabl[y]." Br. at 38.

But Wade's argument here illustrates how far she has missed the mark on the legal standard. Wade must establish that the officers *knew* that their actions were insufficient to avert an excessive risk of harm. *See supra* Part I. It is not enough to prove that the officers were generally aware of a problem and therefore should have acted reasonably.

Wade's argument emphasizes the extremity of her legal theory. Arguments about a defendant doing one thing when he *should have* done another stray far from the "intentional[] den[ial] or delay[]" of medical care that constitutes deliberate indifference. *Estelle*, 429 U.S. at 104. Here, Wade argues the officers were deliberately indifferent because they did two things (annotate the MAR and tell Henegar to contact medical staff) when they supposedly should have done three (also call medical staff themselves). But one cannot remotely infer that the officers *knew* Henegar faced a serious risk of harm should they not personally call medical staff. And proof of that inference is essential because

45

it keeps deliberate indifference within its constitutional ambit, as "only inflictions of punishment carry liability" under the Eighth Amendment. *Farmer*, 511 U.S. at 841. Again, "neither mere medical malpractice … nor a minor difference in medical opinion constitute deliberate indifference" for prison doctors. *Ireland*, 53 F.4th at 1294 (first citing *Estelle*, 429 U.S. at 106; then citing *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989)). *A fortiori*, there cannot be deliberate indifference where Wade is merely splitting hairs about the ways in which Lieutenant Stroh and Sergeant Keith—not medical professionals—attempted to inform medical staff of Henegar's missed Dilantin.

The officers' responses here stand in stark contrast to instances in which deliberate indifference claims have survived summary judgment. For example, in *Sparks v. Ingle*, 724 F. App'x 692, 695 (11th Cir. 2018), which Wade relies on, an inmate with a seizure disorder did not receive anti-seizure medication for *forty-five days*. There, a prison official *witnessed* the inmate have two seizures because of missed medication, never passed on information about the missing medication, and *actively prevented* the inmate from seeing a prison doctor. *Id.* The difference between what occurred in *Sparks* and what Lieutenant Stroh and Sergeant Keith did here is impossible to miss. *See also, e.g.*, *Mahan*, 64 F.3d

46

at 18 (no deliberate indifference where officials were aware of inmate missing anti-seizure medication for seven days and of his repeated requests for it because no awareness of specific risk posed by interruption).

On top of everything else, even under Wade's own theory, the officers should not be liable. Assuming for the moment that the officers had to act objectively reasonably, the evidence establishes that they did. The MAR entries were logical, as standard MAR notations do not account for a scenario like Henegar's, in which an inmate arrives at pill call and no medicine is available. *See Henegar*, 2021 WL 11133945, at *1 ("[P]rison officials recorded 'A' for administered, 'N' for no-show, 'R' for refused, and 'A/W' for accepted but wasted."). It also was not "objectively insufficient," *Taylor*, 221 F.3d at 1258, for Lieutenant Stroh and Sergeant Keith, neither of whom is a medical professional, to have instructed Henegar to contact medical staff at the next available opportunity. In the officers' eyes, not only would medical staff be informed through the MAR, but Henegar himself would also ensure they were aware. Doc. 147-5 at 117, 141, 144, 145, 149; Doc. 147-15 at 122, 143. Even if the officers' response was not perfect, it was not objectively unreasonable.

In sum, Wade presents no evidence to support her allegation that either correctional officer "*consciously disregard*[*ed*] a substantial risk of serious harm" to Henegar. *Farmer*, 511 U.S. at 839 (emphasis added). She not only fails to put forth evidence to create a triable issue of fact as to whether either correctional officer drew the inference that Henegar's delay in receiving Dilantin would cause an excessive risk of harm, but the evidence affirmatively weighs *against* her. The district court properly granted summary judgment in the officers' favor.

**B.    Wade failed to present evidence that could establish that Nurses Lee and Harrell actually knew Henegar faced an excessive risk of serious injury.**

As with the officers, Wade puts forth no evidence to show either nurse actually believed that Henegar would experience an excessive risk of serious harm from missing three doses of Dilantin. Because it is her burden to establish a triable issue of fact, the absence of evidence defeats her claim, even if her remaining allegations are viewed exceedingly generously.

The nurses knew, at most, that Henegar had missed three Dilantin doses because their August 31st shifts both ended before the 9:00 p.m. pill call. Doc. 147-4 at 37; Doc. 147-8 at 200–01. Wade must, then, put forth evidence sufficient to establish that

the nurses were aware that Henegar had missed three doses of Dilantin *and* that the nurses believed that a three-day delay in receiving Dilantin would put Henegar at an excessive risk of serious harm.

Again, Wade tries to assume the issue away, asserting without citation that the "parties agree that the only question" is whether the nurses "were aware that Mr. Henegar was not receiving his medication." Br. at 40. The nurses have never conceded that they *knew* a few days' delay in Henegar's receiving Dilantin was such a serious risk that it required action on their part. And Wade provides no evidence to support that view.

