No. 21-14275

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

―――――――――――

BETTY WADE, in her capacity as Personal Representative
of the Estate of David Henegar,

*Plaintiff-Appellant*,

v.

GEORGIA CORRECTIONAL HEALTH, LLC, *et al.*,

*Defendants-Appellees*.

―――――――――――

On Appeal from the United States District Court
for the Northern District of Georgia
No. 4:18-cv-192 (Hon. Amy Totenberg)

―――――――――――

## EN BANC BRIEF OF PROFESSOR JOHN F. STINNEFORD AS
## *AMICUS CURIAE* SUPPORTING APPELLANT

―――――――――――

Joseph A. Greenaway, Jr.
ARNOLD & PORTER
  KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8000
Fax: (212) 836-8689
joseph.greenaway@arnoldporter.com

Andrew T. Tutt
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
Telephone: (202) 942-5000
Fax: (202) 942-5999
andrew.tutt@arnoldporter.com

*Counsel for Amicus Curiae John F. Stinneford*

No. 21-14275, *Betty Wade v. Georgia Correctional Health, LLC, et al.*

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1(a)(1), 26.1-2(c), and 29-1, *amicus* Professor John F. Stinneford, through undersigned counsel, hereby submits this Certificate of Interested Persons and Corporate Disclosure Statement.

Professor Stinneford states that he is not a corporation, does not have a parent corporation, nor has he issued shares or debt securities to the public. Professor Stinneford is not a subsidiary or affiliate of any publicly owned corporations.

I hereby certify that the following have an interest in the outcome of this appeal:

1. Applebaum Henefeld & Green, P.C. – Appellee's Counsel

2. Arnold & Porter Kaye Scholer LLP – Amicus Counsel

3. Brady, Rachel – Appellant's Counsel

4. Elgron, Inc. – Appellant's Counsel

5. Estate of David Henegar – Appellant

6. Georgia Office of the Attorney General – Appellees' Counsel

7. Greenamyre, Zack – Plaintiff's Counsel

8. Greenaway, Jr., Joseph A. – Amicus Counsel

9. Henefeld, Paul – Appellee's Counsel

10. Henegar, David Jacob – Beneficiary of Estate of David Henegar

No. 21-14275, *Betty Wade v. Georgia Correctional Health, LLC, et al.*

11. Kanovitz, Mike – Appellant's Counsel

12. Loevy & Loevy – Appellant's Counsel

13. Lones, Laura – Appellees' Counsel

14. Mitchell & Shapiro, LLP – Plaintiff's Counsel

15. Murphy, Harold – United States District Judge

16. Stinneford, John F. – Amicus

17. Totenberg, Amy – United States District Judge

18. Tutt, Andrew T. – Amicus Counsel

19. Wade, Betty – Appellant/Representative of the Estate of David Henegar

Dated: November 29, 2023            Respectfully submitted,

                                                                             */s/ Andrew Tutt*

Joseph A. Greenaway, Jr.            Andrew T. Tutt
ARNOLD PORTER                    ARNOLD & PORTER
  KAYE SCHOLER LLP              KAYE SCHOLER LLP
250 West 55th Street                601 Massachusetts Avenue, NW
New York, NY 10019-9710            Washington, DC 20001
Telephone: (212) 836-8000          Telephone: (202) 942-5000
Fax: (212) 836-8689                Fax: (202) 942-5999
joseph.greenaway@arnoldporter.com  andrew.tutt@arnoldporter.com

*Counsel for Amicus Curiae John F. Stinneford*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT....................................................................C-1

TABLE OF CONTENTS...............................................................................i

TABLE OF AUTHORITIES ....................................................................... ii

INTEREST OF AMICUS CURIAE ...............................................................1

STATEMENT OF THE ISSUES....................................................................1

SUMMARY OF ARGUMENT ......................................................................2

ARGUMENT ................................................................................................4

I.    History Shows that the Cruel and Unusual Punishments Clause
      Prohibits Cruel Effects, Not Cruel Intent ........................................4