Even the notion that the nurses knew Henegar was not receiving his Dilantin requires speculation and logical leaps. Wade contends that Sergeant Keith informed Nurse Lee about Henegar's missed medication, Br. at 6 & n.5, but actually Sergeant Keith could not remember which nurse he informed, and it is not clear that he did anything other than ask if Henegar's Dilantin had arrived, Doc. 147-5 at 142, 145, 149. It is entirely speculation to assert that he spoke to Nurse Lee and informed her that Henegar was missing medication.[3] And although Wade

_____

[3] Wade erroneously asserts that Sergeant Keith must have informed Nurse Lee, specifically, because she was the only nurse

49

argues that the nurses must have known because they would review the MARs and see the post-it note, there is no evidence either reviewed Henegar's MAR *or* saw the post-it note. The only concrete evidence about anyone actually seeing the note is Nurse Harrell's testimony that, well after the events in question, she saw a photocopy of "a MAR with a blank area with something written in it … [that] looked like it was a Post-it note." Doc. 147-4 at 224. And even if one of the nurses saw the post-it *before* Henegar's seizures, it supposedly indicated the Dilantin "had been ordered"—nothing that would alert an observer to an urgent medical need or missing medication. Doc. 147-5 at 132.

Wade cannot establish a triable issue of fact relying on such rampant speculation. "Although all reasonable inferences are to be

---

with whom Sergeant Keith overlapped. Br. at 6 n.5. But Sergeant Keith could not remember when he spoke to a nurse, so it could have been (at least) Nurse Lee, Nurse Harrell (with whom he overlapped on August 31st, Doc. 147-4 at 37; Doc. 147-6 at 3), or Nurse Willingham, who generally worked in a nearby building but sometimes in the main facility, Doc. 147-4 at 99, 102; Doc. 147-8 at 28, 30. On top of everything else, assuming for the moment that Sergeant Keith informed Nurse Lee the morning of August 29th that Henegar had missed his medication—Wade's working theory—that means she knew Henegar missed a *single dose* of Dilantin. There is no evidence of any kind suggesting that Nurse Lee believed that missing a single dose of the drug could risk catastrophic consequences.

drawn in favor of the nonmoving party, an inference based on speculation and conjecture is not reasonable." *Hammett v. Paulding County*, 875 F.3d 1036, 1049 (11th Cir. 2017) (quotation omitted). To get where Wade wants to go, it requires inference upon inference upon speculation, without any actual evidence that Nurses Lee or Harrell knew Henegar missed his medication.

Regardless, assuming both nurses somehow knew that Henegar had missed three doses of Dilantin, Wade still failed to establish the nurses' subjective awareness of the risks. As with the officers, Wade ignores her burden and fails to put forth any evidence that suggests either nurse *actually believed* that Henegar would be at an excessive risk of harm from missing three Dilantin doses. Br. at 40–42. Courts "should avoid transforming deliberate indifference back into negligence by finding that the reasonably prudent person would have surely known of the issues. We look to whether it was so obvious they *must* have known, instead of whether it was so obvious they *should* have known." *Koon v. North Carolina*, 50 F.4th 398, 407 (4th Cir. 2022).

Wade tries to hide behind the notion that "circumstantial" evidence can be sufficient, Br. at 12, 17, 20, but it still must be circumstantial evidence that tends to prove the nurses' states of mind, and here we have no evidence of that sort. If a physician

had noted the urgency of the medication, that might tend to establish a nurse's state of mind. *Cf. Greason v. Kemp*, 891 F.2d 829, 838 (11th Cir. 1990) (therapist described inmate's history of mental illness, schizophrenia, and suicidal tendencies and urged physician to continue inmate's medication and monitor him closely). If Henegar had explained to a nurse that he could have seizures any moment without the medicine, that might be relevant evidence. *Cf. Goebert v. Lee County*, 510 F.3d 1312, 1327 (11th Cir. 2007) (pregnant inmate informed officer that she had been leaking amniotic fluid for seven days, that she had not felt her baby move for several days, and that the leakage was worsening). If the time grew long enough, you might be able to infer knowledge based on the sheer length of the period. *Cf. Sparks*, 724 F. App'x at 695 (corrections officer witnessed inmate have two seizures and knew he went without prescription anti-seizure medication for 45 days). If Henegar had a stroke previously when he missed his medicine and a nurse knew about it, that might tend to prove subjective awareness. *Cf. Snow*, 420 F.3d at 1269 (specific knowledge of a suicide attempt within the last month supported inference of subjective knowledge while general knowledge of some past suicide attempt did not).

Even these examples do not conclusively prove a mental state, but they at least provide some evidence of it. Here, by contrast, we have *nothing* that goes to either nurse's subjective state of mind at the time. To be sure, when viewing the facts in the light most favorable to Wade, the overall response of the prison staff was far from heroic. It was a series of errors, miscommunications, maybe even egregious absent-mindedness. But there is nothing here to support the notion that the nurses *knew* they were subjecting Henegar to a serious risk and decided to do it anyway, to "inflict[] … punishment." *Farmer*, 511 U.S. at 841.