II.   Under the Original Meaning of the Cruel and Unusual Punishments
      Clause, Conduct by Prison Officials that Causes a Greater Risk of
      Severe Suffering than Longstanding Prior Practice Permits is
      Unconstitutional.............................................................................14

CONCLUSION ..........................................................................................16

CERTIFICATE OF SERVICE ....................................................................18

CERTIFICATE OF COMPLIANCE ............................................................19

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Baze v. Rees*,
  553 U.S. 35 (2008)....................................................................4

*Commonwealth v. Wyatt*,
  27 Va. (6 Rand.) 694 (Va. Gen. Ct. 1828)............................9

*Ely v. Thompson*,
  10 Ky. (3 A.K. Marsh.) 70 (Ky. 1820) ....................9, 10, 11

*Estelle v. Gamble*,
  429 U.S. 97 (1976)................................................................3, 13

*Jones v. Commonwealth*,
  5 Va. (1 Call) 555 (1799)...........................11, 12, 14, 15

*Spicer v. Williamson*,
  191 N.C. 487, 132 S.E. 291 (1926) ............................3, 13

*Texas v. Rettig*,
  993 F.3d 408 (5th Cir. 2021) ..............................................3

## Constitutional Provisions

U.S. Const. amend VIII....................................................2, 4

## Rules

Fed. R. App. P. 29(a)(4)(E)...............................................1

## Other Authorities

John F. Stinneford, *Experimental Punishments*, 95 Notre Dame L.
  Rev. 39 (2019) ......................................................................1

John F. Stinneford, *Is Solitary Confinement a Punishment?*, 115 Nw.
  U. L. Rev. 9 (2020) ..............................................................1

John F. Stinneford, *The Original Meaning of 'Cruel'*, 105 Geo. L.J.
441 (2017)...................................................... 1, 2, 4, 5, 6, 7, 8, 11, 12, 13, 14, 15

John F. Stinneford, *The Original Meaning of 'Unusual': The Eighth
Amendment as a Bar to Cruel Innovation*, 102 Nw. U. L. Rev.
1739 (2008)..........................................................................................................1

## INTEREST OF AMICUS CURIAE[1]

*Amicus curiae* John F. Stinneford is a law professor at the University of Florida Levin College of Law who has written extensively on the history and original meaning of the Eighth Amendment. His published works include: *Is Solitary Confinement a Punishment?*, 115 Nw. U. L. Rev. 9 (2020); *Experimental Punishments*, 95 Notre Dame L. Rev. 39 (2019); *The Original Meaning of 'Cruel'*, 105 Geo. L.J. 441 (2017); and *The Original Meaning of 'Unusual': The Eighth Amendment as a Bar to Cruel Innovation*, 102 Nw. U. L. Rev. 1739 (2008). Parts of this brief have been drawn and adapted from the above-referenced articles. Professor Stinneford submits this brief to provide the Court with historical context regarding the original public meaning of the Cruel and Unusual Punishments Clause of the Eighth Amendment, and in particular, what mental state is necessary for a state official to engage in cruel and unusual punishment.

## STATEMENT OF THE ISSUES

What is the standard for establishing liability on an Eighth Amendment deliberate-indifference claim?

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), amicus curiae affirms that no counsel for a party authored this brief in whole or in part and that no person other than amicus or his counsel has made any monetary contributions intended to fund the preparation or submission of this brief.

1

## SUMMARY OF ARGUMENT

This case presents a constitutional question of exceptional importance: what is the appropriate standard for establishing liability on an Eighth Amendment deliberate-indifference claim? This brief is intended to offer historical context for the Court as it considers that question in this appeal.

In relevant part, the Eighth Amendment forbids the "inflict[ion]" of "cruel and unusual punishments." U.S. Const. amend VIII. But to what meaning of "cruel" does the Cruel and Unusual Punishments Clause refer? Does the word refer to the effect of the punishment or to the intent behind it? The Supreme Court has not answered that question.