And Wade's cited cases are no help to her; they instead illuminate the canyon between subjective criminal recklessness and what Nurses Lee and Harrell did here. *See* Br. at 39–40. In *Benson v. Gordon County*, 479 F. App'x 315 (11th Cir. 2012), for example, an inmate suffered from a "pre-existing T11 vertebral compression fracture." *Id.* at 318. The inmate received prescription painkillers for only twelve of his thirty-three days in jail because he was in too much pain to get out of bed. *Id.* The jail nurse refused to administer the medication if the inmate did not come to his cell door—because his pain kept him from getting out of bed to retrieve it. *Id.* Such palpable cruelty (essentially toying with an inmate who is in too much pain to retrieve his pain

53

medication) triggers the Eighth Amendment's ban on "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 104 (quotation omitted). That is a world apart from the facts here, where nothing suggests the nurses knew a few days' delay in receiving Dilantin would constitute an excessive risk.

The Court should affirm.

## III. Defendants are entitled to qualified immunity.

Defendants did not violate Henegar's constitutional rights, but even if the Court were unsure, it should not matter. After clarifying that the appropriate standard is well beyond negligence—criminal recklessness—the Court could easily dispose of this case on the basis of qualified immunity, as the district court did. *Henegar*, 2021 WL 11133945, at *14.

"Qualified immunity offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Lee v. Ferraro*, 284 F.3d 1188, 1193–94 (11th Cir. 2002) (quotation omitted). "The usual way of establishing that a constitutional violation was clearly established law is by pointing to a case, in existence at the time, in which the Supreme Court or this Court found a violation based on materially similar facts."

54

*Johnson v. City of Miami Beach*, 18 F.4th 1267, 1273 (11th Cir. 2021) (quotation omitted).

There is no case that would have placed any Defendant here on notice that their conduct was constitutionally deficient. Although she does not address qualified immunity in her brief on appeal, in the district court, Wade "relie[d] on: (1) broadly stated general propositions that prison authorities' failure to treat prisoner's medical needs or provide access to medical care or needlessly delaying treatment violates the Eighth Amendment; (2) unpublished opinions from the Eleventh Circuit involving prison officials' intentional refusal to provide prescription medication to prisoners; (3) district court cases; and (4) decisions from other Circuits." *Henegar*, 2021 WL 11133945, at *12. That is insufficient to establish that Defendants violated a clearly established right.

No one could say that "it is 'sufficiently clear that *every reasonable official* would have understood that what he is doing violates that right.'" *Johnson*, 18 F.4th at 1273 (emphasis added) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). Indeed, a panel of this Court *held that there was no such violation. See Wade I*, 67 F.4th at 1378. Even if the *en banc* Court were uncertain about the correctness of that holding—and it should not be—state officials cannot possibly have known their conduct violated the

Constitution when a panel of this Court unanimously held, based on current precedent, that it did not.

Wade suggests that the district court should redo its qualified immunity analysis once this Court clarifies the appropriate standard, but that makes no sense. Br. at 11 n.6. For one, the appropriate standard is *more stringent* than the standard that even the panel applied, so redoing the analysis could only make Wade's failure clearer. But most important, qualified immunity depends on the case law as it existed at the time of the challenged conduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). This Court's post hoc determination of the scope of the Eighth Amendment could not even in principle support liability against Defendants. To the extent it addresses the question, the Court should hold that qualified immunity applies.

## CONCLUSION

For the reasons set out above, this Court should affirm the district court's grant of summary judgment to Defendants.

Respectfully submitted.

|  |  |
|---|---|
|  | /s/ *Stephen J. Petrany* |
| Loretta L. Pinkston-Pope | Christopher M. Carr |
| *Deputy Attorney General* | *Attorney General of Georgia* |
| Laura L. Lones | Stephen J. Petrany |
| *Senior Asst. Attorney General* | *Solicitor General* |
|  | Justin T. Golart |
|  | *Deputy Solicitor General* |
|  | Zachary A. Mullinax |
|  | *Asst. Attorney General* |
|  | Office of the Georgia |
|  | Attorney General |
|  | 40 Capitol Square, SW |
|  | Atlanta, Georgia 30334 |
|  | (404) 458-3408 |
|  | spetrany@law.ga.gov |

*Counsel for Defendant-Appellees*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 11,807 words as counted by the word-processing system used to prepare the document.

/s/ *Stephen J. Petrany*
Stephen Petrany

## CERTIFICATE OF SERVICE

I hereby certify that on December 29, 2023, I served this brief by electronically filing it with this Court's ECF system, which constitutes service on all attorneys who have appeared in this case and are registered to use the ECF system.

/s/ *Stephen J. Petrany*
Stephen J. Petrany