The language and history of the Eighth Amendment are clear. As explained at length in *The Original Meaning of 'Cruel'*, 105 Geo. L.J. 441 (2017), the word "cruel" in the Eighth Amendment refers to cruel effects not cruel intentions. To violate the Cruel and Unusual Punishments Clause, some government official must possess intent to punish but not necessarily intent to punish cruelly. If a given punishment significantly heightens the risk of severe, unjustified harm beyond the baseline risk established by longstanding prior practice, it is cruel and unusual. In light of the Cruel and Unusual Punishments Clause's original meaning, Defendants' actions violated David Henegar's constitutional rights. They significantly heightened the risk that he would suffer a seizure that would cause him lasting brain

damage—a severe, unjustified harm beyond the baseline risk for an ordinary prisoner receiving competent medical care. As the Supreme Court recognized in *Estelle v. Gamble*, the duty to ensure the safety and well-being of prisoners in custody reflects "the common-law view that '(i)t is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself.'" 429 U.S. 97, 103-04 (1976) (quoting *Spicer v. Williamson*, 191 N.C. 487, 490, 132 S.E. 291, 293 (1926)).

In deciding the standard for an Eighth Amendment deliberate indifference claim, the Court should adopt the interpretation that brings it the closest to the Eighth Amendment's text and original public meaning.[2] The state is not permitted to inflict a grievous injury on a prisoner through a negligent failure to provide medical care any more than it is permitted to inflict the same injury through its own deliberate refusal to provide needed care. The Court should hold that conduct by prison officials that predictably results in the cruel suffering of the prisoners in their care violates the Eighth Amendment.

---

[2] *Texas v. Rettig*, 993 F.3d 408, 409 (5th Cir. 2021) (Ho, J., dissenting from denial of rehearing en banc) ("[J]udges swear an oath to uphold the Constitution, consistent of course with a judicial system based on precedent. That should mean that we decide every case faithful to the text and original understanding of the Constitution, to the maximum extent permitted by a faithful reading of binding precedent.").

## ARGUMENT

Punishment often results in the infliction of pain that is neither authorized nor intended. Officials may botch an execution, causing an offender to suffer terribly before dying. Prisons may be overcrowded, poorly heated, or provide unhealthy food or inadequate medical care. There may be a fire in the cell block, killing or injuring prisoners who are unable to escape. When can such harms appropriately be considered part of an offender's punishment?

As explained at length below, under the original meaning of the Eighth Amendment, unintended harm is part of the punishment when prison officials permit conditions that significantly enhance the risk of severe harm in violation of longstanding common law standards. *See The Original Meaning of 'Cruel'*, 105 Geo. L.J. 441, 502 (2017).

## I.    History Shows that the Cruel and Unusual Punishments Clause Prohibits Cruel Effects, Not Cruel Intent

The text of the Eighth Amendment prohibits "cruel and unusual" punishments. But what makes a punishment cruel? Is the measure of cruelty the intent of the punisher or the effect of the punishment? The Supreme Court has not settled the question. Some justices take the view that the Eighth Amendment bars only those punishments that are intended to be cruel. *See The Original Meaning of 'Cruel'*, 105 Geo. L.J. 441, 444-45 & n.10 (2017) (citing, *inter alia*, *Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., concurring in the judgment) ("[I]n my view, a

method of execution violates the Eighth Amendment only if it is deliberately designed to inflict pain")); *see also id.* at 451-56. But the Court as a whole has never adopted this mistaken view. Under modern doctrine, deliberate indifference is enough. *Id.* at 457.

The Eighth Amendment's text and history make plain that cruelty is measured by effects, not intentions. *See id.* at 447-48. A cruel punishment negligently inflicted is cruel punishment none the less.

The evidence that cruelty is measured by effects not intentions "displays a remarkable consistency in interpretation of this term across a range of readers and time periods." *Id.* at 446. Linguistic and historical evidence establishes that a punishment is considered cruel and unusual under the original meaning of the Cruel and Unusual Punishments Clause if its effects are unfairly harsh compared to long-standing punishment practices. *Id.* at 464. Research has revealed no instances in the late eighteenth century or early nineteenth century where anyone argued that the punisher's cruel intent was a criterion for deciding whether a punishment was cruel and unusual. *Id.* Additionally, in an eighteenth-century case under the Virginia Declaration of Rights, a court ruled that a punishment causing a higher risk of unjust suffering than allowed at common law was cruel and unusual, even if the jury was not aware of this risk when imposing the sentence. There is no evidence that a public

5

official's cruel intent was part of the original legal meaning of "cruel," and there is substantial evidence indicating that such intent was not part of this meaning. *Id.*

To understand the original meaning of the Eighth Amendment one must first understand the law that came before it. The Cruel and Unusual Punishments Clause already had a meaning before it became part of the Eighth Amendment in 1791. It was a known concept tracing to 1689 in the English Bill of Rights and to 1776 in the Virginia Declaration of Rights. *Id.* at 464-65. The Cruel and Unusual Punishments Clause not only had a pre-existing legal meaning, it was understood by the general public to have such a meaning. *Id.* That means that discussions of cruel and unusual punishments by legally informed speakers and in formal legal contexts have particular salience for any inquiry into its original meaning. *Id.* at 466.

The dictionary meaning of the word "cruel" shows that the word was ambiguous at the time the Eighth Amendment was adopted. Two leading founding-era dictionaries, Samuel Johnson's *Dictionary of the English Language*, published in 1755, and Noah Webster's *American Dictionary of the English Language*, published in 1828, each contained two definitions of "cruel"—one that corresponded to cruel intent and one that corresponded to cruel effects. *See id.* at 467-68. Thus, although the Johnson and Webster dictionaries demonstrate that possessing cruel intent is one possible meaning of the term "cruel," they do little more than that. *Id.* If anything, they push in the direction of the cruel-effect reading of "cruel." After

all, the Eighth Amendment never mentions a punisher, only a punishment: a thing, not a person. *Id.*

The original meaning of "cruel" comes more sharply into focus when one considers the word in relation to its syntactic and conceptual partner, "unusual." *Id.* at 466. In the context of the Eighth Amendment, the word "unusual" is a term of art derived from the common law. *Id.* at 467. It was part of the lexicon of rights used in the debates surrounding the American Revolution and the subsequent ratification of the United States Constitution. To say that something was unusual was to say that it was new and that it violated rights established through long usage. *Id.* at 467-71. The placement of the words "cruel" and "unusual" next to each other in a conjunctive phrase ("cruel and unusual") implies a conceptual relationship between them. Each term, on its own, connotes unconstitutionality. Placed together, they appear to describe a specific kind of unconstitutionality: A punishment that is unjustly harsh because it transgresses the limits imposed by longstanding prior practice. *Id.* at 471. That the Eighth Amendment directs us to use longstanding prior practice as the measure of a punishment's cruelty indicates that "cruel" likely refers to the effect of the punishment, not the intent of the punisher. *Id.*

This reading of "cruel" is further confirmed by the Cruel and Unusual Punishments Clause's placement within the Eighth Amendment as a whole. *See id.* at 471-73. The Eighth Amendment is comprised of a single sentence listing three

types of penalties that the government is forbidden to impose: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." If cruel and unusual punishments are conceptually related to excessive bail and excessive fines, it must be through the notion of undue harshness. *Id*. at 472. A punishment's effect, not the intent behind it, is the proper measure of its constitutionality.

The "cruel effects" reading of "cruel" in the Eighth Amendment is further supported by relevant historical materials, including discussions of the English Bill of Rights' prohibition of "Cruell and Unusuall Punishments"; use of the term "cruel" in the various state conventions for ratifying the United States Constitution and in the debates in the first Congress over adoption of a bill of rights; adjudication of claims involving cruel and unusual punishments in the early case law; and finally, discussion of the term in early legal treatises. *See id.* at 473-486. The sources found in these four contexts are remarkably consistent in interpreting a cruel punishment as one whose effects are unduly harsh, not as one imposed with a cruel intent. *Id.* at 473-74.

Courts in the early republic, for example, invalidated punishments that were too harsh in light of long usage, either as an absolute matter or in relation to the crime. *Id.* at 482. Significantly, courts not only struck down punishments with direct effects that were unduly harsh but also those that created an undue risk of harm

8

compared to the risks entailed by prior common law practice. *Id.* This fact can be seen by comparing two cases from the early republic, *Commonwealth v. Wyatt*, 27 Va. (6 Rand.) 694 (Va. Gen. Ct. 1828) and *Ely v. Thompson*, 10 Ky. (3 A.K. Marsh.) 70, 74–75 (Ky. 1820).

In *Wyatt*, the defendant was convicted of violating an illegal gaming statute that permitted the court to impose a sentence of up to six months imprisonment and gave the court discretion to order that the defendant be flogged on one or several occasions, so long as he was not given more than thirty-nine stripes at a time. 27 Va. (6 Rand.) at 698. Wyatt argued that this sentencing provision violated Virginia's prohibition of cruel and unusual punishments because it would allow a judge "to direct the party convicted to be subjected to thirty-nine stripes every day of the six months, which would inevitably terminate in death; a death produced by the most *cruel torture.*" *Id.* at 700 (emphasis added). The General Court of Virginia acknowledged that the statute created a risk of cruel punishment by giving the trial judge discretion to decide how much flogging to give a defendant, but it noted that such discretion was "of the same character with the discretion always exercised by Common Law Courts to inflict fine and imprisonment, and subject to be restrained by the same considerations." *Id.* at 701. If the judge abused this discretion and imposed a cruel quantum of flogging, "he might and would be impeached." *Id.* Because the risk entailed by judicial discretion was consistent with longstanding

prior practice, and was mitigated by rules designed to deter abuse of discretion, the statute did not violate the Cruel and Unusual Punishments Clause of the Virginia Bill of Rights.

The Court of Appeals of Kentucky reached a different conclusion regarding the risks entailed by a penal statute in *Ely v. Thompson*, 10 Ky. (3 A.K. Marsh.) at 74-75. In *Ely*, the plaintiff was a "free person of colour" who had previously been punished under a statute ordering that any black person who "lift[s] his or her hand in opposition" to a white person should be given "thirty lashes on his or her bare back, well laid on" and was now suing the judge and constable responsible for the punishment. *Id.* at 70-71. Although the act was similar in some ways to other statutes prohibiting assault and battery, the Court of Appeals noted that:

> Its expressions, "lift his or her hand in opposition to any person," includes many acts which will not be either an affray or assault or battery. It is not necessary, according to the letter of the act, that this lifting of "hand in opposition," should be so directly against the person as to commit either. It is not necessary that it should be done in an angry or threatening manner. It may be done in self defence, or in warding off injury, or in repelling attempts on the virtue of the female of color, by an intended ravisher. Another remarkable feature exists in the act. The proof is pointed out. The oath of the party complaining is conclusive, and the justice must inflict the punishment, although the proof may be untrue, and he disbelieves it.

*Id.* at 73. Because this statute created an unacceptable risk that innocent people would be punished—either because their conduct fell within traditional self-defense

10

doctrine or because they were convicted by incontestable lies—the Court of Appeals found it to be "cruel indeed" and held it unconstitutional. *Id.* at 74.

Why was the former statute acceptable and the latter not, particularly given that the former statute permitted a far greater quantum of flogging than the latter? The difference between these statutes lay in their relation to longstanding prior practice. *The Original Meaning of 'Cruel'*, 105 Geo. L.J. at 484. The discretion in *Wyatt* was consistent with the sentencing discretion traditionally given common law judges in similar cases. *Id.* The statute in *Ely*, on the other hand, was filled with innovations. *Id.* It redefined traditional common law crimes, taking away longstanding substantive and procedural protections from African-American defendants. *Id.* Because the risk of unjust punishment was significantly greater than prior practice would permit, the punishment was unconstitutionally cruel. *Id.*

The case of *Jones v. Commonwealth*, decided in 1799 by the Supreme Court of Appeals of Virginia, confirms that early courts did, in fact, use the cruel-effect reading of "cruel." 5 Va. (1 Call) 555 (1799). In *Jones*, three men were convicted of assaulting a magistrate, and the jury imposed upon them a joint fine of £106. *Id.* at 555. Under Virginia law, a person who failed to pay his fine could be imprisoned in lieu of payment. *Id.* at 556. Therefore, if one of the codefendants failed to pay his share of the fine, the other codefendants could suffer a longer period of imprisonment or be forced to pay a disproportionate share of the fine. *Id.* at 556-58.

11

The Supreme Court of Appeals struck down this punishment as unconstitutional. *Id.* at 557. Judge Carrington's opinion noted that the punishment violated a longstanding common law rule against joint fines in criminal cases. *Id.* at 558. The purpose of this rule was to eliminate the risk that one defendant's failure to pay would result in disproportionate punishment for other defendants. *Id.* Therefore, Judge Carrington held, the joint fine constituted both an excessive fine and a cruel and unusual punishment in violation of the Virginia Constitution and Virginia statutory law. *Id.* at 557–58.

The *Jones* case is instructive for two reasons. *The Original Meaning of 'Cruel'*, 105 Geo. L.J. at 485. First, like the statute in *Wyatt*, it did not involve actual harm but a risk of harm. Because the joint fine created a greater risk of disproportionate punishment than was permissible at common law, it was cruel and unusual. Second, this case did not involve even a hint of cruel intent. There was no indication that the jury was aware of what would happen if one of the codefendants defaulted, nor did anyone involved in the case seem to have raised this issue at the trial level. This fact demonstrates the distinction between intent to punish and cruel intent. The jury intended to impose the fine, and therefore the fine was a punishment. The fine created an undue risk of disproportionate pain, and therefore it was cruel and unusual. Whether the jury was aware of the risk was not relevant because the

cruelty of a punishment depends upon its effect, not the intent with which it is imposed.

The evidence from language and history demonstrates that, originally, the term "cruel" in the Cruel and Unusual Punishments Clause referred to the effect of the punishment, not the intent behind it. The connection between "cruel" and "unusual," as well as "cruel" and "excessive," implies that the clause initially prohibited punishments that were excessively harsh compared to long-standing practices. Research in four legal contexts found no instances in the 18th or 19th century where someone argued that proving cruel intent was needed to show a violation of the Cruel and Unusual Punishments Clause. In one case, an 18th-century American court deemed a punishment cruel and unusual without evidence of cruel intent because it posed a greater risk of disproportionate effects than common law allowed.

As the Supreme Court acknowledged in *Estelle*, prison officials have a longstanding common law duty to provide adequate medical care to prisoners. *The Original Meaning of 'Cruel'*, 105 Geo. L.J. at 456-57. As the Court explained in *Estelle*, the duty to ensure the safety and well-being of prisoners in custody reflects "the common-law view that '(i)t is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself.'" *Estelle*, 429 U.S. at 103-04 (quoting *Spicer*, 132 S.E. at 293). Thus, if the State elects

to impose imprisonment as a punishment for crime, it has an obligation to provide the persons in its custody with health care that meets minimal standards of adequacy. As part of that basic obligation, the State and its agents have an affirmative duty to provide reasonable access to medical care, to provide competent, diligent medical personnel, and to ensure that prescribed care is in fact delivered.

## II.    Under the Original Meaning of the Cruel and Unusual Punishments Clause, Conduct by Prison Officials that Causes a Greater Risk of Severe Suffering than Longstanding Prior Practice Permits is Unconstitutional

As explained above, the word "cruel" in the Cruel and Unusual Punishments Clause means unjustly harsh, not motivated by cruel intent. *The Original Meaning of 'Cruel'*, 105 Geo. L.J. at 493. This fact clarifies the Eighth Amendment's intent requirement: To violate the Cruel and Unusual Punishments Clause, some government official must intend to punish but not necessarily intend to punish cruelly. *Id.* If the government inflicts a punishment that poses a significantly greater risk of unjustified harm than longstanding prior practice would permit, it is cruel and unusual. *Id.* at 502.

To see the application of that principle in practice, recall *Jones v. Commonwealth*, 5 Va. (1 Call) 555 (1799), discussed earlier, *see* pages 11-13, *supra*. A jury convicted three men of assaulting a magistrate and imposed a joint fine on them. *Id.* at 555. This sentence violated a longstanding common law rule that joint fines should not be imposed in criminal cases because such fines create the risk that

14

a default by one defendant could cause excessive punishment of his codefendants. *Id.* at 557. Thus, the Supreme Court of Appeals of Virginia found the sentence cruel and unusual. *Id. Jones* was one of several late-eighteenth- and early-nineteenth-century cases that stand for the proposition that unjustified risk of harm, without regard to intent, is the touchstone of cruel and unusual punishment.

The same principle would apply in cases involving challenges to prison conditions. *The Original Meaning of 'Cruel'*, 105 Geo. L.J. at 502. If officials create or permit conditions that significantly enhance the risk of severe harm, as compared to longstanding prior practice, the resulting punishment may appropriately be called cruel and unusual. *Id.* Putting 2,000 prisoners in a facility traditionally used for 1,000 prisoners, for example, can appropriately be called cruel and unusual when it predictably results in higher rates of assault and rape. *Id.* at 502-03. Placing prisoners in solitary confinement for much longer periods of time than was traditionally permissible, which predictably causes severe psychological and sometimes physical harm, may also be called cruel and unusual. *Id.* Placing a woman in a general male prison population, a practice also traditionally avoided, can be called cruel and unusual when that person is assaulted and raped. *Id.* The key issue is not the public officials' cruel intent regarding this issue, but the likelihood and severity of the harm as compared to longstanding prior practice. *Id.*

Applying the original meaning of the Eighth Amendment to the facts here resolves this case in Plaintiff's favor. For four days the defendants in this case did not provide David Henegar his prescribed seizure medication, which ultimately resulted in to two seizures and permanent brain damage. The longstanding practice of U.S. prisons is to provide minimally adequate medical care to prisoners that does not expose them to a serious risk of brain damage from a known serious medical condition. The Defendants' failure to provide Henegar with necessary medication was cruel and unusual punishment that violated the Eighth Amendment.

## CONCLUSION

The Court should hold that a plaintiff may establish liability on an Eighth Amendment deliberate-indifference claim by showing that a government official has harmed a prisoner by exposing the prisoner to a significantly greater risk of unjustified harm than longstanding prior practice would permit.

Dated: November 29, 2023                Respectfully submitted,

                                         */s/ Andrew Tutt*
                                         Andrew T. Tutt
Joseph A. Greenaway                      ARNOLD & PORTER
ARNOLD PORTER                              KAYE SCHOLER LLP
  KAYE SCHOLER LLP                       601 Massachusetts Avenue, NW
250 West 55th Street                     Washington, DC 20001
New York, NY 10019-9710                  Telephone: (202) 942-5000
Telephone: (212) 836-8000                Fax: (202) 942-5999
Fax: (212) 836-8689                      andrew.tutt@arnoldporter.com
joseph.greenaway@arnoldporter.com


*Counsel for Amicus Curiae John F. Stinneford*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing brief was filed electronically on November 29, 2023 and will therefore be served electronically upon all counsel.

*/s/ Andrew Tutt*
Andrew T. Tutt

*Counsel for Amicus Curiae*
*John F. Stinneford*

**CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5), 32(a)(7)(B)(i), and 11 Cir. R. 32-4, because it contains 3,880 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), according to the word count feature of Microsoft Word. This document complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E), 32(a)(5), and 32(a)(6) because it has been prepared in a proportionally spaced typeface using 14-point Times New Roman font.

*/s/ Andrew Tutt*
Andrew T. Tutt

*Counsel for Amicus Curiae*
*John F. Stinneford*

19